UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAMILARE SONOIKI, <br><br> Plaintiff, <br><br> v. <br><br> HARVARD UNIVERSITY, HARVARD UNIVERSITY BOARD OF OVERSEERS, and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br> Defendants. | Civil Action No. 1:19-cv-12172 <br><br> Leave to file redacted granted December 20, 2019 |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO
DISMISS THE COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.1(b), Defendants

Harvard University, Harvard University Board of Overseers, and the President and Fellows of

Harvard College (together, "Harvard")[1] submit this Memorandum in support of their Motion to

Dismiss the Complaint.

## INTRODUCTION

Two days before Plaintiff Damilare Sonoiki's 2013 Harvard College graduation

ceremony, two different women filed complaints alleging that Plaintiff engaged in non-

consensual sexual intercourse with them.  One complainant alleged that Plaintiff had non-

consensual sex with her earlier that month.  Another alleged that two years earlier, after having

"blacked out" at a party, she awoke to Plaintiff having sex with her.  Then, several days later, a

third complainant alleged that Plaintiff engaged in non-consensual sex with her several times

while they were living as roommates.

Harvard's policy applicable at the time of the complaints prohibited "sexual misconduct,"

including "any act of sexual intercourse that takes place against a person's will or that is

accompanied by physical coercion or the threat of bodily injury," and "any unwanted touching or

fondling of a sexual nature that is accompanied by physical force or threat of bodily injury."

Harvard's *Handbook for Students* ("Handbook") detailed the multi-step process by which

Harvard investigated and, if necessary, disciplined students who engaged in prohibited sexual

misconduct.

---

[1] The Complaint incorrectly identifies the Harvard entities as "Harvard University, Harvard University Board of Overseers, and the President and Fellows of Harvard College."  The President and Fellows of Harvard College is the legal entity that comprises the various named defendants and is the only proper party to this litigation.  All other Harvard entities should be dismissed from this proceeding.

In Plaintiff's case, Harvard followed its extensive process consistent with the Handbook in effect during the period at issue in the Complaint. *First*, the Handbook precluded Harvard from awarding a diploma to an accused student once a complaint has been filed until the complaint has been resolved, so while Harvard allowed Plaintiff to walk in his graduation ceremony, it did not issue him a diploma along with his graduating class. *Second*, a Subcommittee of Harvard's Administrative Board ("Ad Board"), as well as an independent factfinder, investigated the complaints, interviewed witnesses (including Plaintiff and the complainants), and gathered evidence. At the conclusion of this investigation, the Subcommittee prepared three separate disciplinary case reports—108 pages for the first complaint, 62 pages for the second, and 72 pages for the third—determining that Plaintiff engaged in serious sexual misconduct, and recommending (i) that Plaintiff be required to withdraw from Harvard for four terms and (ii) that he be dismissed from Harvard (*i.e.*, that Harvard sever its connection with him and allow him to be readmitted only by a vote of the Faculty Council). *Third*, the full Ad Board found, after considering the Subcommittee's findings and Plaintiff's response, that Plaintiff had committed the sexual misconduct alleged, required him to withdraw from the College, and recommended to the Faculty Council that he be dismissed. *Fourth*, Plaintiff's appeal to the Faculty Council was denied, and the Council concluded that Plaintiff should be dismissed from Harvard.

Five years later, Plaintiff filed this lawsuit, which challenges the process through which Harvard determined that he engaged in sexual misconduct and dismissed him. The suit rests on three basic legal theories, each of which is meritless. Plaintiff first contends that Harvard promised Plaintiff (and other students) that it would follow the procedures contained in the Handbook when investigating and punishing sexual misconduct, and that it broke that promise

by failing to follow those procedures here.  But as both Plaintiff's Complaint and the documents

incorporated into that Complaint make plain, Harvard did follow its procedures, just as it

promised to do.  Plaintiff next complains that these procedures themselves failed to afford him

the "basic fairness" that Massachusetts law requires, but courts have recently, repeatedly, and

unanimously held that procedures like those at issue here more than satisfy that standard.

Finally, Plaintiff argues that Harvard's definition of "sexual misconduct" is vague and thus failed

to put him on notice of what conduct was prohibited.  But there is nothing vague about Harvard's

prohibition against "any act of sexual intercourse that takes place against a person's will," which

is exactly what several different investigatory and review bodies concluded that Plaintiff did.

The motion to dismiss should be granted.

## BACKGROUND[2]

### A.    Harvard's Policies and Procedures

The Handbook describes standards of behavior required of all Harvard College students

and the process for determining whether a student has violated those standards.  Plaintiff was

accused of sexual misconduct that occurred in 2011, 2012, and 2013, and Harvard instituted

disciplinary proceedings against him in 2013.  *See* Compl. ¶¶ 97-99.  The 2011-2012 and 2012-

2013 Handbooks' policies on sexual misconduct and the 2012-2013 Handbook's disciplinary

procedures are thus of central importance here.[3]

---

[2] At the pleadings stage, the Complaint's factual, non-conclusory allegations must be accepted as true.  *See Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016).

