**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————

)
)
**DAMILARE SONOIKI,**                                    )
)
       **Plaintiff,**                                )
)
    **v.**                                              )
)    **Case No. 19-cv-12172**
)
**HARVARD UNIVERSITY et al.,**                          )
)
    **Defendants.**                               )
)
)
———————————————————————)

## MEMORANDUM AND ORDER

**CASPER, J.**                                               **June 22, 2020**

## I.    Introduction

    Plaintiff Damilare Sonoiki ("Sonoiki") has filed this lawsuit against Defendants Harvard University, Harvard University Board of Overseers and the President and Fellows of Harvard College (collectively, "Harvard"). Sonoiki brings claims for breach of contract (Count I), denial of basic fairness (Count II), breach of the covenant of good faith and fair dealing (Count III) and estoppel and reliance (Count IV). The claims arise from a disciplinary process against him for allegations of separate incidents of sexual misconduct by three students filed in May and June 2013 and resulting in his dismissal from Harvard College. D. 1 ¶¶ 374-432. Harvard moved to dismiss all claims. D. 23. For the reasons stated below, the Court ALLOWS the motion to dismiss.

## II.    Standard of Review

    To decide a motion to dismiss for failure to state a claim, the Court must determine if the well-pled facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State

Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).  At this stage, a plaintiff need only demonstrate that its claims are facially plausible.  Garcia-Catalán v. United States, 734 F.3d 100, 102 (1st Cir. 2013).  Plausible means "more than a sheer possibility" and permits the Court to incorporate a contextual analysis of the facts.  Id. at 102-03 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  This determination requires a two-step inquiry.  Id. at 103.  First, the Court must distinguish the factual allegations from the conclusory legal allegations in the complaint.  Id. Second, taking plaintiff's allegations as true, the Court should be able to draw "the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Iqbal, 556 U.S. at 678); Ocasio–Hernández v. Fortuño–Burset, 640 F.3d 1, 11 (1st Cir. 2011).  The Court is not required to accept as true any legal conclusions.  Iqbal, 556 U.S. at 678 (noting that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  Even if the facts in a complaint are well-pled, dismissal is warranted where the allegations in the complaint fail to support a viable claim.  See Morales-Tanon v. P.R. Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008); Diaz-Ramos v. Hyundai Motor Co., 501 F.3d 12, 15 (1st Cir. 2007).

## III.    Factual Background

Except as otherwise stated, the following facts are based upon the allegations in the complaint, D. 1, including the documents fairly incorporated therein, Rodi v. S. New England Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004), and the Court accepts them, as required at this stage, as true for consideration of the pending motion to dismiss.

A.    **The Alleged Sexual Assaults**

Sonoiki enrolled at Harvard as part of the class of 2013.  D. 1 ¶ 19.  On May 28, 2013, two days prior to his graduation, two fellow students, Ann and Cindy,[1] filed Title IX complaints against Sonoiki with the Administrative Board of Harvard College (the "Ad Board") alleging that Sonoiki had sexually assaulted them in September 2011 and May 2013, respectively.  See D. 1 ¶¶ 82-84. On May 29, 2013, Sonoiki spoke to the graduating class as the class day orator.  D. 1 ¶ 90.  The following day, Sonoiki walked at graduation, but, given the pendency of the sexual assault complaints against him, did not receive his diploma. See  D. 1 ¶¶ 90, 93.  On June 4, 2013, five days later, another student, Betty, filed an additional Title IX complaint against Sonoiki with the Ad Board, alleging that Sonoiki had sexually assaulted her during the summer of 2012 when she lived with him while the two were interning in New York City.  D. 1 ¶ 88.

1.    *Ann*

Ann's Title IX complaint against Sonoiki arose out of an incident that occurred after a party in September 2011.  D. 1 ¶¶ 46-50; D. 28-1 at 3. Ann alleged that she "blacked out" at the event and did not recall leaving with Sonoiki.  D. 1 ¶ 50; D. 28-1 at 10.  She further alleged that she woke up to Sonoiki having sex with her and that she never consented to any sexual activity with Sonoiki.  D. 1 ¶ 50; D. 28-1 at 10.  Sonoiki alleges that there was no indication that Ann was incapacitated and that their sexual encounter was consensual and was not "accompanied by physical coercion or the threat of bodily injury."  D. 1 ¶ 47; D. 28-1 at 16.

---

[1]This Court adopts the pseudonyms used in the complaint to refer to the three women who filed Title IX claims against Sonoiki.

2.      *Betty*

Betty's allegations resulted from conduct she alleged occurred while she and Sonoiki were roommates in New York City during the summer of 2012.  D. 1 ¶¶ 53-59; D. 28-2 at 3.  Betty and Sonoiki, who were friends, decided to live together in a studio apartment while interning for the summer.  D. 1 ¶¶ 52-53.  The apartment only had one bed and a couch, so the two agreed that they would share the bed. D. 1 ¶ 54.  Betty alleged that, early in the summer, she awoke multiple times to Sonoiki having sexual intercourse with her without her consent.  D. 1 ¶ 57; D. 28-2 at 9.  Betty further acknowledged that later in the summer she engaged in consensual sexual intercourse with Sonoiki.  D. 1 ¶ 57; D. 28-2 at 11.  Sonoiki alleges that every instance of sexual contact between him and Betty was consensual.  D. 1 ¶ 56.

3.      *Cindy*

Cindy alleged that Sonoiki sexually assaulted her during a formal event on campus on May 7, 2013.  D. 1 ¶¶ 64-68; D. 28-3 at 11.  Cindy stated that she and Sonoiki went to the basement of the building in which the event was taking place and were kissing when Sonoiki knelt down and began performing oral sex on Cindy without her consent.  See D. 28-3 at 11.  She further alleged that she asked him to stop multiple times and that he eventually did, but that he then spun her around, bent her over and began having sexual intercourse with her against her will.  D. 28-3 at 11-12.  Sonoiki counters that Cindy led him down the stairs and that the two engaged in a consensual sexual encounter.  D. 1 ¶ 66.  On the morning following the alleged incident, Cindy went to Harvard's health and human services center seeking emergency contraception and treatment.  D. 1 ¶ 67.

### B.    Harvard's Disciplinary Policies

The 2012-2013 Harvard Student Handbook, (the "Handbook"), which was in effect at the time the complaints against Sonoiki were made, included multiple policies related to student conduct at Harvard, including (1) the Resolution on Rights and Responsibilities (the "Rights Policy"); (2) the Faculty of Arts and Sciences Policy on Rape, Sexual Assault, and Other Sexual Misconduct (the "Sexual Misconduct Policy") and (3) the General Regulations for the Administrative Board of Harvard College (the "Ad Board Regulations").  D. 1 ¶ 97.  Additional Ad Board policies for handling sexual misconduct complaints were included in:   (1) the "Administrative Board of Harvard College:  Information for students facing allegations in a peer dispute case" (the "Student Information Form"); (2) the "Administrative Board of Harvard College:  General Information on Disciplinary Cases" (the "General Information Form"); (3) the "Administrative Board:  Disciplinary Process for allegations involving a peer dispute" (the "Ad Board Chart"); (4) the "Administrative Board of Harvard College:  Reconsideration and appeals" (the "Appeals Info Sheet"); (5) the "Administrative Board: Reconsideration and Appeals Process" (the "Appeals Process Chart"); and (6) the Faculty Council's procedural rules, known as the Rules of Faculty Procedure (the "Faculty Rules").  D. 1 ¶ 123.