[3] Because the Complaint refers repeatedly to, and attaches as exhibits, these portions of the Handbook, they are "incorporated into the complaint by reference" and thus may be considered at the pleadings stage.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

The sexual misconduct policies in effect between 2011 and 2013 prohibited "sexual misconduct," which was defined to encompass: (i) "rape," meaning "any act of sexual intercourse that takes place against a person's will or that is accompanied by physical coercion or the threat of bodily injury"; (ii) "[i]ndecent assault and battery," meaning "any unwanted touching or fondling of a sexual nature that is accompanied by physical force or threat of bodily injury"; and (iii) "other serious or persistent unwanted sexual contact or conduct, such as harassment, threats, or intimidation." Ex. 1 at 10-11.[4] Students who engaged in any of these behaviors were "subject to severe penalties." *Id.* at 10.

Under the 2013 Handbook, a "disciplinary case . . . begins," Ex. 3 at 1, when a student files a sexual misconduct complaint against another student. Over the course of the subsequent proceeding, the accused was entitled to numerous procedural protections designed to ensure that he or she receives a "fair opportunity to be heard." Ex. 4 at 1. The 2013 Handbook provides:

- Preliminary Notice: The accused receives notice of the allegations and is informed of his right to select a member of the Ad Board to serve as his Board Representative (a liaison with the Board) and a member of the University community to serve as his personal adviser (an individual who accompanies him to meetings). Ex. 3 at 2-3.

- Initial Review Phase: An independent factfinder and a Subcommittee of the Ad Board solicit written statements from the complainant and the accused student, both of whom are given an opportunity to review and respond to each other's statements. *Id.* at 3-4. The factfinder and Subcommittee also interview the complainant and the accused student (if the accused student agrees to be interviewed), and can interview additional individuals identified in the initial statements at its discretion. *Id.* Based on all of the evidence gathered, the Subcommittee and factfinder determine whether to recommend that the Ad Board issue a charge. *Id.* at 4. If a charge is recommended, the accused student is notified and permitted to respond in writing before the recommendation is shared with the full Ad Board. *Id.* at 5.

- Charge Decision: The Ad Board reviews the Subcommittee and independent factfinder's recommendation, the accused student's response, and all of the evidence from the initial investigation. If the Ad Board determines that "the allegations, if

---

[4] Numbered exhibits refer to the exhibits attached to the Complaint.

true, might constitute a violation of the rules" and that "further investigation is likely to enable it to resolve the case," the Ad Board issues a charge. *Id.* The accused's Board Representative notifies the accused of the Ad Board's decision, and the Subcommittee and factfinder resume their investigation. *Id.*

- Disciplinary Case Report: At the conclusion of the investigation, the Subcommittee and the factfinder prepare a disciplinary case report, Ex. 5 at 1, which includes factual findings, the Subcommittee and the factfinder's recommendation for disciplinary action, and copies of all statements and other evidence, Ex. 3 at 5.[5] Again, the accused student receives a copy of the report and is permitted to respond. *Id.* at 6.

- Ad Board Decision: The Ad Board determines, based on all the evidence gathered (including any responses of the accused), whether it is "sufficiently persuaded" that the student violated Harvard's rules. *Id.* If the answer is yes, the Ad Board can take various actions, including requiring the student to withdraw or recommending that he be dismissed from the College. *Id.* at 7. The student is notified of the Ad Board's decision and is permitted to ask the Ad Board to reconsider its decision or (in some cases) appeal to the Faculty Council. Ex. 6 at 1.

- Appeal to Faculty Council: If a student chooses to appeal, the Ad Board Chair responds to the appeal in writing, and the student has another opportunity to reply. Ex. 7 at 1. The Faculty Council then reviews all of the material gathered throughout the proceeding and issues a final disposition. *Id.*

**B.     The Complaints Against Plaintiff and the Ad Board Proceeding**

On May 28, 2013, two days before Plaintiff's graduation ceremony, two women filed

sexual misconduct complaints against Plaintiff.  Compl.  ¶ 263.  One alleged that earlier in May,

Plaintiff had non-consensual sexual intercourse with her while the two attended an event.  *See*

Compl. ¶¶ 66, 83; *see also* Ex. C at 25 ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████.  The other alleged that two years earlier, in

---

[5] Because the Complaint repeatedly references the Subcommittee and the factfinder's disciplinary case reports, the court "may properly consider" them on a motion to dismiss, "even though [they are] not attached to the complaint, without converting the motion into one for summary judgment."  *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (quotation omitted).  These reports are attached as Exhibits A, B, and C to the Declaration of Patrick D. McKegney.

September 2011, she "blacked out" at a party and regained consciousness while Plaintiff was having sexual intercourse with her.  *See* Compl. ¶ 50; *see also* Ex. A at 22 ████████. ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████.  After the complaints were filed, Plaintiff walked at Commencement, but did not receive his diploma.  Compl. ¶¶ 266-67.