#### 1.    Relevant Policies and Procedures

The Rights Policy in the Handbook states that "it is the responsibility of officers of administration . . . to give full and fair hearing to reasoned expressions of grievances . . . ."  D. 1 ¶ 103; D. 1-1 at 2.  The Handbook includes a "Faculty Policy Statement" of Sexual Harassment that states that "[t]he determination of what constitutes sexual harassment will vary with the particular circumstances, but it may be described generally as unwanted sexual behavior, such has as physical contact . . .  which adversely affects the working or learning environment of an

individual." D. 1-1 at 5.  The Sexual Misconduct Policy included in the Handbook defines sexual

misconduct as encompassing rape, indecent assault and "other serious or persistent unwanted

sexual contact or conduct, such as harassment, threats, or intimidation." D. 1-1 at 10-11; see D. 1

¶ 109.  The Sexual Misconduct Policy further defines rape as:

> any act of sexual intercourse that takes place against a person's will or that is
> accompanied by physical coercion or the threat of bodily injury. Unwillingness
> may be expressed verbally or physically. Rape may also include intercourse with a
> person who is incapable of expressing unwillingness or is prevented from resisting,
> as a result of conditions including, but not limited to, those caused by the intake of
> alcohol or drugs.  Rape includes not only unwilling or forced vaginal intercourse,
> but also the sexual penetration of any bodily orifice with a body part or other object.

D. 1 ¶ 110; D. 1-1 at 10-11.  It further defines indecent assault and battery as involving "any

unwanted touching or fondling of a sexual nature that is accompanied by physical force or threat

of bodily injury." D. 1-1 at 11.  The Sexual Misconduct Policy also clarifies that "being intoxicated

does not diminish a student's responsibility in perpetrating rape, sexual assault, or other sexual

misconduct." D. 1-1 at 11.  It provides that complaints of sexual misconduct "may be filed with

the College according to the procedures of the [Ad Board] and on the website of the [Ad Board]."

D. 1-1 at 13.

The Handbook further discusses procedures for handling complaints.  The Ad Board

Regulations advise that they contain only a "brief introduction" and state that students may consult

the Ad Board website or the student's Resident Dean for more details.  D. 1-2 at 1; see D. 1 ¶ 122.

The Handbook states that Ad Board disciplinary actions "ordinarily" begin with a discussion

between the student and their adviser.  D. 1-2 at 3.  Following these discussions, the student and

Resident Dean present the issue to the Ad Board.  D. 1-2 at 4.  The Ad Board Regulations state

that "[t]he College will decide whether to issue a charge and, if so, against whom and for what"

and that "[c]omplaints must ordinarily be brought to the College in a timely manner."  Id.  The Ad

Board Regulations further note that "[d]isciplinary cases are ordinarily considered by the [Ad Board] as quickly as is reasonably possible" and indicates that the Ad Board does not meet during the summer.  Id.

Once a charge is issued, an investigation continues until the Ad Board decides the outcome. D. 1 ¶ 135; D. 1-2 at 4.  Once the Ad Board determines that an individual has committed wrongdoing, it can take a variety of actions, including (1) issuing a warning or admonishment, which becomes a part of the student's official record; (2) putting a student on disciplinary probation; (3) requiring the student to withdraw for a set amount of time and prohibiting them from participating in any academic or extracurricular activities; (4) recommendation of dismissal, in which a student's "connection with the University is ended" and (5) recommendation of expulsion.  D. 1-2 at 6-7.  Recommendations for dismissal and expulsion are submitted by the Ad Board to a faculty council (the "Faculty Council"), which makes the final determination.  D. 1-2 at 7.  The Ad Board Regulations note that "[a] degree will not be granted to a student who is not in good standing or against whom a disciplinary charge is pending."  D. 1-2 at 5.

The Student Information Form indicates that it is meant to provide students with "information about the process by which the [Ad Board] will address the complaint that has been brought against you . . . and to provide guidance for you as your case moves forward."  D. 1-3 at 1.  It states that a disciplinary case "always begins with an *allegation* of student misconduct in the form of a complaint or report."  Id. (emphasis in original).  An allegation goes to the Ad Board for initial review and the Ad Board decides whether to issue a charge, which would lead to further investigation by the Ad Board, as discussed in the Handbook.  Id.  "A charge does not assume misconduct has occurred."  Id.  There are three phases of a peer dispute case and states that "[t]he

entire process, from start to end, ordinarily takes between 3 to 6 weeks, depending on how much information the [Ad Board] received during the investigation." Id.

The first phase begins with the Ad Board's determination of whether to issue a charge, which occurs when it determines that "allegations, if true, would constitute a violation of the rules of the Faculty of Arts and Sciences and that further investigation is likely to enable [the Ad Board] to resolve the case." Id. During this phase, the complaining student submits a detailed written statement summarizing their allegations with a list of all sources of information, including witnesses and written records. D. 1-3 at 2. The Dean of the College, who serves as the Ad Board Chair, refers the matter to an independent fact finder who is generally a professional who is not affiliated with Harvard and a subcommittee of the Ad Board. Id. The secretary of the Ad Board then meets with the responding student to notify them of the allegations against them and to discuss the policies and process. Id. Where a complaint involves potentially criminal content, respondents are advised to seek legal counsel before submitting any written or oral statements regarding the allegations. Id.

The Student Information Form instructs respondents that they will have a "representative" on the Ad Board who "serves as a liaison with the College in any Board matter." D. 1-3 at 3. Respondents are encouraged to "be open and honest" with their Ad Board representative who "is to represent [the respondent] to the subcommittee and the Board." Id. The representative will be present at all Ad Board meetings and keeps the respondent informed throughout the process. Id. The representative will also present "a full summary of the facts of the case" to the Ad Board, but the Student Information Form notes that the representative "will not advocate for [the respondent] but will make certain [their] perspective is clearly presented." Id. This representative does not vote on the outcome, but participates in deliberations. Id. A respondent also may choose a

personal adviser in addition to their Ad Board representative who "is given access to all case information, may attend interviews with [the respondent], and can provide general advice and support." Id.  The personal adviser "must be an officer of the University affiliated with the Faculty of Arts and Sciences" and may not be another undergraduate student or a family member.  Id.

During the initial phase, the respondent is asked to prepare a written statement responding to the allegations against them.  Id.  Respondents are encouraged to share a draft with their Ad Board representative and the Student Information Form notes that "you may wish to share a draft of the statement with your family members, legal counsel, or your personal adviser."  Id.  The respondent's initial statement may also include a list of all sources of information, such as witnesses and records, that the student believes the Ad Board should investigate. D. 1-3 at 4.  Once the respondent's statement is received by the Ad Board, the complainant and respondent are permitted to review one another's statements and respond to them in writing.  Id.

Both the complainant and respondent then have the opportunity to meet with the fact finder and subcommittee to discuss the allegations  and answer questions.  Id. The complainant and respondent will meet with the fact finder and subcommittee separately and will not have the opportunity to confront one another.  Id.  Ad Board representatives and personal advisers are permitted to attend the meetings with the fact finder and subcommittee for the limited purposes of suspending the meeting to take the respondent outside the room for a break and to address the subcommittee briefly if there are relevant facts that they feel the respondent failed to raise.  Id. The Ad Board representative also attends interviews with the complainant and any witnesses and discusses the information obtained during those interviews with the respondent.  Id.

Following the interviews, the subcommittee and fact finder will make a charge recommendation and the Board representative will notify the respondent of the decision.  Id.  Both

the complainant and respondent have an opportunity to respond to the charge recommendation in writing. D. 1-3 at 5. The subcommittee then presents its recommendation to the full Ad Board, which then reviews the recommendation and all of the written statements and responses. Id. If the Ad Board decides to issue a charge, the matter will be referred back to the fact finder and subcommittee for further investigation. Id.