On June 3, 2013, the then-Associate Dean of Harvard College met with Plaintiff to discuss the complaints.  *Id.* ¶ 275.  The Dean informed Plaintiff that he could select a Board Representative and a personal adviser to accompany him throughout the process.  *Id.* ¶ 278; *see also* Ex. 3 at 2-3; Ex. 4 at 1.  The following day, a third woman submitted a complaint, alleging that Plaintiff had non-consensual sexual intercourse with her on several occasions while they were living as roommates in the summer of 2012.  Compl. ¶ 88; *see also* Ex. B at 20 ████████. ████████████████████████████████████████████████.

An Ad Board Subcommittee and an independent factfinder were assigned to investigate the complaints.  *See* Ex. A at 4; Ex. B at 3; Ex. C at 3; *see also* Ex. 3 at 2; Ex. 5 at 1.  They began by soliciting statements and responses from, and then interviewing, Plaintiff and the complainants.  Compl. ¶¶ 286, 295; *see also* Ex. 3 at 4-5; Ex. 5 at 1.  On June 25, the Subcommittee sent letters to Plaintiff and the Ad Board, recommending that the Ad Board issue charges against Plaintiff in each case.  Compl. ¶ 303; *see also* Ex. 3 at 4; Ex. 5 at 1.  Plaintiff responded that day, Compl. ¶ 306; *see also* Ex. 3 at 4-5, and over Plaintiff's objections, the Board voted to issue three charges of "sexual misconduct" against Plaintiff and referred the cases for further investigation, Compl. ¶ 307; *see also* Ex. 3 at 5; Ex. 5 at 1.

Between June 2013 and September 2013, the Subcommittee solicited additional written statements from the complainants, Plaintiff, and several witnesses who either knew the students involved or observed the complainants shortly before or after the incidents.  Compl. ¶ 314; *see also* Ex. 3 at 5; Ex. 5 at 1.  Plaintiff received copies of each statement.  Compl. ¶ 315; *see also* Ex. 3 at 5; Ex. 4 at 1.  The Subcommittee again interviewed the people from whom it had received written statements (including Plaintiff).  Compl. ¶ 323; *see also* Ex. 3 at 5.

On November 13, 2013, the Subcommittee issued three reports, totaling more than 200 pages, each recommending that (i) the Ad Board require Plaintiff to withdraw from Harvard College and (ii) the Ad Board in turn recommend to the Faculty Council that Plaintiff be dismissed, severing his connection with the University and allowing him to be readmitted only by a vote of the Faculty Council.  Compl. ¶¶ 329, 333; *see also* Ex. 4 at 2.[6]  Plaintiff received the reports and responded to them in writing on November 18.  Compl. ¶ 338; *see also* Ex. 3 at 6.  The next day, the Ad Board met to discuss the cases.  Compl. ¶ 339.  The Board agreed with the Subcommittee's recommendations, *id.* ¶ 351, and on November 25, 2013, notified Plaintiff of its decision to require Plaintiff to withdraw and to recommend dismissal to the Faculty Council, *id.* ¶ 354; *see also* Ex. 3 at 7; Ex. 5 at 1.

Six months later, in May 2014, Plaintiff appealed the Ad Board's decision to the Faculty Council.  Compl. ¶ 357; *see also* Ex. 6 at 1; Ex. 7 at 1.  The Ad Board Chair submitted a written response to the appeal, and Plaintiff submitted a reply.  Compl. ¶¶ 361-62; *see also* Ex. 7 at 1.

---

[6] The Ad Board may require a student to withdraw from Harvard College for a set period of time if it concludes that he has violated Harvard's rules.  Only the Faculty Council, however, is empowered to dismiss or expel a student from Harvard.  When a student is dismissed, he or she may reapply for admission.  When a student is expelled, all the student's ties with the University are severed.  *See* Ex. 3 at 7; Ex. 4 at 2.

On October 16, 2014, the Faculty Council denied Plaintiff's appeal.  Ex. D; Ex. E.  On

December 10, 2014, the Faculty Council dismissed Plaintiff from the College.  Compl. ¶ 368.[7]

### C.    Plaintiff's Lawsuit

On October 21, 2019, almost five years after his disciplinary proceeding concluded,

Plaintiff commenced this action, asserting four claims against Harvard, all of which rely on

alleged procedural failings in his disciplinary proceeding:

- Breach of Contract (Count One):  Plaintiff alleges that the 2012-2013 Handbook was a contract between him and Harvard and that Harvard breached that contract by failing to provide Plaintiff required procedures.  Id. ¶¶ 374-412.[8]  Plaintiff also asserts that because the sexual misconduct policy was impermissibly vague, his disciplinary proceeding is void.  Id. ¶¶ 389-91.

- Breach of Basic Fairness (Count Two): Plaintiff contends that the disciplinary procedures he received did not provide "basic fairness" under Massachusetts law.  Id. ¶¶ 413-20.

- Breach of the Covenant of Good Faith and Fair Dealing (Count Three): Plaintiff alleges that by failing to afford him the procedures specified in the Handbook, Harvard breached the covenant of good faith and fair dealing.  Id. ¶¶ 421-26.