After the Ad Board issues a charge, further investigation by the fact finder and subcommittee of the Ad Board is the second phase of the disciplinary process. Id. During this investigation, additional interviews are conducted with the complainant and respondent as well as relevant witnesses. Id. A respondent's Ad Board representative continues to attend all meetings and interviews to keep the respondent informed of the progress of the case and will provide respondent copies of all documents and other information obtained by the fact finder and subcommittee. Id. Once the investigation is concluded, the subcommittee prepares a Disciplinary Case Report ("DCR") that is presented to the Ad Board in the third phase. Id. The DCR "describes the facts and circumstances of the case and may include a recommendation for disciplinary action." Id. Statements and documents obtained by the subcommittee are included in the DCR. Id. The complainant and respondent will have the opportunity to read and respond to the DCR prior to the meeting in which the Ad Board decides the case. D. 1-3 at 6. The subcommittee and fact finder then provide an oral summary of the allegations of the case to the Ad Board and, following discussion, the Ad Board votes on the case. Id. Disciplinary actions require at least a majority vote and the fact finder, resident deans and the students' Ad Board representatives may not vote on the outcome. D. 1-3 at 6, 7. "To take any disciplinary action against a student, the [Ad Board] must be sufficiently persuaded that the student has violated the rules." D. 1-3 at 6. Certain actions taken by the Ad Board lead to the respondent's no longer being in good standing. See id. These

actions are placing the respondent on probation, requiring the respondent to withdraw and recommending dismissal and expulsion to the Faculty Council.  D. 1-3 at 7.  The Student Information Form provides that "[a] student cannot receive a degree before a pending disciplinary case is resolved, or before his or her status in the College is restored to good standing, and ordinarily may not participate in commencement or related activities or exercises."  Id.

The General Information Sheet provides a similar, but more succinct, overview of the disciplinary procedures of the Ad Board.  Compare D. 1-3 with D. 1-4.  It reiterates that the procedures are "designed to ensure that students are given a fair opportunity to be heard . . . ."  D. 1-4 at 1.  The General Information Sheet notes that procedures may vary depending upon the nature of the complaint and lists some of the procedures and practices that are discussed in more detail in the Student Information Form.  Id.  In discussing the role of a respondent's Ad Board representative, the General Information Sheet states that "[t]o ensure that the [Ad] Board receives a full and balanced account of a case or petition, students should work closely with their [Ad] Board representative."  Id.  The General Information Sheet reiterates that students may seek advice from others, including parents and faculty, regarding the disciplinary proceedings, but that "the procedures of the [Ad Board] . . . do not allow for direct participation of parents, attorneys, or those who are not officers of the University affiliated with the Faculty of Arts and Sciences."  D. 1-4 at 2.  The General Information Sheet also states that, to take disciplinary action, the Ad Board must be "sufficiently persuaded" that the respondent has violated the rules.  Id.

The Appeals Info Sheet describes the process for appealing a decision of the Ad Board.  It provides that students may request that the Ad Board reconsider its decision "provided new materially relevant information becomes available or there is reasonable evidence of a procedural error."  D. 1-6 at 1.  Further, the Appeals Info Sheet notes that students may appeal an Ad Board

decision to the Faculty Council because (1) the Ad Board made a procedural error; (2) the Ad Board came to the wrong conclusion regarding whether rules were violated; or (3) the sanction imposed was inconsistent with the Ad Board's usual practice and was, therefore, inappropriate.  Id.  Appeals are initially screened by a "Docket Committee" consisting of three elected representatives of the Faculty Council.  Id.

Regarding the reconsideration process, the Appeals Process Chart provides that the student first submits a written statement for reconsideration to the secretary of the Ad Board.  D. 1-7.  The full Ad Board then meets to decide whether the request meets the guidelines for reconsideration and, if the Ad Board decides that it does, it meets to decide the outcome.  Id.  Once a student submits a written statement of their appeal, the chair of the Ad Board then responds to the student's statement in writing and forwards the response statement and the original case materials to the secretary of the faculty.  Id.  The student is also permitted to submit a written response to the statement prepared by the chair of the Ad Board.  Id.  If the Docket Committee determines that grounds for appeal are met, the case materials are sent to the Faculty Council who reviews the material and determines an outcome.  Id.  Once an outcome is determined, the secretary of the faculty notifies the appealing student.  Id.

C.     **Disciplinary Proceedings Again Sonoiki**

As noted previously, Ann and Cindy filed sexual misconduct complaints against Sonoiki on May 28, 2013.  D. 1 ¶ 263.  The following day, Sonoiki was permitted to speak as the male Harvard orator for Class Day.  D. 1 ¶ 265.  Sonoiki walked in Harvard's graduation ceremony on May 30, 2013, but did not receive his degree.  D. 1 ¶ 266.  At the time of the graduation ceremony, Sonoiki had completed all of the academic requirements to receive his undergraduate degree and was in good standing.  D. 1 ¶¶ 267-68.  Sonoiki met with Jay Ellison, the then-Associate Dean of

Harvard College and Ad Board secretary ("Ellison"), on June 3, 2013 to discuss the complaints that had been filed against Sonoiki. D. 1 ¶ 275. The following day, Betty filed her complaint against Sonoiki. D. 1 ¶ 281. Sonoiki did not have an initial meeting with Ellison to discuss Betty's complaint. D. 1 ¶ 282. A single subcommittee of the Ad Board simultaneously investigated the claims made by Ann, Betty and Cindy. D. 1 ¶ 283-84. Sonoiki and the three complainants submitted their initial statements and responses to the subcommittee in late May and early June of 2013. D. 1 ¶ 286. Laura Johnson ("Johnson"), the Allston Burr Resident Dean for Currier House, served as Sonoiki's Ad Board representative. D. 1 ¶ 287.

The subcommittee interviewed both Ann and Cindy on June 17, 2013. D. 1 ¶ 297. Later that day, the subcommittee interviewed Sonoiki regarding Ann's claims against him and then regarding Cindy's claims against him. D. 1 ¶ 298. Both of these interviews occurred via Skype because, by that time, Sonoiki was working in New York City. D. 1 ¶¶ 296, 298. On June 19, 2013, the subcommittee interviewed Betty and then Sonoiki. D. 1 ¶ 299. On June 25, 2013, the subcommittee issued three written recommendations to the Ad Board that they issue charges against Sonoiki for sexual misconduct in relation to the claims made against him by Ann, Betty and Cindy. D. 1 ¶ 303. That same day, Sonoiki responded to the charge recommendations. D. 1 ¶ 306. Later that day, the Ad Board voted to issue charges of "sexual misconduct" against Sonoiki in each case and referred the cases for additional investigation. D. 1 ¶ 307.

Throughout the summer of 2013, the subcommittee sought and received written statements from witnesses in each of the cases. D. 1 ¶ 314. Sonoiki was provided with these written statements, but was not given the names of the student witnesses who submitted statements. D. 1 ¶ 315. Sonoiki was not permitted to submit questions to the witnesses who provided statements. D. 1 ¶ 319. The subcommittee interviewed the parties and many of the witnesses who had

submitted statements in August, September and October of 2013.  D. 1 ¶ 323.  Sonoiki was not permitted to attend or participate in the interviews with the complainants or adverse witnesses.  D. 1 ¶ 325.

On November 13, 2013, Johnson sent Sonoiki the three separate DCRs that the subcommittee had drafted, which each recommended that the Ad Board require Sonoiki to withdraw and that the Ad Board recommend dismissal to the Faculty Council.  D. 1 ¶¶ 329, 333.  Sonoiki was instructed that he could respond to each of the DCRs by November 18, 2013, which he did.  D. 1 ¶¶ 331, 338.  The Ad Board met on November 19, 2013 and discussed all three complaints against Sonoiki.  D. 1 ¶ 339.  Johnson, as Sonoiki's Ad Board representative, attended the Ad Board meeting.  D. 1 ¶ 342.  The Ad Board agreed with the subcommittee's recommendations regarding each case against Sonoiki and voted to require him to withdraw from Harvard and to recommend his dismissal to the Faculty Council.  D. 1 ¶ 351.  Johnson informed Sonoiki of the Ad Board's decision on November 25, 2013 and provided him with three outcome letters.  D. 1 ¶¶ 353, 354.