- Estoppel and Reliance (Count Four):  Plaintiff alleges that even if the Handbook did not constitute a contract, it was nonetheless a series of promises that induced reliance.  And again here, Plaintiff alleges that Harvard violated those promises by failing to provide the procedures described in the Handbook.  Id. ¶¶ 427-32.

All of Plaintiff's claims are thus premised on three common theories.  Three of Plaintiff's

claims (Counts One, Three, and Four), rise and fall on his allegations that Harvard failed to

provide him the process he was promised under the applicable Handbook.  A fourth claim (Count

---

[7] Appeals are first reviewed by the Faculty Council's Docket Committee, which can vote to elevate the matter to the Faculty Council.  Plaintiff's appeal was denied by the Docket Committee, which did not vote to send the matter to the Council.  Ex. D (Docket Committee decision on appeal, referenced in ¶ 371 of the Complaint); Ex. E (same).  The Faculty Council voted to dismiss Plaintiff from the College.  Compl. ¶ 368.

[8] For purposes of this motion, Defendants do not dispute that an entering student forms a contractual relationship with his university and that the Handbook is part of that contract.

Two) rests on allegations that the procedures outlined in the Handbook were inadequate as a matter of law because they failed to provide him "basic fairness" under Massachusetts law. Finally, Plaintiff alleges in Count One that the Handbook was too vague to put him on notice of the conduct that would constitute a violation of Harvard's policy. These legal theories fail because, as described in detail below, (i) Harvard's process was fully consistent with (and, indeed, dictated by) the Handbook, (ii) those procedures were more than adequate to satisfy the "basic fairness" requirement as construed by numerous courts and most recently by the First Circuit, and (iii) the "sexual misconduct" standards applicable to Plaintiff's conduct are not vague. Plaintiff's Complaint must be dismissed with prejudice.

## ARGUMENT

On a motion to dismiss under Rule 12(b)(6), the court must determine whether the pleading contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). This inquiry involves a "two-step analysis." *Saldivar*, 818 F.3d at 18 (quotation omitted). "At the first step, [the Court] distinguish[es] the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Id.* (quotation omitted). "At step two, [the Court] must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable." *Id.* (quotation omitted).

## I.   PLAINTIFF RECEIVED THE PROCEDURES TO WHICH HE WAS ENTITLED UNDER THE HANDBOOK.

Counts One, Three, and Four all rest on the contract-related theory that Harvard promised Plaintiff that it would comply with certain procedures but then failed to do so. *See supra* at 8-9. This theory is based on a laundry list of alleged defects in the procedures that Harvard used in his

disciplinary proceeding. Plaintiff, however, received the procedures the Handbook promised, which precludes his contract-related theory.

When a student alleges that a university violated the terms of its student handbook, the meaning of the handbook is a question of law for the court, and is judged by "the standard of reasonable expectation," *i.e.*, the "meaning [the university] should reasonably expect the [student] to give" the handbook. *Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 170 (D. Mass. 2017) (quotations omitted). As explained in detail below, Plaintiff here received the procedures that a reasonable student who read the 2012-2013 Handbook would have expected. Indeed, in most cases, the procedures to which Plaintiff objects were provided for in the Handbook. And to the extent Plaintiff's argument is really that he was entitled to procedures *other* than those spelled out in the applicable Handbook, such allegations cannot sustain a theory of liability based on the procedures Harvard promised to provide. Plaintiff's contract-related theories (Counts One, Three, and Four) should be dismissed.

### A.   Plaintiff's Contention that Harvard Lacked "Jurisdiction" to Discipline Him After His Expected Graduation Date is Contrary to the Handbook.

Plaintiff's principal contract-related argument is that the Ad Board lacked "jurisdiction" to withhold his degree and dismiss him because it did not formally charge him before he participated in Commencement; he contends that Harvard's procedures deprived the Ad Board of the power to withhold a degree or otherwise discipline him once his graduation day passed. Compl. ¶¶ 382-87. But the Handbook states that "[a] student *cannot* receive a degree before a pending disciplinary case is resolved." Ex. 3 at 7 (emphasis added). And a "disciplinary case . . . begins with an allegation of student misconduct in the form of a complaint or report," *id.* at 1, so Plaintiff's "disciplinary case" began two days before the Commencement ceremony, when the first two women filed complaints against him. Thus, once the complaints against Plaintiff

were filed, the Handbook precluded Harvard from awarding Plaintiff a degree until the disciplinary case initiated by those complaints was resolved.