Approximately six months later, on May 19, 2014, Sonoiki appealed the Ad Board's decision to the Faculty Council.  D. 1 ¶ 357.  In particular, Sonoiki objected to the simultaneous investigation and consideration of all three cases.  D. 1 ¶ 358.  Several months later, Rakesh Khurana ("Khurana"), the Dean of Harvard College and Ad Board chair, submitted objections to Sonoiki's appeal on September 26, 2014.  D. 1 ¶ 360.  Sonoiki then submitted replies to Khurana's objections shortly thereafter.  D. 1 ¶ 362.  The Faculty Council met on December 10, 2014 and voted to dismiss Sonoiki from Harvard. D. 1 ¶ 368.  Sonoiki was not permitted to appeal the Faculty Council decision. D. 1 ¶ 371.  Sonoiki's dismissal from Harvard became effective on December 12, 2014 and he has not received his degree.  D. 1 ¶ 372.

## IV.     Procedural History

Sonoiki instituted this action on October 21, 2019.  D. 1.  Harvard has now moved to dismiss all counts.  D. 23.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 39.

## V.     Discussion

### A.     **Breach of Contract (Count I)**

Sonoiki alleges that Harvard breached its contract with him based upon a number of actions that he claims violated Harvard's policies and procedures and its promise and obligation to conduct hearings with basic fairness.  D. 1 ¶¶ 4; 374-412.

In particular, Sonoiki claims that:  (i) Harvard withheld his undergraduate degree and subjected him to the Ad Board disciplinary process without jurisdiction; (ii) the decisions of the Ad Board and Faculty Council are void for lack of jurisdiction; (iii) Harvard denied Sonoiki the opportunity to be advised by an attorney; (iv) Harvard did not disclose the identities of adverse witnesses to Sonoiki; (v) Harvard did not provide Sonoiki with adequate notice of the charges against him; (vi) Harvard did not permit Sonoiki to question or confront witnesses[2]; (vii) the Ad Board process was tainted by racial biases; (viii) the standard of proof applied in the proceedings was "insufficient and unrecognizable;" (ix) Sonoiki was denied confidentiality with his Ad Board representative; (x) Sonoiki was not provided an advocate during the proceedings; (xi) Harvard solicited the complaints against Sonoiki; (xii) the complaints were untimely and the process was unduly long; (xiii) Harvard improperly adjudicated the three complaints against him

---

[2] In his opposition to the motion to dismiss, Sonoiki acknowledges that <u>Doe v. Trs. of Boston Coll.</u>, 942 F.3d 527 (1st Cir. 2019) ("<u>BC II</u>") precludes his claims of breach of contract and basic fairness as it relates to his contention that he was denied the opportunity to cross-examine witnesses.  D. 30 at 18, n.10.

simultaneously; (xiv) the Ad Board subcommittee made improper credibility determinations; (xv) the deliberative bodies lacked independence and simply "rubber-stamped" the initial findings; (xvi) the Dean of Harvard College opposed Sonoiki's appeal; (xvii) Harvard did not establish proper appeal procedures and failed to establish a timeframe for appeals and (xviii) Harvard did not permit Sonoiki to appeal the Faculty Council's decision to dismiss him from Harvard.  D. 1 ¶ 4.  Additionally, in opposition to the motion to dismiss, Sonoiki claims that Harvard violated their duty of basic fairness in conducting the disciplinary process based upon the above enumerated grounds and because Sarah Rankin ("Rankin"), the director of Harvard's Office of Sexual Prevention and Response, who Sonoiki alleges solicited the complaints, was permitted to serve as a personal adviser to complainants throughout the proceeding and served as an adverse witness against Sonoiki and because Ellison, who Sonoiki alleges pressured Cindy to file her complaint, was permitted to serve on the Ad Board.  D. 30 at 19-20.[3]

To establish a breach of contract, a plaintiff must demonstrate a valid and binding contract existed, the defendant breached that contract and the plaintiff suffered damages as a result.  General Cas. Co. v. Five Star Bldg. Corp., No. 11-cv-30254-DJC, 2013 WL 5297095, at *8 (D. Mass. Sept. 19, 2013) (citing Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999)).  Student-college relationships are contractual in nature and the terms of that contractual relationship can be derived from student policy manuals.  Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 593 (D. Mass. 2016) (citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)).  Under Massachusetts law, courts apply a "reasonable expectation" standard when interpreting contracts between students and their universities.  Bleiler v. Coll. of Holy Cross, No. 11-cv-11541-DJC, 2013 WL 4714340, at

---

[3]In resolving this motion, this Court has also considered Sonoiki's sur-reply brief filed in opposition to the motion to dismiss, D. 38-1.  Sonoiki's motion to file a sur-reply brief, D. 38, is thus granted.

*15 (D. Mass. Aug. 26, 2013) (citing Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000)).  The reasonable expectation standard asks what meaning the party making the manifestation under the contract—the university—should reasonably expect the other party—the student—to give it. Schaer, 432 Mass. at 478 (citing Cloud v. Trustees of Boston Univ., 720 F.2d 721, 724 (1st Cir. 1983)).

As part of the analysis of the express and implied terms of the contract between a university and its students, the Court must also determine whether the allegations support an inference that an academic institution failed to provide a process conducted with "basic fairness" to the student when analyzing a student's claim as part of the breach of contract analysis.  See Brandeis, 177 F. Supp. 3d at 594; Cloud, 720 Mass. at 725 (noting that, in addition to reviewing the allegations of breach of contract, the court also examines the hearing "to ensure that it was conducted with basic fairness").  This inquiry is "uncertain and elastic" with "little case law to serve as guideposts," but essentially requires the Court to assess whether the university provided "some minimum level of fair play" to the student during the disciplinary hearing.  Brandeis, 177 F. Supp. 3d. at 572, 601; see Coveney v. President & Trs. of the Coll. of the Holy Cross, 388 Mass. 16, 19-20 (1983) (concluding that a private university did not act arbitrarily or capriciously where the school acted in good faith and on reasonable grounds and noting that "the fact that these [disciplinary] proceedings occurred and were conducted fairly" further indicates that the college's discipline of the student was "neither arbitrary nor capricious").  It does not, however, require "adher[ence] to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts."  Schaer, 432 Mass. at 482.

###### 1.     *The Governing Contract*

The parties do not dispute that they entered into a binding contract upon Sonoiki's enrollment at Harvard.  D. 1 ¶ 379; D. 27 at 8, n.8.  Sonoiki argues, however, that the Handbook is the only contractual document that governs the relationship and that it controls and limits any ancillary documents relied upon by Harvard.  D. 30 at 7-9.  Sonoiki's contention is belied by the allegations in the complaint, in which he states that he "enrolled at Harvard with the understanding and reasonable expectation that Harvard would enforce the provisions and policies in Harvard's official publications, including the Handbook . . . as well as all other official documents, including the Student Information Form, General Information Form, Ad Board Chart, Appeals [Info Sheet], Appeals Process Chart, and Faculty Rules."  D. 1 ¶ 378. Sonoiki then states that "[a]s such, an express contract, or . . . a contract implied in law or in fact, was formed between [Sonoiki] and [Harvard]."  D. 1 ¶ 379.  Further, the Handbook contemplates that it incorporated ancillary documents as the Ad Board Regulations in the Handbook explicitly note that they are only a "brief introduction" and direct students to consult the Ad Board website and a student's resident dean for additional information.  D. 1-2 at 1; see D. 1 ¶ 122.  That is, both parties contemplated that the contract governing their relationship consisted not only of the Handbook, but also the ancillary documents discussed above and, therefore, this Court will consider the terms and conditions included in all documents listed above in evaluating the breach of contract claim.  See Doe v. W. New Eng. Univ., 228 F. Supp. 3d 154, 169 (D. Mass 2016) (finding that a student and university relationship was governed by "the terms contained in the Student Handbook and other college materials").  Moreover, "interpretation of a contract is ordinarily a question of law for the court." Brandeis, 177 F. Supp. 3.d at 594 (quoting Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)).