Plaintiff points to a different sentence in the Handbook providing that a "degree will not be granted to a student who is not in good standing or against whom a disciplinary charge is pending." Ex. 2 at 5. He argues that because no "disciplinary charge" was yet pending against him—a "disciplinary charge" does not issue until the Subcommittee and the factfinder have investigated the complaint(s) and issued recommendations to the Ad Board, Ex. at 3 at 4-5; *see supra* at 4-5—Harvard was required to give him a degree. Plaintiff misconstrues the Handbook. It is true that a "degree *will not* be granted to a student . . . against whom a disciplinary charge is pending." Ex. 2 at 5 (emphasis added). But that does not mean that a degree *must* be granted to every student who does not yet have a disciplinary charge pending by the time of Commencement. Certainly, it does not require Harvard to give a degree to students with pending but as-yet uninvestigated complaints of sexual assault—again, the Handbook prohibits Harvard from granting a degree after a complaint has been filed, until the complaint is resolved. Plaintiff's position, moreover, is not only contrary to the Handbook but illogical. On his view, Harvard would be required to grant a degree to a student who is accused of committing a serious policy or even criminal offense so long as evidence of the offense arose too close to graduation to allow the Ad Board time to conduct a preliminary investigation to determine whether to issue a formal charge. That is as wrong as it sounds.

## B. Plaintiff's Allegations of Procedural Deficiencies Are Foreclosed by the Handbook.

Plaintiff also contends more broadly that Harvard denied him various procedures—for example, criminal-trial-like rights such as the right to cross-examine witnesses and the right to an attorney. But Massachusetts law does not require private universities to provide procedures that

would be required in a trial setting, *see infra* Part II, and there are good reasons for universities

not to adopt such trial-like procedures.  Massachusetts has recognized universities' need for

"flexibility to adopt diverse approaches to student discipline matters that do not meet federal due

process requirements."  *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019).  As a

consortium of private universities explained to the First Circuit in the recent *Boston College*

case, the reason for that rule is to allow each institution "to adopt student disciplinary processes

that best reflect its particular mission, learning community expectations and pedagogical

objectives," so long as "the college or university implements those processes with the fairness

required by common law when interpreting the contractual promises between schools and

students."  Am. Br. of Private Universities at 3, *Trs. of Bos. Coll*, 942 F.3d 521 (No. 19-1871).

Thus, while Harvard's Handbook promises students robust procedures that balance the

rights of complainant and accused, *see infra* Part II, it does not provide the sorts of trial-like

procedures Plaintiff seeks.  And that precludes Plaintiff's contract-related claims:  Harvard

simply "d[id] not provide for the right[s] . . .  that Plaintiff alleges that he was denied."  *Doe v.

Vanderbilt Univ.*, 2019 WL 4748310, at *14 (M.D. Tenn. Sept. 30, 2019); *see Doe v. Trs. of Bos.

Coll.*, 892 F.3d 67, 81 (1st Cir. 2018) (college "could not have breached its contract" where its

procedures did not establish the requirement the student alleged was violated).

For example, the Handbook expressly contradicts many of the purported procedural

deficiencies Plaintiff cites in the Complaint:

- Plaintiff alleges that Harvard denied him an opportunity to cross-examine the witnesses against him.  Compl. ¶¶ 400, 402(i), (vi).  But while Harvard grants accused students numerous opportunities to present their side of the case and answer the allegations against them, Harvard has chosen not to afford accused students the kind of cross-examination right that accompanies a criminal trial.  Ex. 3 at 4.

- Plaintiff alleges that Harvard prevented him from selecting an attorney as his personal adviser, Compl. ¶ 402(v), barred him from Ad Board meetings, *id.* ¶ 402(i), (ii), and

denied him an advocate to represent him before the Ad Board, *id.* ¶ 402(i), (iii).  But again, while accused students have numerous opportunities to tell their side of the story and respond to allegations—and are expressly encouraged in the Handbook to seek legal counsel outside the Ad Board meetings—they are not allowed to have attorneys participate in the disciplinary proceeding itself by serving as personal advisers (as would be required in a criminal trial).  Ex. 3 at 2-3, Ex. 4 at 1-2.[9]  The Handbook also informs students that while students themselves may not attend Ad Board meetings, the Board Representative "will be present when the Board hears the case," Ex. 3 at 6, and that Board Representative will "make certain that [the student's] perspective is clearly presented," although she "will not advocate for [the student]," *id.* at 3.

- Plaintiff alleges that Harvard subjected him to an improper standard of proof in the Ad Board proceeding, Compl. ¶ 393, but the Handbook directs the Ad Board to apply a "sufficiently persuaded" standard when deciding whether to discipline students, *see* Ex. 4 at 2—exactly the standard the Board applied, *see* Compl. ¶ 352.  Plaintiff does not explain why that standard—which is not materially different than the "preponderance of the evidence" standard applicable in civil litigation—is unfair in any respect.

- Plaintiff alleges that Harvard improperly permitted the Ad Board Chair to file a response to his appeal, Compl. ¶ 404, but there is no reason why the Faculty Council should not have the benefit of the Ad Board's answers to the accused's contentions, which is why the Handbook provides that the Chair of the Ad Board is entitled to "respond[] to the Student's statement [of appeal] in writing" and submit that response to the Faculty Council, Ex. 7 at 1.

The Handbook also implicitly refutes numerous other of Plaintiff's alleged procedural deficiencies; no reasonable student could read the Handbook and conclude that he or she is entitled to the procedures on which Plaintiff insists.