### 2.   *Harvard Had Jurisdiction Over the Complaints Against Sonoiki*

Sonoiki relies upon a provision in the Handbook, which states that "[a] degree will not be granted to a student who is not in good standing or against whom a disciplinary charge is pending," D. 30 at 6; D. 1-2 at 5, in arguing that Harvard lost jurisdiction over the Title IX complaints against him upon graduation and that he should have received his degree because he was in good standing at the time of graduation.  D. 1 ¶¶ 382-87; D. 30 at 7.  This logic fails, however, because it relies upon an inverse interpretation of the statement in the Handbook.  While the Handbook asserts that a student who is not in good standing or against whom a disciplinary charge is pending cannot receive a degree, it does not require that a student who is in good standing and against whom a formal disciplinary charge is not yet pending receive his degree.

Further, the Student Information Form, which is part of the contractual relationship between Sonoiki and Harvard as discussed above, specifically states that "[a] student cannot receive a degree before a disciplinary case is resolved . . . ."  and that "[a] disciplinary case always begins with an allegation of student misconduct in the form of a complaint or report."  D. 1-3 at 1, 7.  It is undisputed that a disciplinary case against Sonoiki, which was initiated by allegations filed by Ann and Cindy on May 28, 2013, was unresolved at the time of graduation.  See D. 1 ¶ 263.  As such, Harvard complied with the terms of the contract regarding the initiation of disciplinary proceedings and conferring of degrees as to Sonoiki and the decisions of the Ad Board and Faculty Council in resolving the disciplinary case against Sonoiki are not void for lack of jurisdiction.

### 3.   *Harvard Provided Appropriate Procedural Protections Consistent with the Contract*

Harvard permits respondents to choose a personal adviser to assist them through the disciplinary process, but requires that the adviser be "an officer of the University affiliated with the Faculty of Arts and Sciences" and prohibits the "direct participation" of attorneys in the Ad

Board process.  D. 1-3 at 3; D. 1-4 at 2.  Although prohibiting direct involvement and advocacy by an attorney adviser, Harvard advises students to consult with legal counsel throughout the process.  D. 1-3 at 3; D. 1-4 at 1.  The fact that Harvard did not permit Sonoiki to have an attorney adviser, therefore, is consistent with the contractual language and the reasonable expectations to be drawn therefrom.

Sonoiki claims that Harvard breached the contract by failing to disclose to him the identities of the adverse witnesses who submitted statements to and were interviewed by the subcommittee of the Ad Board investigating the complaints.  See D. 1 ¶ 4.  Sonoiki, however, was permitted to review all written statements submitted by witnesses and his Ad Board representative was permitted to attend all interviews with witnesses and report their content to Sonoiki.  Sonoiki does not point to, and this Court has been unable to identify, any provision in the Handbook or ancillary documents that can be reasonably read to require further disclosure.  See D. 1-2–D. 1-8.  Harvard's failure to make these disclosures to Sonoiki, therefore, is consistent with the terms of the contract and the reasonable expectations of students subject to their terms.

Sonoiki also alleges that Harvard breached their contract because they did not provide Sonoiki with adequate notice of the charges against him.  D. 1 ¶ 4; D. 30 at 20.  Sonoiki claims that the charge of sexual misconduct as discussed in the Sexual Misconduct Policy of the Handbook includes rape, indecent assault and battery and "other serious or persistent unwanted sexual contact or conduct" and that he was not informed of which he was being charged with. D. 30 at 11-12.  Harvard required that a respondent be notified that an allegation has been filed against them, that they be given an overview of the allegation and that a respondent have the opportunity to review all written statements submitted by the complainant and adverse witnesses. See D. 1-3 at 2, 4, 6.  Even as alleged, Sonoiki received such notice here.  Moreover, based on the

definition of sexual misconduct in the Handbook and the written statements submitted by complainants, which Sonoiki was permitted to review, a student should have reasonably understood that the actions he was alleged to have committed were prohibited under Harvard's policies and procedures. Additionally, respondents are provided a representative on the Ad Board that serves as a liaison between the respondent and the Ad Board who is permitted to attend all meetings and keep the respondent informed of the proceedings. Id. at 3. The respondent is also permitted to choose a personal adviser in addition to the Ad Board representative who is given "access to all of the case information." Id. at 2. Although Sonoiki does not indicate whether he chose a personal adviser to assist him through the process, there is no allegation that he was denied the opportunity to do so. The allegations in the complaint indicate that Harvard complied with the procedures promised in the Handbook and ancillary documents and that Sonoiki was provided adequate notice of the nature of the charges against him.

Sonoiki further alleges that Harvard breached the contract because they did not permit him to have an advocate represent him before the Ad Board. D. 1 ¶ 4. In the complaint, however, Sonoiki acknowledges that Harvard's disciplinary policies and procedures did not permit him to have an advocate at the Ad Board meeting. D. 1 ¶ 202. As such, Harvard did not violate the express terms of the contract by prohibiting Sonoiki to have an advocate present at the Ad Board meeting because the contract provided no reasonable expectation of such a right. Further, Sonoiki was given numerous opportunities to provide written statements to the Ad Board and to respond to the statements made by complainants and adverse witnesses. As such, he had the opportunity to present his version of the incidents alleged in the complaints.

4.      *Sonoiki Has Not Alleged Facts Supporting a Claim of Racial Bias*

Sonoiki alleges both that the disciplinary process was "riddled with implicit and explicit racial bias" and that the deliberative bodies adjudicating and deciding the complaints against him were racially monolithic. D. 1 ¶¶ 4, 402. Sonoiki argues that this constituted a violation of the Racial Harassment Policy and the Student Rights Policy of the Handbook. D. 30 at 17. Sonoiki's allegations, however, do not contain any facts indicating racial bias as it pertained to the resolution of the complaints against him. See S. 1 ¶¶ 39-42. Although Sonoiki cites two articles in support of this allegation, D. 1 ¶¶ 40-41, he has not stated any facts supporting a claim that those individuals involved in the adjudication of the disciplinary cases against him were biased. See Doe v. Univ. of Massachusetts-Amherst ("Amherst"), No. 14-cv-30143-MGM, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) (dismissing a claim of gender bias where the plaintiff failed to plead "specific factual allegations from which a factfinder could plausibly infer the influence of gender bias on the outcome of Plaintiff's disciplinary proceeding"); W. New Eng. Univ., 228 F. Supp. 3d at 185 (stating that "[g]enerally[,] the alleged bias of the disciplinary board must be evident from the record and not based on inference and speculation") (quoting Doe v. Univ. of Cincinnati, 173 F. Supp. 3d 586, 2016 WL 1161935, at *9 (S.D. Ohio 2016) (dismissing a claim of bias and stating that "[a] plaintiff must allege facts sufficient to overcome [the] presumption" that school disciplinary boards are impartial). In dismissing the gender bias claim in Amherst, the court stated that  the plaintiff's "subjective belief that he was the victim of discrimination—however strongly felt—[was] insufficient to satisfy his burden at the pleading stage." Id. (citing Doe v. Columbia Univ., No. 14-cv-3773, 2015 WL 1840402, at *11 (S.D.N.Y. Apr. 21, 2015)). As such, the allegations in the complaint fail to allege plausibly the claim that

Harvard breached the contract on this ground.  See Ikpeazu v. Univ. of Neb., 775 F.2d 250, 254 (8th Cir. 1985).