---

[9] To the extent Plaintiff asserts that Harvard violated the Violence Against Women Act Amendments to the Clery Act by failing to afford him "the same opportunity as the Complainant" to submit statements written by attorneys, Compl. ¶¶ 171-73, that claim also fails. First, the Amendments require schools to grant the accused student the same opportunity "to have others present during an institutional disciplinary proceeding"; they say nothing about written statements.  20 U.S.C. § 1092(f)(8)(B)(iv)(II).  And even if Harvard had violated that statute, "such a finding would have no bearing on [Plaintiff's] pending contractual and quasi-contractual claims," *Doe v. Univ. of S.*, 687 F. Supp. 2d 744, 757-58 (E.D. Tenn. 2009), because that statute "expressly states that it does not create a private cause of action against any college, university, or employee," *Emery v. Talladega Coll.*, 688 F. App'x 727, 729-30 (11th Cir. 2017); *see* 20 U.S.C. § 1092(f)(14)(A)(i).

For instance, Plaintiff contends that Harvard improperly adjudicated complaints that were filed long after the alleged misconduct occurred, Compl. ¶¶ 407-09, and took more than 18 months to complete the disciplinary proceeding, *id.* ¶ 410. But while the Handbook specifies that "[c]omplaints must ordinarily be brought to the College in a timely manner," Ex. 2 at 4, and that "ordinarily" disciplinary proceedings will be completed within three to six weeks, Ex. 3 at 1, no reasonable student could conclude that complaints filed outside some unspecified period of time—presumably less than two years—are not "timely" and thus will not be adjudicated. Nor is there any good reason to place such a tight time bar—shorter than most civil statutes of limitations—on sexual assault complaints.[10] Nor is there anything in the Handbook requiring disciplinary proceedings to be completed in six weeks. To the contrary, the use of the word "ordinarily" puts reasonable readers on notice that, in some cases, proceedings may take more than six weeks. In fact, the Handbook flags one such case—when, as here, the proceedings begin toward the end of the school year, there will be some delay because "[t]he Board does not meet during Summer months." Ex. 2 at 4.

Plaintiff also alleges that Harvard promised to guarantee him a confidential relationship with his Board Representative. Compl. ¶ 402. But when the Handbook intends to make a particular relationship confidential, it expressly says so. No reasonable reader could conclude that a relationship that the Handbook does *not* designate as confidential—such as an accused's relationship with his Board Representative—must nevertheless be treated as such. *Compare, e.g.*, Ex. 3 at 1 (all proceedings of the Board "are confidential"), *and* Ex 4. at 2 (material relating

---

[10] Moreover, Plaintiff's allegation of complaints filed long after the alleged conduct occurs is factually incorrect as to at least one of them, which was filed 20 days after the misconduct at issue. *See* Compl. ¶ 83.

to a case "must remain confidential"), *with* Ex. 3 at 3 (failing to describe student's relationship with his Board Representative as confidential).

Plaintiff next complains that the Subcommittee made credibility determinations in the disciplinary case report, Compl. ¶¶ 396-400, and that the Ad Board and Faculty Council failed to engage in independent fact finding during the proceedings before those bodies, *id.* ¶ 402(xi).  But the Handbook provides that the Subcommittee will make credibility determinations and that the Ad Board and Faculty Council will not engage in any independent fact finding.  The student information form explains that the Subcommittee members initially interview the accused student and the complainant, Ex. 3 at 4, and then, if a charge issues, "conduct additional interviews with [the accused student], the complainant, and possibly other relevant parties," *id.* at 5.  Because the Handbook designates the Subcommittee as the primary observer of the relevant witnesses during the interview process, no reasonable reader of these provisions could understand the Handbook to preclude the Subcommittee from making credibility determinations. Moreover, consistent with the Subcommittee's role as primary factfinder, the Handbook describes the Ad Board and Faculty Council as *reviewing* the evidence and reports gathered by the Subcommittee, further confirming that those bodies will not conduct independent fact finding.  *See id.* at 5-7.  And this division of labor is a sensible choice for a university to make. Just as a trial court that is present for witness testimony is entrusted with making credibility determinations, a university can reasonably determine that the investigator who interviews the witnesses is best able to assess their credibility.  And it is likewise reasonable to limit the functions of later bodies reviewing the record created by investigators to those of review and final determination of whether policy has been violated, not credibility findings.

Plaintiff also alleges that he should have been permitted to appeal the decision of the Faculty Council to dismiss him, Compl. ¶ 406, but the Handbook's appeal procedures form describes the full appeal process and does not provide students with an opportunity to appeal final outcomes reached by the Faculty Council. *See* Ex. 6 at 1; Ex. 7 at 1. No reasonable student could conclude that such a right existed.

Finally, several of the procedures Plaintiff says Harvard should have employed have no direct analogue in the Handbook, and Plaintiff cannot identify any Handbook provision that would lead a reasonable reader to think that he was entitled to these procedures.