5.      <em>The Standard of Proof Applied Was Consistent with the Contract</em>

Sonoiki argues that the standard of proof applied to the Ad Board proceedings was "insufficient and unrecognizable" and that its ambiguity rendered the contract unenforceable.  D. 1 ¶ 4; D. 30 at 11.  As discussed previously, the Student Information Form states that, to take disciplinary action against a respondent, the Ad Board "must be sufficiently persuaded" that respondent violated applicable rules.  D. 1-3 at 6.  In support of his claim, Sonoiki points to an article published in Harvard's student newspaper that criticized Harvard for adopting the "sufficiently persuaded" standard in lieu of more common "clear and convincing evidence" and "preponderance of the evidence" standards.  D. 1 ¶ 32.  This does not support Sonoiki's contention that the "sufficiently persuaded" standard was insufficient as applied to the complaints against him.  Harvard was not required to apply a legal standard to their disciplinary process.  Further, the Complaint does not contain any facts that indicate that this was not the standard that was applied by the Ad Board in resolving the complaints brought against Sonoiki.   To the extent that Sonoiki also alleges that applying this standard in his proceedings violates his right to basic fairness, a disciplinary decision must be arbitrary or capricious or made in bad faith to violate basic fairness.  W. New Eng. Univ., 228 F. Supp. 3d at 182 (stating that "[i]f school officials act in good faith and on reasonable grounds . . . their decision to suspend or expel a student will not be subject to successful challenge in the courts") (quoting Cloud, 720 Mass. at 724).  Even as alleged, the complaint, and documents incorporated and referenced therein, do not plausibly allege that Harvard's application of the "sufficiently persuaded" standard in the disciplinary hearing lead to

an arbitrary or capricious decision or that Harvard's decision to dismiss Sonoiki following the investigation and hearing was made in bad faith.

6.   *The Contract Did Not Promise Confidentiality with Sonoiki's Ad Board Representative*

Sonoiki argues that Harvard breached the contract because the contract led him to reasonably expect that his interactions with his Ad Board representative would remain confidential.  D. 1 ¶¶ 149-67; D. 30 at 13-14.  Neither the Handbook nor any of the ancillary documents promised that a student would have a confidential relationship with his Ad Board representative.  See D. 1-2–1-8.  The Student Information Form encouraged respondents to "be open and honest" with their Ad Board representative, noting that they would "represent [a respondent] to the subcommittee" of the Ad Board, but clarified that the Ad Board representative would present "a full summary of the facts of the case" and "will not advocate for" the respondent. D. 1-3 at 3.  Further, the General Information Sheet encourages students to "work closely with" their Ad Board representative "[t]o ensure that the [Ad] Board receives a full and balanced account of a case or petition."  D. 1-4 at 1.  None of the contract documents include a promise of confidentiality between a respondent and their Ad Board representative and the contract's terms do not create a reasonable expectation of such confidentiality.

7.   *No Contract Violation Alleged Based on Rankin's and Ellison's Roles*

Sonoiki alleges that Harvard breached the contract documents because Rankin and Ellison solicited the complaints that were filed against him.  D. 1 ¶ 4.  Sonoiki also claims that Rankin, who initially discussed the option of filing complaints with Ann, Betty and Cindy, "should not have served as complainants' personal advisor and as an adverse witness," D. 30 at 18, and that Ellison, who discussed filing a complaint with Cindy, should not have participated on the Ad Board.  Sonoiki alleges that Rankin encouraged Cindy to file a Title IX complaint and, after Cindy

initially declined to do so, Rankin "contacted Cindy again and pressured her to undergo a SANE exam and submit a formal report" and that Rankin also called Ann to pressure her into filed a Title IX complaint.  D. 1 ¶¶ 70-79.  Sonoiki does not indicate any provision of the contract documents that were violated by Rankin, the director of Harvard's Office of Sexual Prevention and Response, in communicating with complainants regarding filing a complaint.  Sonoiki also does not provide any factual support for his claim of bias in the disciplinary proceedings against him.  See W. New Eng. Univ., 228 F. Supp. 3d at 189-90 (dismissing a claim where plaintiff failed to plead "particularized factual allegations" supporting bias).  The contract documents do not include any provision indicating that a complainant's personal adviser could not also serve as a witness.  The Student Information Form indicates only that a personal adviser "must be an officer of the University affiliated with the Faculty of Arts and Sciences" but does not circumscribe a personal adviser's potential role as a witness.  See D. 1-3 at 3.  Moreover, the fact that an individual had multiple roles in a student disciplinary process does not alone "violate the requirements of fairness."  Gorman v. University of Rhode Island, 837 F.2d 7, 15 (1st Cir. 1988).

> 8. *The Timing and Resolution of the Complaints Did Not*
> *Violate the Contract*

Sonoiki alleges that Harvard breached the contract because the complaints were untimely and the process for resolution of the disciplinary process was unduly long.  D. 1 ¶ 4; D. 30 at 16-17.  Sonoiki cites language from the Handbook and Student Information Form that states that complaints "must ordinarily be brought to the College in a timely manner" and that the disciplinary process "ordinarily takes between 3 to 6 weeks."  D. 30 at 16; D. 1-2 at 4; D. 1-3 at 1.  Neither of these statements provides a promise as to the timeliness of complaints or as to the length of a disciplinary process.  The Handbook notes that the Ad Board does not meet during the summer, D. 1-2 at 4, and the Student Information Form also states that the length of the disciplinary case

25

will be dependent upon "how much information the [Ad] Board receives during the investigation,"

D. 1- 3 at 1.  Notably, Harvard was investigating three, separate complaints of sexual assault

against Sonoiki from three complainants and time periods remote from one another and the

subcommittee investigated and prepared a separate report for each claim.  See D. 28-1, 28-2, 28-

3.  Although the contract provides guidance for the timing of complaints and the duration of

proceedings, neither can reasonably be considered a guarantee as to either.  See Doe v. Brown

Univ., 327 F. Supp. 3d 397, 417 (D.R.I. 2018) (dismissing claim of untimeliness where the

investigation occurred during the summer when school was not in session); cf. Doe v. Harvard

Univ., 18-cv-12150-IT, 2020 WL 2769945, at *9-10 (D. Mass. May 28, 2020) (denying motion to

dismiss portion of breach of contract and implied covenant of good faith and fair dealing claim

where plaintiff alleged that college did not conduct follow-up interview as provided under FAS

policy in effect at the time).

       9.      *The Ad Board was not Prohibited from Considering the Three Complaints Simultaneously*

Sonoiki alleges that Harvard breached the contract documents because they considered the

complaints filed by Ann, Betty and Cindy simultaneously.  Sonoiki has failed to identify any

provision in the contract documents that precluded Harvard from simultaneously considering

multiple sexual misconduct complaints against an individual respondent that are filed close in time

to one another.  Id.  The DCRs, as incorporated by reference into the complaint, see D. 1 ¶¶ 329-

38, 396-400, indicate that the subcommittee and fact finder made separate determinations based

on the statements and interviews conducted in each case and collected separate evidence and

reports regarding each individual complaint.  See D. 28-1, 28-2, 28-3.  That the same fact finder

and subcommittee investigated each claim does not lead to a plausible basis for a claim that

Harvard breached the contract documents and there is no breach of an express or implied contract as to this claim.