For example, Plaintiff faults the Ad Board for failing to identify in its communications to him the precise category of sexual misconduct that was the basis for his discipline, *i.e.*, rape, indecent assault and battery, or miscellaneous. Compl. ¶ 389. But Plaintiff does not (and cannot) point to any provision of the Handbook that would require the Ad Board to categorize a student's conduct in this manner. Rather, the Handbook only requires the Ad Board to inform the student about the allegations and evidence against him, and to notify the student when it issues a charge and reaches a final disposition in the case. *See* Ex. 3 at 2, 5, 7. And, as Plaintiff himself concedes, Plaintiff was repeatedly informed not only that he was accused of "sexual misconduct," but of the detailed allegations and evidence against him, just as the Handbook requires. *See* Compl. ¶¶ 275, 303, 307, 329, 353, 368. Indeed, Plaintiff was presented with the Subcommittee and the fact finder's charge recommendations and the disciplinary case reports themselves, which included detailed factual findings concerning the allegations against him. There is no plausible argument that he was not aware of the nature of the claims against him.

Plaintiff also contends that Harvard improperly investigated and adjudicated all three of his complaints simultaneously. Compl. ¶ 402(ix). But Plaintiff's premise is wrong—the three

complaints were investigated and adjudicated separately, which is why the Subcommittee

generated three separate reports. *See supra* at 7. In any event, Plaintiff cites no Handbook

provision that would lead a reasonable student to believe that complaints against the same

student—filed close in time to each other—must be investigated and adjudicated separately.

Plaintiff's contract-related theories (Counts One, Three, and Four) thus fail. Such claims

can only be based on a violation of rights that Harvard promised Plaintiff, and here Plaintiff

received all the procedures he was promised. The contract-related claims should be dismissed.[11]

## II. HARVARD'S PROCEDURES PROVIDED PLAINTIFF WITH "BASIC FAIRNESS" UNDER MASSACHUSETTS LAW.

In addition to the Complaint's allegations that Harvard failed to provide Plaintiff the

procedures it promised in its Handbook, the Complaint also alleges in Count Two that the

procedures themselves were inadequate because they did not provide him the "basic fairness"

that Massachusetts law requires. *See supra* at 8-9. That contention fails as a matter of law.

Massachusetts courts review student disciplinary proceedings to ensure they are

"conducted with basic fairness." *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 380 (Mass. 2000)

(quoting *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 725 (1st Cir. 1983)). "Basic fairness" in

Massachusetts serves to ensure that accused students are not treated arbitrarily or capriciously,

---

[11] Plaintiff also mentions in passing three other alleged procedural failings: (i) the Associate Dean's purported failure to inform him that he could have a Board Representative present at his initial meeting, Compl. ¶ 277; (ii) the Associate Dean's failure to have an initial meeting with Plaintiff about the third complaint, *id.* ¶ 282; and (iii) Harvard's alleged pressuring of students to file complaints, *id.* ¶¶ 75, 79, 263, 281. Plaintiff, however, does not raise these allegations again when discussing his four claims. *See id.* ¶¶ 374-432. Even if Plaintiff did intend to press claims based on these allegations, he cannot because they are time-barred. In Massachusetts, the statute of limitations for claims sounding in contract is six years, *see* Mass. Gen. Laws Ann. ch. 260, § 2, and the cause of action accrues at the time of the breach, *Melrose Hous. Auth. v. New Hampshire Ins. Co.*, 402 Mass. 27, 32 (1988). Plaintiff filed his complaint in October 2019, so these three alleged procedural failings—each of which occurred in June 2013—are time-barred.

*Coveney v. Pres. & Trs. of Coll. of Holy Cross*, 445 N.E.2d 136, 139 (Mass. 1983), and that they have notice of the allegations against them and an opportunity to be heard, *see Driscoll v. Bd. of Trs. of Milton Acad.*, 873 N.E.2d 1177, 1187 (Mass. App. Ct. 2007) (explaining that student was ensured basic fairness where he and his parents were "informed of the proceedings" and "given an opportunity to explain his behavior").  As the Massachusetts Supreme Judicial Court has explained, however, guaranteeing a student "basic fairness" as part of a school disciplinary process does not require private universities to "adhere to the standards of due process guaranteed to criminal defendants," *Schaer*, 735 N.E.2d at 381, nor does it require them to adopt specific disciplinary procedures, *see id.*; *see also supra* at 11-12.

Here, the Complaint itself shows that Plaintiff was afforded far more procedural protection than basic fairness requires.  Plaintiff was notified of the allegations against him within days after the complaints were filed.  Compl. ¶¶ 80, 275.  Shortly thereafter, he received copies of the complainants' initial statements, which detailed the precise charges against him and the factual allegations underlying those charges.  *Id.* ¶¶ 275, 286, 295, 315.  This case thus stands in sharp contrast to those in which courts have found that a student did not receive notice sufficient to satisfy basic fairness requirements.  *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 604 (D. Mass. 2016) (student did not receive adequate notice where the school "refus[ed] to provide [the student] with the specific factual conduct alleged to have given rise to the charge").