### 10. The Contract Documents Did Not Prohibit the Ad Board Subcommittee from Making Credibility Determinations

Sonoiki further contends that Harvard breached the contract because the subcommittee issued "impermissible" credibility determinations in the DCRs. D. 1 ¶¶ 396-400. Sonoiki alleges that the subcommittee did not have the express authority to issue credibility determinations and that these determinations "poisoned" the adjudicatory body. D. 1 ¶ 399. Sonoiki does not provide support for his contention that such determinations were impermissible or that they violated the terms of the contract. The Student Information Form delineates the role of the subcommittee and fact finder, indicating that they would conduct interviews and review statements submitted by the complainant, respondent and witnesses and that they would review and evaluate the information obtained and issue a charge recommendation to the Ad Board. D. 1-3 at 4. Once a charge was issued, the subcommittee and fact finder may conduct additional interviews and draft a DCR that would provide an overview of the case and potentially a disciplinary recommendation. Id. at 5. The Student Information Form also explains that the subcommittee and fact finder present the case to the Ad Board and indicates that the Ad Board would not engage in independent fact-finding or interviews. See id. at 6. There are no provisions in the contract documents that preclude the subcommittee from making credibility determinations and, based on these procedures, it would be unreasonable for a respondent to expect that a subcommittee was not permitted to make credibility determinations as they were responsible for interacting with the witnesses and potentially making a recommendation.

11.     *There are No Factual Allegations for the Claim that the Adjudicatory*
        *Bodies Lacked Independence*

Sonoiki alleges that the disciplinary process constituted a breach of contract because the adjudicatory bodies—the Ad Board and Faculty Council—lacked independence and simply "rubber-stamped" the findings of the fact finder and subcommittee. D. 1 ¶¶ 4, 402.  In support of this argument, Sonoiki claims that the Ad Board and Faculty Council must lack independence because they did not conduct any independent fact-finding. D. 1 ¶ 402.  As discussed previously, the contract documents make clear that the subcommittee and fact finder were responsible for investigating the complaints, including by interviewing witnesses, compiling written statements and evidentiary documents and preparing a written DCR regarding each complaint. <u>See</u> D. 1-3 at 5.  The Ad Board was provided the opportunity to review the written statements prepared by both the complainant and the respondent prior to the subcommittee's presentation of a case to the Ad Board. D. 1-3 at 6.  Additionally, when a respondent seeks to appeal a decision of the Ad Board, he/she has  the opportunity to submit a statement of appeal, which will then be responded to by the Ad Board chair. See D. 1-7 at 1.  The respondent then may respond in writing to the Ad Board chair's statement.  <u>See id.</u>  The Faculty Council will then review all of the case files, including the newly drafted statements, in making their final determination.  <u>Id.</u>  The contract includes no promise that either a complainant or respondent would be permitted to personally appear before the Ad Board or Faculty Council and it would be unreasonable for the respondent to expect to do so based on the procedures outlined in the Handbook and ancillary documents.   Sonoiki's allegations regarding a lack of independence of the adjudicatory bodies are simply speculation and are insufficient to survive a motion to dismiss. <u>See</u> <u>Schaer,</u> 432 Mass. at 478 (noting that, on a motion to dismiss, a plaintiff may not "rest on 'subjective characterizations' or conclusory

descriptions of a 'general scenario which could be dominated by unpleaded facts'") (quoting Judge v. Lowell, 160 F.3d 67, 77 (1st Cir. 1998)).

12.     *Appeals Procedure Under Contract*

Sonoiki's claim also challenges Harvard's appeals procedure.  The Appeals Process Chart indicates the three bases upon which a student may appeal a decision of the Ad Board to the Faculty Council and provides a step-by-step overview of the process for an appeal.  See D. 1-7 at 1.  These steps include the respondent's opportunity to provide a written statement of appeal and a written response to the Ad Board chair.  See id.  The Docket Committee of the Faculty Council first reviews all of the case materials, including the respondent's statements, and determines whether the appeal fits within one of the enumerated grounds for appeal.  See id.

Sonoiki further contends that, because the Ad Board chair is permitted to respond to a respondent's statement of appeal, this rendered the Ad Board an "interested adverse party" and constituted a breach of the contract documents.  D. 1 ¶¶ 4, 241-44, 403-06.  As discussed, the Ad Board Chart indicates that, when a respondent submits a statement of appeal to the Faculty Council challenging the Ad Board's decision, the chair of the Ad Board would then have the opportunity to "respond to the [respondent's] statement in writing."  D. 1-7 at 1.  Based on Harvard's notice of and compliance with these policies and procedures, the Court cannot conclude that Sonoiki's allegations plausibly state a  breach of contract.  That Sonoiki does not agree with the policies and procedures articulated in the contract documents does not give rise to a breach of contract claim. There is no indication that Harvard failed to comply with the appeals procedures stated in the contract documents and, as such, there is no breach of contract claim on the basis of the appeals process.  See  Brandeis, 177 F. Supp. 3d at 596 (dismissing a breach of contract claim where the university complied with the appeals procedures in the student handbook).

13.     *The Contract Did Not Require Harvard to Allow Sonoiki to Appeal the Faculty Council's Decision*

Sonoiki also alleges that Harvard breached the contract by prohibiting him from appealing the Faculty Council's decision to dismiss him from Harvard.  D. 1 ¶¶ 4, 368, 406.  As discussed previously, the contract included an overview of the appeals process that made clear that, although a respondent could appeal the decision of the Ad Board, including the decision to recommend dismissal to the Faculty Council, the decision of the Faculty Council was final and not subject to appeal.  See D. 1-7 at 1.  Based on a reasonable reading of the contract documents, a student could not have a reasonable expectation that they had a right to appeal the decision of the Faculty Council.

**B.     Basic Fairness (Count II)**

As discussed above under Count I, Sonoiki has alleged an array of specific breaches of contract that he also contends state a plausible claim that Harvard did not comply with basic fairness.  See D. 1 ¶¶ 413-20.  Even considering the allegations discussed above as to Sonoiki's breach of contract claim, either singularly or cumulatively, Sonoiki has not plausibly stated a denial of basic fairness claim. At base, this analysis requires scrutinizing whether the college provided a student with a "minimum level of fair play" in terms of both procedural fairness and substantive fairness.   Brandeis, 177 F. Supp. 3d, at 572; see Kiani v. Trustees of Bos. Univ., No. 04-cv-11838-PBS, 2005 WL 6489754, at *8 (D. Mass. Nov. 10, 2005); Schaer, 432 Mass. at 481-82; Morris, 2004 WL 369106, at *2.  Accordingly, in conducting a basic fairness analysis, the Court examines the conduct of the hearing and the disciplinary process to ensure that a student was not sanctioned arbitrarily and capriciously, that the university acted in good faith and the entire process provided basic fairness even as it is not required to follow due process standards guaranteed to criminal defendants or to follow the judicial rules of evidence to meet the basic

fairness requirement.  See Walker v. President and Fellows of Harvard College, 82 F. Supp. 3d 524, 532 (citing Schaer, 432 Mass. at 481).

In Schaer, the Massachusetts Supreme Court, in considering whether a university disciplinary hearing complied with basic fairness, noted that "courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities" and "[a] college must have broad discretion in determining appropriate sanctions for violations of its policies" in denying plaintiff's claim.  Schaer, 735 N.E.2d at 381.  Following Schaer, in Brandeis, the court noted that "[t]here is . . . no one-size-fits-all answer to the question of what constitutes the 'basic fairness' that a student is due," and clarified that "a private university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts."  Brandeis, 177 F. Supp. 3d at 601, 602 (internal quotation marks omitted).  In BC II, the First Circuit reiterated that the Massachusetts Supreme Judicial Court "has been explicit that a private university need not comply with federal due process to meet the basic fairness requirement in disciplining students."  942 F.3d at 534-535 (citing Schaer, 735 N.E.2d at 381).