Plaintiff also received numerous opportunities to tell his side of the story and respond to the evidence against him:  he was able to prepare written responses to the evidence, *see* Compl. ¶¶ 286, 306, 314, 338; Ex. 3 at 3–4; Ex. 4 at 1, and he was interviewed several times and asked to provide lists of evidence and proposed witnesses, *see* Compl. ¶¶ 297-300, 315, 323.  Plaintiff asserts that he was entitled to an in-person hearing with an advocate and an opportunity to cross-

examine the witnesses against him, Compl. ¶ 402, but that assertion is contrary to Massachusetts law. The Supreme Judicial Court has made clear that students at private universities "ha[ve] no constitutional right to a hearing," *Coveney*, 445 N.E.2d at 140, and has expressly upheld disciplinary procedures where the student was not even "asked to give a statement, to offer evidence, or to provide witnesses," let alone afforded an opportunity to advocate at an in-person hearing, *Schaer*, 735 N.E.2d at 378, 380. And the First Circuit has recently recognized that "basic fairness" in Massachusetts does not require "any opportunity for the accused student to pose questions to be addressed to the accuser." *Trs. of Bos. Coll.*, 942 F.3d at 534.

Nor does the Complaint plausibly allege that Plaintiff was treated arbitrarily. Plaintiff offers only a conclusory allegation (without factual basis) that the Subcommittee, Ad Board, and Faculty Council did not include black members and that he was treated unfairly as a result. Compl. ¶ 402(vii). But the First Circuit has made clear that a presumption of impartiality favors school administrators, so allegations of prejudice and bias must be accompanied by more than "mere speculation and tenuous inferences." *Gorman v. Univ. of R.I.*, 837 F.2d 7, 15 (1st Cir. 1988) (quotation omitted). Plaintiff cannot overcome that presumption even if his conclusory assertion that these administrative bodies had no black members were correct.

In short, Harvard provided Plaintiff with fair procedures well in excess of the minimum requirements of Massachusetts law. Plaintiff's contention that the procedures he was afforded violate Massachusetts law is meritless.

## III.   HARVARD'S SEXUAL MISCONDUCT POLICY IS NOT VOID FOR VAGUENESS.

Finally, Plaintiff asserts that the proceedings against him were invalid because the sexual misconduct policies under which he was charged did not define all relevant terms and were therefore "void for vagueness." Compl. ¶ 391. As an initial matter, the "void for vagueness"

doctrine, which is rooted in constitutional due process rights, *see URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13 (1st Cir. 2011), does not apply to disciplinary proceedings of a private university, *see Schaer*, 735 N.E.2d at 381 (private universities need not "adhere to the standards of due process guaranteed to criminal defendants").  Instead, the relevant question here is whether "under an objective standard, the University reasonably could expect a student in Plaintiff's position to understand that the [Handbook] prohibited the conduct in which he engaged." *W. New England Univ.*, 228 F. Supp. 3d at 173.

The answer to that question is, obviously, yes.  The Handbook makes clear that Harvard does not tolerate "sexual misconduct," which it defines to include "intercourse that takes place against a person's will or that is accompanied by physical coercion" and "intercourse with a person who is incapable of expressing unwillingness." Ex. 1 at 10-11.  No reasonable student could fail to understand that this prohibition includes the conduct for which Plaintiff was disciplined:  having sexual intercourse with a complainant while she ██████████ ████████████████████████████████████████████████████ Ex. B at 17; having sexual intercourse with another complainant while she ████████████████ ██████████████████████████████████████████████████████████ Ex. A at 21; and using ████████████████████████████ ████████████████████████████████ Ex. C at 19.  Plaintiff's suggestion that there is some confusion about whether such conduct counts as "sexual misconduct" is frivolous and should be rejected out of hand.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  December 20, 2019                    Respectfully submitted,


/s/ Anton Metlitsky
Anton Metlitsky (*pro hac vice*)
ametlitsky@omm.com
Patrick D. McKegney (*pro hac vice*)
pmckegney@omm.com
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone:     (212) 326-2000
Facsimile:     (212) 326-2061

Apalla U. Chopra (*pro hac vice*)
achopra@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Telephone:     (213) 430-6000
Facsimile:     (213) 430-6407

Bradley N. Garcia (*pro hac vice*)
bgarcia@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:     (202) 383-5300
Facsimile:     (202) 383-5414

Victoria L. Steinberg, BBO #666482
Tara Dunn, BBO # 699329
TODD & WELD LLP
One Federal Street
Boston, MA  02110
Telephone:     (617) 624-4714
Facsimile:     (617) 624-4814
vsteinberg@toddweld.com
tdunn@toddweld.com

*Attorneys for Defendants,*
*Harvard University, Harvard Board of*
*Overseers, and President and Fellows of*
*Harvard College*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on December 20,

2019.

*/s/ Anton Metlitsky*
Anton Metlitsky (*pro hac vice*)