The allegations in the complaint, considered in conjunction with the exhibits incorporated therein, do not state a denial of basic fairness claim.  As discussed above, the procedures that Harvard followed in initiating, investigating and adjudicating the complaints against Sonoiki complied with the policies and procedures enumerated in the Handbook and the ancillary contract documents.  Even as alleged, Sonoiki was provided with notice of the complaints against him and Sonoiki was provided with the written statements of complainants and witnesses.  D. 1 ¶¶ 275, 315; see D. 28-1, 28-2, 28-3. The subcommittee and an independent fact finder investigating the complaints interviewed each of the complainants, Sonoiki and additional witnesses.  See D. 1 ¶¶

295-99.  Further, Sonoiki was appointed an Ad Board representative who was permitted to attend all interviews and meetings and report back to Sonoiki regarding their content.  D. 1 ¶ 300.  After the Ad Board subcommittee drafted its charge recommendations, but before these recommendations were submitted to the Ad Board, Sonoiki was permitted to review the charge recommendations and respond to them in writing and these responses were submitted to the Ad Board with all case materials.  See D. 1 ¶¶ 303, 306.

Once the charges were issued, the subcommittee interviewed each party again, permitting them to describe their version of the incidents at issue.  See D. 1 ¶ 323.  The subcommittee also permitted Sonoiki to submit a written statement and additional evidence, such as text messages and emails, to be considered by the Ad Board.  See D. 1 ¶ 314.  Once the subcommittee prepared a DCR for each case that included its recommendations, Sonoiki was again permitted to submit responses to the DCRs for consideration by the Ad Board and did so.  D. 1 ¶¶ 331, 338.  Further, once the Ad Board made its determinations as to the outcome of each complaint against Sonoiki, Sonoiki was permitted to appeal those determinations.  D. 1 ¶ 357.  As part of this process, Sonoiki submitted written statements to the Faculty Council considering the appeal.  See D. 1 ¶ 362.  Sonoiki subsequently received notification regarding the Docket Committee of the Faculty Council's decision regarding his appeal.  See D. 28-4.  For these reasons, considered in conjunction with the reasoning regarding the breach of contract claim above, the Court concludes that Sonoiki has failed to sufficiently allege a claim for denial of basic fairness.

## C.   Breach of Covenant of Good Faith and Fair Dealing (Count III)

Under Massachusetts law, all contracts also include an implied covenant of good faith and fair dealing.  Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004).  "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have

the effect of destroying or injuring the right of the other party to the fruits of the contract.'" <u>T.W.</u>

<u>Nickerson, Inc. v. Fleet Nat'l Bank</u>, 456 Mass. 562, 570 (2010) (quoting <u>Anthony's Pier Four, Inc.</u>

<u>v. HBC Assocs.</u>, 411 Mass. 451, 471 (1991)).  Good faith and fair dealing, however, cannot "create

rights and duties not otherwise provided for in the existing contractual relationship, as the purpose

of the covenant is to guarantee that the parties remain faithful to the intended and agreed

expectations of the parties in their performance." <u>Id.</u> (quoting <u>Uno Rests., Inc.</u>, 441 Mass. at 385).

The "inquiry is whether the challenged conduct conformed to the parties' reasonable

understanding of performance obligations, as reflected in the overall spirit of the bargain,"

<u>Brandeis</u>, 177 F. Supp. 3d at 612, and by assessing "the party's manner of performance." <u>Weiler</u>

<u>v. PortfolioScope, Inc.</u>, 469 Mass. 75, 82 (2014).  Moreover, "[g]ood faith and fair dealing cannot

be separated from context . . . and in evaluating those covenants in the educational milieu, courts

must accord a school some measure of deference in matters of discipline." <u>Havlik v. Johnson &</u>

<u>Wales Univ.</u>, 509 F.3d 25, 35 (1st Cir. 2007).

Here, in alleging a claim for breach of the covenant of good faith and fair dealing, Sonoiki

alleges that "the essential inquiry is whether the challenged conduct conformed to the parties'

reasonable understanding of performance obligations." D. 1 ¶ 423.  This inquiry is essentially

identical to the analysis under the breach of contract claim and the standard applied to the basic

fairness of the proceedings.  Further, Sonoiki alleges that Harvard "breached the duty of good faith

and fair dealing . . . for all the reasons set forth in Count One and Count Two." D. 1 ¶ 424.

Additionally, the First Circuit has considered resolution of a good faith and fair dealing claim in

the academic context to be concomitant with the basic fairness analysis.  <u>See</u> <u>Doe v. Trs. of Bos.</u>

<u>Coll.</u>, 892 F.3d at 87 (stating that "the implied covenant of good faith and fair dealing . . . creates

a duty to provide basic fairness").  For the reasons stated above as to Counts One and Two, the

Court concludes that Sonoiki has also not stated a plausible claim as to a breach of implied covenant of good faith and fair dealing in his contractual relationship with Harvard.

### D.     Estoppel and Reliance (Count IV)

Sonoiki's final count alleges a claim of estoppel and reliance, stating that Harvard's "various standards, policies and procedures constitute representations and promises that Harvard expected or should have reasonably expected would induce action or forbearance" by Sonoiki and that Harvard "expected or should have expected [Sonoiki] to accept [Harvard's] offer of admission . . . based on its express and implied promises, including that [Harvard] would provide [Sonoiki] with a fundamentally fair process . . . ." D. 1 ¶¶ 427-32.  This is essentially a promissory estoppel claim.  See Brandeis, 177 F. Supp. 3d at 612 (finding that a claim of estoppel and reliance in the context of a challenge to a university's disciplinary process asserted "a claim for promissory estoppel").  Under Massachusetts law, if a written contract exists, a claim of promissory estoppel is not permitted.  Trent Partners & Assocs., Inc. v. Dig. Equip. Corp., 120 F. Supp. 2d 84, 104-05 (D. Mass 1999) (citation omitted) (explaining that "as a matter of law . . . an oral statement made in the face of a written contract was not a 'promise' or 'commitment' for promissory estoppel purposes because the existence of a written contract demonstrated the intention that it would govern their intricate transaction"); see Brandeis, 177 F. Supp. 3d at 612-13; see also Doe v. Brown Univ., No. 15-cv-1445, 2016 WL 715794, at *15 (D.R.I. Feb. 22, 2016).

Both Sonoiki and Harvard concede that a contract exists and governs the relationship between them.  See D. 1 ¶ 379; D. 27 at 8, n.8.  As such, there is no reason for Sonoiki to assert a quasi-contract theory regarding the same subject matter governed by the valid contract.  See W. New Eng. Univ., 228 F. Supp. 3d at 185 (noting that "[i]t is well-established that recovery under a quasi-contract theory is not available where there is a written contract governing the same subject

matter") (quoting <u>Brandeis</u>, 177 F. Supp 3d at 612); <u>Malden Police Patrolman's Ass'n v. City of</u>
<u>Malden</u>, 92 Mass. App. Ct. 53, 61 (affirming dismissal of both breach of contract and estoppel
claims and stating that "[g]iven that there was a written contract between the [parties], the doctrine
of promissory estoppel is not applicable").  Moreover, Sonoiki's estoppel claim also is based on
his assertion that Harvard has failed to provide him with a fair process as promised in the Student
Handbook and ancillary contract documents, which the Court has rejected.  The Court, therefore,
grants Harvard's motion to dismiss on this count.

## VI.     Conclusion

For the foregoing reasons, the Court ALLOWS Harvard's motion to dismiss.  D. 23.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge
