# United States Court of Appeals
## For the First Circuit

No. 20-1689

DAMILARE SONOIKI,

Plaintiff, Appellant,

v.

HARVARD UNIVERSITY; HARVARD UNIVERSITY BOARD OF OVERSEERS; THE
PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Thompson, Howard, and Gelpí,
Circuit Judges.

Susan C. Stone and Kristina W. Supler, with whom Kohrman
Jackson & Krantz, LLP were on brief, for appellant.
Anton Metlitsky, with whom Apalla U. Chopra, Patrick
McKegney, Anna O. Mohan, O'Melveny & Myers LLP, Victoria L.
Steinberg, and Todd & Weld LLP were on brief, for appellee.

June 14, 2022

**THOMPSON, <u>Circuit Judge</u>**.  In the spring of 2013, Damilare Sonoiki's career path was on a steady upward trajectory.  He was about to graduate from Harvard University, his classmates had chosen him to speak at a ceremony held the day before graduation for the graduating class and their families, and he was set to move to New York City to work in finance for two years before returning to Cambridge to attend Harvard Business School as part of the "2+2" program.  This trajectory took a sharp downward turn when three female Harvard students accused him of sexual assault and, following a university disciplinary proceeding, Harvard withheld his undergraduate degree.  Sonoiki still moved to New York and started work as planned, but the business school withdrew his acceptance to the 2+2 program, and, in the following spring, he missed out on a lucrative employment opportunity when the employer discovered Harvard had not awarded him an undergraduate degree.  Sonoiki eventually sued Harvard for breach of contract and other related claims.  Harvard moved to dismiss the complaint on the basis that Sonoiki had not alleged any plausible claims. The district court agreed with Harvard, and Sonoiki now asks us to reverse the district court's judgment dismissing his complaint. For the reasons we explain below, we do just that, though only in part.

# I

## HOW SONOIKI GOT HERE

We begin, as usual, with the factual background of the case. Because this case landed on our bench after the trial court 12(b)(6)'ed[1] the complaint, we rely on the allegations in the pleading, accepting the factual version of the events Sonoiki described as true and reciting them as such. See <u>Zell</u> v. <u>Ricci</u>, 957 F.3d 1, 4 (1st Cir. 2020). We also consider and rely on the student handbook documents Sonoiki attached to his complaint. See <u>Lass</u> v. <u>Bank of Am., N.A.</u>, 695 F.3d 129, 134 (1st Cir. 2012).

### A

### Sexual Encounters Leading to the Allegations of Assault

The three female students who claimed they'd had a nonconsensual sexual experience with Sonoiki had some level of friendship and/or flirtation with him prior to the encounters while they were all students at Harvard. Cindy[2] and Sonoiki flirted "primarily over text" and kissed a couple of times "at parties and concerts" before the May 7, 2013 school event at which their sexual encounter at issue occurred. Cindy visited a health center the next day "for emergency contraception and sexually transmitted

---

[1] Federal Rule of Civil Procedure 12(b)(6) identifies "failure to state a claim upon which relief can be granted" as one of the defenses to a complaint available to a defendant.

[2] Sonoiki used a pseudonym for each woman in his complaint and we carry on with the assigned names here.

infection prophylaxis."  A concerned doctor phoned Sarah Rankin, the director of Harvard's Office of Sexual Assault Prevention and Response and expressed concern that Cindy may have been assaulted. Rankin and Cindy met to discuss the encounter; Cindy insisted she did not want to submit a formal complaint to the school, but Rankin tried to persuade her to do so because Rankin knew about another female classmate who might have been sexually assaulted by Sonoiki a couple of years earlier.  Rankin then contacted Jay Ellison, Associate Dean of Harvard College and the Secretary of the Administrative Board (the group who adjudicates disciplinary issues and student peer disputes -- much more about them soon), to discuss the situation.  After hearing the allegations, Dean Ellison persuaded Rankin to contact Cindy again to encourage Cindy to file a Title IX complaint.[3]  On May 10, 2013, Rankin did reach out and she successfully convinced Cindy to visit a nurse with special

---

[3] "Title IX of the Education Amendments of 1972 is a federal statute prohibiting discrimination on the basis of sex in 'any education program or activity receiving Federal financial assistance.'"  Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 89 (1st Cir. 2021) (quoting 20 U.S.C. § 1681(a)).  Sexual harassment and assault "can constitute discrimination on the basis of sex under Title IX," Doe v. Brown Univ., 896 F.3d 127, 130, 132 (1st Cir. 2018) (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 283 (1998)), though "the 'discrimination' that Title IX prohibits is not the acts of sexual assault or sexual harassment in and of themselves, but rather the differential treatment by a funding recipient of persons of a particular sex who are taking part or trying to take part in its educational program or activity but are suffering acts of sexual harassment or assault that undermine their educational experience," id. at 132.

training for a physical exam (the so-called SANE exam). She also accompanied Cindy to the appointment. A few days after the exam, Rankin and Cindy met with Dean Ellison who personally encouraged Cindy to file a formal complaint. Two weeks later (and two days before the graduation ceremony) Cindy submitted a complaint.

In comes Ann (who'd met Sonoiki a few years before); she submitted a complaint -- same day as Cindy -- alleging a sexual encounter she'd had with Sonoiki one night in September 2011 had not been consensual. She'd "blacked out" at a party and recalled becoming conscious of her surroundings in the middle of intercourse. Approximately nine months after that incident, in June 2012, Ann -- on her own initiative -- reached out to Rankin about the encounter but told Rankin she did not want to file a complaint. This is what changed her mind: After Rankin facilitated the meeting between Cindy and Dean Ellison, Rankin called Ann on May 17, 2013, and told her another sexual assault allegation against Sonoiki had come to light and -- in Sonoiki's words -- Rankin "pressure[d]" Ann to file a formal complaint.

The third complainant was Betty. She had shared an apartment with Sonoiki during their 2012 summer internships in New York City. At the beginning of that summer, they'd started a sexual relationship which lasted until they returned to campus in the fall. In Betty's complaint submitted the week after graduation, she alleged three to five of their initial sexual

encounters had not been consensual.[4]  With three complaints in hand, Harvard's adjudicatory wheels started cranking as we next describe.

**B**

**Harvard's Adjudicatory Process for Alleged Student Misconduct**

Harvard's Faculty of Arts and Sciences ("FAS") created the Administrative Board (aka the "Ad Board" or "Board") in 1890 to process student disciplinary complaints, including allegations of academic dishonesty, disruptive conduct, violation of rules about the use of alcohol, and sexual harassment.  The Ad Board is composed of approximately thirty members, including administrative deans, resident deans, and senior members of the faculty.  The FAS also tasked the Ad Board with adjudicating complaints of sexual misconduct using the Ad Board's usual disciplinary procedures.[5]

---

[4] Betty may have learned from Cindy that Cindy and another woman or two were filing complaints against Sonoiki, but the allegations are not crystal clear on this point.  Sonoiki alleged Cindy "emailed [Sonoiki's] ex-girlfriend and encouraged her to join the Title IX process against [him]" and that "two other women were reporting . . . and pressured [his] ex-girlfriend to get involved . . . ."  The "ex-girlfriend" to which the complaint refers may or may not be Betty.  There is an allegation that Cindy and Betty were friends though, so we can reasonably infer Sonoiki is talking about Betty.

[5] The FAS's Policy Statement on Rape, Sexual Assault, and Other Sexual Misconduct alerts students that "[c]omplaints of sexual misconduct may be filed with the College according to the procedures of the Administrative Board" and that the school has a set disciplinary procedure "when an allegation of sexual misconduct is made against a student at Harvard College."

Documents attached to Sonoiki's complaint included detailed (though, as we'll get into below, not always entirely consistent) explanations of these disciplinary procedures, all of which were part of the 2012-2013 Student Handbook (collectively, "Ad Board Procedures").[6] These documents identified three phases of a "peer dispute case" -- an Initial Review, Further Investigation, and Findings -- and, for each phase, spelled out the Ad Board's general sequence of events for adjudicating complaints. The summary below relies primarily on the Student Information Form but pulls in some details and descriptions from the Ad Board's General Regulations, the Ad Board's General Information on Disciplinary Cases, and the Ad Board's flow chart depicting the general process for a case.

---

[6] The parties agree that the 2012-2013 Student Handbook included the policy statements and Ad Board Procedures documents Sonoiki attached to his complaint. These documents include:

- FAS's Resolution on Rights and Responsibilities
- General Regulations regarding Harassment
- FAS's Policy Statement on Rape, Sexual Assault, and Other Sexual Misconduct
- General Regulations regarding the Ad Board
- Ad Board's "Information for students facing allegations in a peer dispute case" (we'll refer to this as the "Student Information Form")
- Ad Board's "General Information on Disciplinary Cases"
- Ad Board's "Disciplinary Process" flowchart "for allegations involving a peer dispute"
- Ad Board's "Reconsideration and appeals" statement and flowchart
- FAS's "Rules of Faculty Procedure"

## 1. Initial Review

During the relevant timeframe, an Initial Review began when a complaining student submitted to the Secretary of the Ad Board a "detailed written statement summarizing [the student's] allegations."[7]  Once received, the Secretary notified the accused student[8] and the Dean of Harvard College (who served as the Ad Board's Chair) that an accusation had been lodged.  The Secretary then met with the accused student to verbally "outline" the accusation, the disciplinary process, and the attendant confidentiality policies.  Also included in that first meeting was the student's "resident dean" (mentioned throughout the Ad Board Procedures but whose role was neither defined nor explained in the record before us).  Commensurately, the Ad Board Chair did a couple of things.  First, the Chair appointed a subcommittee of Ad Board members (usually "two or three people") and second, "refer[red] the matter to" a fact finder to review and investigate the allegations.  This fact finder was usually "a professional from outside the University" and was "ordinarily an independent

---

[7] As mentioned above, in 2013, Dean Ellison was the Secretary of the Board.

[8] The accused student was not permitted to review the complainant's written accusation at this time.

consultant with conflict resolution experience" (but was not a member of the Ad Board).

The process called for both the complainant and the accused to choose a member of the Ad Board to serve as his or her "Board Rep" throughout the adjudicative proceedings. The students could -- but were not obligated to -- choose their "resident dean" to serve in this capacity. The Board Rep's role was to represent the student to the subcommittee and to the full Ad Board as well as be a "liaison" who ensured the "student's 'voice' [wa]s heard." In fulfilling this role, the Board Rep would: "be present at all meetings," "speak on [the student's] behalf," "make certain that [the student was] kept informed throughout the process," and "participate[] in deliberations about [the] case." But the Board Rep "w[ould] not advocate for [the student]."

In addition to a Board Rep, each student could choose a "personal advis[o]r" for support and advice throughout the process. The personal advisor had to be an "officer of the University affiliated with the [FAS]" but could not be a family member or an undergraduate student. The advisor had "access to all case information [and could] attend [investigative] interviews."

Once the Board Rep and personal advisor were in place, the Initial Review proceeded. The accused was tasked with preparing for the Ad Board Secretary a written statement responding

to the allegations previously communicated to him. Before submitting the statement, the student was "encouraged to share a draft" of the response with their Board Rep for feedback about the "style, organization, length, and clarity, while also anticipating questions [the response] may raise for the Board." Once submitted, both the accused and the complainant could read each other's formal written statement and further respond in writing to the Ad Board Secretary. All statements were then forwarded to the fact finder and subcommittee which provided each student with an opportunity to individually meet with them to discuss the allegations and to answer questions.

The fact finder's next job was to evaluate the information gathered from the students and provide an assessment of the allegations to the subcommittee. Together, the subcommittee and fact finder gave the Ad Board a recommendation of whether the school should issue a "charge" against the accused. But before a recommendation was sent to the full Ad Board for consideration, the complainant and the accused were given an opportunity to further respond to it.

Upon receipt of a recommendation and all investigative materials gathered during the Initial Review, the full Ad Board made a determination as to whether a charge -- specifically defined as "the decision by the Board to pursue a case against the

[accused]" -- should issue.  If yes (as happened here) phase two of Harvard's disciplinary process got underway.

## 2. Further Investigation

Resumption of the investigation began with supplementary evidence gathering.  The fact finder and subcommittee conducted additional interviews with the complainant and accused as well as with witnesses, if any.  The further probing ended with the delivery of a written disciplinary case report ("DCR") from the subcommittee to the full Ad Board.  This comprehensive summary of the investigation included all the statements and documents collected during the investigation and could also include a recommended outcome for disciplinary action.  This DCR got sent to the complainant and to the accused prior to a full Ad Board meeting.[9]  Before commencement of that meeting, each student could communicate a written response to the DCR through their Board Rep.  During the Ad Board's deliberations, members discussed the DCR and written responses from the students, if any, and moved (as happened here) to phase three of the process.

## 3. Findings Phase

In the third and final "Findings" phase, the Ad Board members decided whether they were "sufficiently persuaded" that

---

[9]  The DCR may disguise the identity of a complainant and witnesses by blacking out some details and substituting names, but the record before us neither shows nor tells us whether the subcommittee took this step.

the accused had violated the rules of student conduct as charged. Though present during the deliberations, neither the Board Reps, nor the resident deans for the complainant and the accused, nor the fact finder, voted on the outcome.   If the Ad Board was sufficiently persuaded, it then determined what disciplinary consequence to impose (ranging from a formal admonishment to dismissal or expulsion from the school).   Each student learned through their Board Rep the Ad Board's decision.

An aggrieved student found warranting a disciplinary sanction of either a requirement to withdraw or probation for more than one term had additional appellate rights as spelled out in the Ad Board Procedures.   The student could, in writing, request reconsideration and the Faculty Council (a separate administrative body composed of the Dean of the FAS and eighteen faculty members which meets monthly) would entertain it as follows.   If filed, the Ad Board Chair and the student could file further written responses.   Once the record was supplemented, all case materials got forwarded to the "docket committee" for its consideration.[10] If the docket committee determined the "case merit[ed] an appeal" all the materials were then forwarded to the Faculty Council, which

---

[10] The docket committee is a subcommittee of three members of the Faculty Council tasked with organizing the order of business at the Faculty Council's monthly meetings.

reviewed, discussed, and adjudicated the appeal.  The Secretary of the Faculty notified the appealing student of the outcome.

### C

**Ad Board Proceedings for the Complaints vs. Sonoiki**[11]

With Harvard's disciplinary procedure in mind, we return to Sonoiki's tale.  On May 17, 2013, after Dean Ellison's meeting with Cindy, Ellison made Sonoiki aware of some informal complaints of sexual assault leveled against him and "warned" him they would speak again if the status of the complaints changed prior to the May 30 graduation day.  On the 29th, Sonoiki, as noted earlier, delivered his speech to his classmates and their families as the chosen "male Harvard Orator" and, a day later, participated in the graduation ceremony.  However, Harvard awarded him neither a diploma nor an undergraduate degree that day (or ever).  Instead, Harvard's disciplinary process went into full throttle the following month.  Sonoiki and Dean Ellison met again on June 3, this time to discuss the complaints submitted by Cindy and Ann which by then had become formal.  Sonoiki's resident dean was not present at the meeting.  A week later, after Betty submitted the

---

[11] Because Sonoiki's claims in this case hew closely to the Ad Board process as he experienced it and are not actually about the details of his sexual encounters with each woman and whether each was consensual, we focus this part of our recitation on the progression of the complaints through the Ad Board adjudication process and not on the content of the written statements submitted at each step of the process.

third formal complaint, Sonoiki was never summoned to Dean Ellison's office to discuss it.

The Ad Board subcommittee[12] which had been appointed to review all three complaints interviewed Sonoiki, Ann, Betty, and Cindy. Sonoiki chose Laura Johnson, the Allston Burr Resident Dean for Currier House, to serve as his Board Rep and she attended each interview.[13] There is no indication he opted to have a personal advisor in addition to his Board Rep.

Following the subcommittee's supplementary investigation, three things happened on June 25: the subcommittee recommended the Ad Board issue three charges of sexual misconduct against Sonoiki, he promptly responded (though we don't know whether in writing or through other means), and the full Ad Board voted to issue all three charges. Sonoiki was not allowed to attend the deliberations, nor was anyone present to advocate on his behalf. Thereafter, the subcommittee conducted its second-tier additional investigation of each charge simultaneously. It accepted written statements from witnesses which included Rankin, who, in a dual role, wrote on behalf of Ann and Cindy while also

---

[12] Sonoiki's complaint doesn't differentiate between the subcommittee and fact finder. Presumably he is referring to both.

[13] The record does not reveal whether Johnson was Sonoiki's resident dean or whether he was a member of Currier House. Betty and Cindy had the same Board Rep (Laura Brandt) and Ann chose Lisa Boes as her Board Rep. All three women chose Sarah Rankin as their personal advisor.

serving as each complainant's personal advisor.  Betty and Cindy served as witnesses for each other's allegations.

In November 2013, the subcommittee submitted three DCRs, each recommending Harvard require Sonoiki to withdraw from the school and officially dismiss him.  After Sonoiki responded in writing, the full Ad Board met that same month and voted to adopt the subcommittee's recommendations.  Though Sonoiki appealed to the Faculty Council in May 2014, Harvard dismissed him in December 2014.

## D

### District Court Proceedings

Sonoiki filed a four-count complaint against Harvard University, the Harvard University Board of Overseers, and the President and Fellows of Harvard College (collectively, "Harvard"), claiming the Ad Board's adjudication of the complaints of student misconduct against him materially breached the contract governing their student-university relationship in multiple ways, including, inter alia:

- impermissibly withholding his degree after Harvard no longer had jurisdiction to adjudicate disciplinary complaints against him,
- using an incomprehensible standard of review,
- depriving him of fundamental fairness throughout the adjudicatory process, and
- denying an effective process for appeals

(count 1).  Sonoiki also claimed that Harvard denied him the basic level of fairness owed to him (count 2), Harvard breached the

implied promise of good faith and fair dealing (count 3), and that Harvard caused him harm when he relied to his detriment on Harvard's promises (the complaint calls this count "Estoppel and Reliance") (count 4).

Harvard responded by filing a Rule 12(b)(6) motion to dismiss. According to Harvard, rather than plausibly state claims of contract breach arising from Harvard's adjudication of the three sexual assault complaints, the allegations set forth in Sonoiki's complaint about the Ad Board's adjudicatory processes indisputably demonstrated Harvard's rigid consistency with the process described in the Ad Board Procedures, and further evidenced Harvard's legal alignment with the components of basic fairness identified in Massachusetts case law.[14] Persuaded by Harvard's contentions, the district court granted Harvard's motion to dismiss all four counts.[15] It concluded Sonoiki's allegations about the ways in which he claimed Harvard breached the contract were not based on "reasonable expectations" and did not deny him "basic fairness" (legal concepts that go along with breach of contract cases involving student disciplinary matters which we'll

---

[14] Harvard has not advanced an argument here or below that, should the court find Harvard breached its contract with Sonoiki, he has not demonstrated damages.

[15] Sonoiki challenged Harvard's jurisdiction to impose disciplinary sanctions against him but the district court concluded Harvard properly exercised jurisdiction over him and the complaints.

discuss momentarily).  As to Sonoiki's other claims, the district court found them likewise implausible.

Before us on a timely appeal, Sonoiki argues the district court got it all wrong.

## II

### STANDARD OF REVIEW

We review the dismissal of a complaint de novo, taking the factual allegations in the complaint and the inferences reasonably drawn from the complaint as true to determine whether the plaintiff has plausibly stated a claim upon which relief can be granted.  Zell, 957 F.3d at 7; Fed. R. Civ. P. 12(b)(6).  The court approaches the complaint as follows:  it "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," then "take[s] the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see[s] if they plausibly narrate a claim for relief." Zell, 957 F.3d at 7 (quoting Zenon v. Guzman, 924 F.3d 611, 615-16 (1st Cir. 2019)).  "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels us to draw on our judicial experience and common sense." Id. (quoting Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)).

## III

### OUR TAKE

Sonoiki challenges the dismissal of each count in his complaint but he focuses the bulk of his argument energy on his breach of contract claim, first arguing that the Ad Board Procedures contract is ambiguous because the language provides inconsistent rules about when Harvard will withhold a degree, second that the "sufficiently persuaded" standard of proof is ambiguous and so vague and incomprehensible as to be unenforceable, and third that he adequately pled Harvard failed to meet several of his reasonable expectations. With respect to his other three counts, he asserts that several aspects of the Ad Board's adjudication of the three complaints denied him a fair proceeding as promised by the Ad Board Procedures, that his claim about the breach of the implied covenant should be revived alongside the breach of contract claim, and that his "estoppel and reliance" claim should be revived as an alternative theory of liability. We kick off our discussion by describing the contract principles in play in this case, including the legal framework that Massachusetts' courts have developed (and that this court has previously applied) for assessing the merits of a student's breach of contract claim against his or her educational institution. We will then discuss Sonoiki's arguments about why his claims should have survived Harvard's motion to dismiss, starting with his breach

of contract claim and then working through his other three counts, laying the legal framework for each of these other counts as we go.

## A

### Breach of Contract

#### 1. Basic Legal Framework

Neither party disputes that Harvard's 2012-2013 Student Handbook was a binding contract between Harvard and its students or that Massachusetts contract principles apply, so we follow their lead and assume the Ad Board Procedures is a binding contract governed by Massachusetts law.  See Doe v. Trs. of Bos. Coll. (BC I), 892 F.3d 67, 80 & n.4, 94 (1st Cir. 2018) (applying Massachusetts law and assuming a valid contract bound the parties when neither party disputed this point).  "A court interpreting a contract must first assess whether the contract is ambiguous," Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) (citing Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008)), "a question of law decided de novo by the reviewing court," Helfman v. Ne. Univ., 149 N.E.3d 758, 777 (Mass. 2020).  "Language is ambiguous 'only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'"  Lass, 695 F.3d at 134 (quoting Gemini Invs. Inc. v. AmeriPark, Inc., 643 F.3d 43, 52 (1st Cir. 2011) (citing Massachusetts cases)).  When we consider "whether a contract is

ambiguous, we read the agreement 'in a reasonable and practical way, consistent with its language, background, and purpose.'" Id. (quoting Bukuras v. Mueller Group, LLC, 592 F.3d 255, 262 (1st Cir. 2010) (citing Massachusetts law)). "In interpreting contractual language, we consider the contract as a whole. Its meaning cannot be delineated by isolating words and interpreting them as though they stood alone." BC I, 892 F.3d at 81 (quoting Farmers Ins. Exch., 632 F.3d at 785). A contradiction between two contract terms or between multiple documents that comprise one overarching contract can lead to ambiguity that can't be resolved on a 12(b)(6) motion. See Lass, 695 F.3d at 135, 137 (reinstating a breach of contract claim because an ambiguity in contract language meant the plaintiff's construction of the language was not properly deemed unreasonable at the motion to dismiss stage).

When a case involves breach of contract claims between a student and a private academic institution, this court, following Massachusetts' lead, approaches the claims by examining "the terms of the contract established between the college and the student and ask[ing] whether the reasonable expectations of the parties have been met." Doe v. Trs. of Bos. Coll. (BC II), 942 F.3d 527, 533 (1st Cir. 2019) (first citing Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000) and then citing Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 724 (1st Cir. 1983)); see also Walker v. President & Fellows of Harv. Coll., 840 F.3d 57, 61-62 (1st Cir.

2016).  When applying this test, the court queries what the school
"should reasonably expect" the student to understand from the
language of the contract.  BC I, 892 F.3d at 80 (quoting Walker,
840 F.3d at 61).  In claims involving contract breaches based on
purported faulty student disciplinary proceedings, we compare the
procedures used to adjudicate the disciplinary complaint with the
language of the contract spelling out those procedures to determine
whether, given the student's reasonable expectations, there was a
gap between what the school promised and what the school delivered.
Id. (citing Cloud, 720 F.2d at 724-25).  "If the facts show that
the university has 'failed to meet the student's reasonable
expectations[,]' the university has committed a breach."  Id.
(quoting Walker, 840 F.3d at 61-62) (cleaned up).

        With the legal framework set out, we begin our discussion
of Sonoiki's specific arguments about his breach of contract claim.

### 2. When Harvard Would Withhold a Degree

        According to Sonoiki, Harvard breached the Ad Board
Procedures contract when it withheld his degree pending the
adjudication of the three complaints because the contract had
inconsistent and contradictory statements about when Harvard would
be permitted to withhold a degree, i.e., and importantly here,
either as soon as a disciplinary case began or, as Sonoiki argues,
only once a disciplinary charge had been issued.  Sonoiki contends

this contractual inconsistency created an ambiguity which should have precluded the dismissal of his complaint.

Harvard insists the Ad Board Procedures are clear. It will not issue a degree to a student with a pending but not yet investigated complaint of sexual assault, emphasizing the definition in the contract of the "start" of a "case" as being "with an *allegation* of student misconduct in the form of a complaint or report." Harvard argues that it was under no obligation to give Sonoiki a degree simply because the Ad Board had not yet decided to issue a charge. As Harvard reasons, the contract may have explicitly stated when a degree would be withheld but not the universe of circumstances in which a degree would issue.[16]

The district court concluded Sonoiki had not plausibly alleged a breach of contract claim on this point because the Ad Board Procedures stated a degree would not be awarded to a student with a pending disciplinary case and the contract did not promise to award a degree to every student against whom a formal disciplinary charge was not pending. At this early stage, "drawing all reasonable inferences" in Sonoiki's favor and considering the

---

[16] Based solely upon a review of the documents appended to the complaint, viewed in the light most favorable to Sonoiki, we cannot say that all students would reasonably understand or expect that Harvard might withhold their degree once they had completed all of the required course requirements and were in good financial standing with no disciplinary matters pending.

"'implications from documents' attached to or fairly 'incorporated into the complaint,'" we disagree with the district court's conclusion that Sonoiki's allegations on this point were implausible. Schatz, 669 F.3d at 55 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009)).

The General Regulations stated "[a] degree w[ould] not be granted to a student who [wa]s not in good standing or against whom a disciplinary *charge* [wa]s pending." (Emphasis ours.) The Ad Board's disciplinary process flow chart specifically defined a "charge" as "the decision by the Board to pursue a case against the [accused]" and the Student Information Form discussed a "charge" as a discretionary decision by the Ad Board after the initial investigation was complete. At the same time, under the last subheader of the Student Information Form's Finding section (under "Conclusion of the Case"), the contract stated that "[a] student cannot receive a degree before a pending disciplinary *case* is resolved" (emphasis is again ours). The Student Information Form's introduction defined a "case" as beginning with an allegation "in the form of a complaint or report," triggering the Initial Review but "may or may not end with the College issuing a *charge*."[17] "Case" and "charge" are clearly identified as distinct

---

[17] No one is arguing that an open disciplinary case alone makes a student not in good standing and there is no indication in the record that Sonoiki was not otherwise in good standing on graduation day.

concepts within the contract documents, marking different stages of the process, and are not, therefore, interchangeable. Yet, the Ad Board Procedures used these two terms interchangeably.

In addition, under the Student Information Form's Initial Phase "Charge Decision" subheader, the contract stated that, "[i]n all cases, you and the complainant will be informed by your respective Board Representatives whether the Board issued a charge," whereas under the "Conclusion of the Case" subheader in the Finding section the contract stated "[i]n cases other than those involving allegations of sexual assault or physical violence, the complainant will not be informed of the Board's decision." These conflicting provisions about notice to the complainant suggests that the pending disciplinary "case" referred to in the Finding section is the "case" that proceeds after a charge has been issued, potentially not intended to mean the same as the "case" initiated when an allegation of misconduct is made.

In our view, despite the explicit definitions given to "case" and "charge," the use of each throughout the Ad Board Procedures renders the required status of an accusation for triggering Harvard's act of withholding a degree ambiguous. See Lass, 695 F.3d at 134 (stating ambiguity occurs when a contract "is susceptible of more than one meaning" with "reasonably intelligent persons [able to] differ as to which meaning is the proper one" (quoting Gemini Invs. Inc., 643 F.3d at 52)). Thus,

we agree with Sonoiki that the Ad Board could be reasonably viewed as inconsistently defining the circumstances under which Harvard would withhold a degree.

At the time of his graduation day (May 30) two complaints had been filed but no charges had issued per the contract's definition of "charge." Sonoiki alleges the charges against him didn't issue until June 25, 2013. Because the contractual language about when Harvard will withhold a degree was ambiguous on its face and because we need not resolve ambiguities in contract language at the motion to dismiss stage, see Lass, 695 F.3d at 137, we conclude Sonoiki plausibly alleged he reasonably expected his degree would issue at the graduation ceremony and therefore has plausibly alleged Harvard breached the contract between them when it withheld his degree before issuing any disciplinary charges.[18]

---

[18] Sonoiki makes three other arguments relevant to this degree-withholding issue that touch upon jurisdictional claims that we do not address at this time because the Ad Board Procedures' internal ambiguity about when Harvard will withhold a degree needs to be resolved first. First, he says he had a reasonable expectation he would receive his degree on graduation day and then be outside the Ad Board's jurisdiction because, on that day, he had completed all of his academic requirements, was in good standing by the contract's definition, and there were no disciplinary charges pending against him. He also points out that he participated in graduation activities after two of the complaints landed on the Ad Board's desk, including as a featured speaker at one event and with all of the other graduating students at the commencement ceremony, even though the contract states that students with disciplinary cases pending are "ordinarily" not allowed to "participate in commencement or related activities,"

### 3. Ad Board Must be "Sufficiently Persuaded"

Sonoiki alleged in his complaint that the "sufficiently persuaded" standard utilized by the Ad Board when deciding whether an accused student has violated the school's rules is "undefined," "insufficient and unrecognizable." Failing to provide a definition for this standard is one of the many ways he alleges Harvard breached the contract and subjected him to an "arbitrary and capricious disciplinary process." In its motion to dismiss, Harvard challenged this allegation, primarily asserting the standard was just fine because it was "not materially different" than the preponderance of the evidence standard usually applied in civil litigation.

---

and Harvard could have issued charges sua sponte prior to the commencement activities.

Second, Sonoiki contends Harvard never had jurisdiction to adjudicate the third complaint, filed by Betty on June 4, because he should have had his degree by then and, according to him, this would have eliminated Harvard's disciplinary jurisdiction over him altogether. As he points out, the district court did not address this argument in its decision, focusing exclusively instead on Ann and Cindy's cases, which were "initiated" and "unresolved at the time of graduation." Because we are holding that Sonoiki adequately pled a breach of contract claim based on Harvard withholding his degree at graduation, we will not address this argument in the first instance, but note the argument can be litigated on remand. See Ortiz-Bonilla v. Federación de Ajedrez de P.R., Inc., 734 F.3d 28, 39 (1st Cir. 2013) (remanding an issue for further litigation).

Third, he argues for the application of various other principles of contract interpretation, none of which we need discuss given our holding on his primary argument about Harvard breaching the contract by withholding his degree.

In his opposition to Harvard's dismissal motion, Sonoiki challenged the similarity between the two standards of review. And he further insisted that Harvard was obligated to use, but did not use, a preponderance of the evidence standard. In support of this assertion, Sonoiki relied on a document issued by the Department of Education's ("DOE") Office of Civil Rights ("OCR") referred to as the Dear Colleague Letter ("DCL"), issued April 4, 2011, stating that OCR expected schools to apply the preponderance standard to its investigations of sexual misconduct complaints.[19] Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ., <u>Dear Colleague Letter: Sexual Violence</u> (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. Not so, said Harvard in its response to Sonoiki's opposition to its dismissal motion -- because "the fact that Harvard wanted to avoid legalese in a pedagogical setting does not mean there is any material difference between a preponderance and 'sufficiently persuaded' standard." And, in any event, Sonoiki had failed to explain why "sufficiently persuaded" was difficult to understand in the first place.

The district court concluded this part of Sonoiki's claim got him nowhere, commenting that Harvard was not required to

---

[19] This DCL was subsequently rescinded in September 2017. Candice Jackson, Office of Civil Rights, U.S. Dep't of Educ., <u>Dear Colleague Letter</u> (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

apply any legal standard to the disciplinary process it designed and, furthermore, "the Complaint does not contain any facts that indicate that [the sufficiently persuaded standard] was not the standard that was applied by the Ad Board in resolving the complaints brought against Sonoiki."

Sonoiki's argument is teed up for our review because he takes issue here with both findings of the district court. First, Sonoiki says the court's statement about Harvard having no obligation to apply a legal standard to its disciplinary process is wrong, and he once again asserts the primacy of the 2011 Dear Colleague Letter and its evidence standard requirements. Problem with Sonoiki's argument is this: even though he urges us to accept the standard of review he proposes, Sonoiki makes no effort to explain how this DCL was legally binding on Harvard. As a result, we deem this part of his challenge to the standard waived for failure of development. See Holloway v. United States, 845 F.3d 487, 491 n.4 (1st Cir. 2017) (concluding an argument was waived when a party failed to provide any legal support for its argument).

Sonoiki next addresses the district court's finding that Harvard had, in fact, applied its sufficiently persuaded standard, contending he cannot prove Harvard did not follow the standard because the term is not defined in any of the contractual documents binding them. His brief labels the standard "incomprehensible," "ambiguous," "fatally vague," and thus unenforceable. We take his

argument to mean that, without a definition, it is impossible for him to prove a negative.[20]  To support his contention that the standard is "ambiguous" with "no readily ascertainable meaning" Sonoiki relies on an article published in The Harvard Crimson in 2012 which highlighted the standard as problematic because students did not understand what it meant.  See Mercer R. Cook & Rebecca D. Robbins, For Ad Board, Burdened Proof?, The Harv. Crimson         (Oct.         25,         2012), https://www.thecrimson.com/article/2012/10/25/ad-board-burden-process/.

Harvard insists here as it did below that the standard's meaning is, in fact, clear on its face:  to be persuaded one must believe a proposition to be more likely true than not true. Sonoiki counters that Harvard's attempt to show the sufficiently persuaded standard is equivalent to the preponderance of the evidence standard must fail because, as he sees it, the civil

_____

[20] That being said, we see a different obstacle to his ability to plausibly allege, never mind prove, Harvard did not apply this standard:  in each DCR the subcommittee submitted to the Ad Board after the conclusion of the investigations, the subcommittee explicitly declared that it was "sufficiently persuaded" Sonoiki had engaged in sexual acts with each of the women without each woman's consent.  Clearly then, the subcommittee understood and applied the standard articulated in the Ad Board Procedures contract.  Whether the full Ad Board also explicitly articulated this standard in its final decision, on the record before us we do not know.  Nonetheless, we agree with the district court that Sonoiki hasn't alleged in his complaint that the Ad Board failed to apply this standard.

burden of proof standard represents the degree to which one must be persuaded but "[t]here is no objectively measurable level by which someone believes something 'enough'" aka "sufficiently," and so to be more likely than not cannot be the same as "sufficient."[21]

From our vantage, the distinction the plaintiff is trying to drive home is not discernable to us; despite perhaps a clunky choice of words the standard is not actually unintelligible or fatally vague -- indeed it seems to us a perhaps lay person rephrasing of the preponderance of the evidence standard.  At any rate, as we stated before, like the district court, we agree that Sonoiki did not allege in his complaint that Harvard deviated from the explicit standard it articulated in the Ad Board Procedures. As a result, Sonoiki has not plausibly alleged Harvard breached its contractual obligations to him by either using or not using the standard it identified in the contract.

### 4. Other Reasonable Expectations

Sonoiki also argues his breach of contract claim should have survived dismissal because he "sufficiently pled that Harvard failed to meet his reasonable expectations" -- expectations which he says were reasonably based on the contract's "express promises, intentional silence, and fairness guarantees."  Harvard responds

---

[21] Sonoiki uses the online Cambridge English Dictionary's definition of "sufficiently," which is "enough." https://dictionary.cambridge.org/dictionary/english/sufficiently

that the Ad Board Procedures "either expressly foreclose or implicitly refute" the procedures Sonoiki identified as reasonably expected, "defeat[ing] his [breach of contract] claim" because his expectations were not "ground[ed]" in the language of the contract.[22]  These arguments about the specific expectations Sonoiki claims were reasonable but not met reveal a tension in the application of the reasonable expectations framework under Massachusetts law, leading us to consider whether a student can have a reasonable expectation about what a contract guarantees if it cannot be found in the express language of the governing contract.

Harvard asserts the case law is replete with examples of courts rejecting claims about the violation of reasonable expectations when the student cannot identify a specific provision in the governing contract promising the piece of the process at issue.  Our review of the case law, however, reveals this assertion doesn't quite paint the full picture.  True, we once tossed aside an argument about whether a plaintiff had a reasonable expectation to a part of a process to which the plaintiff claimed he'd been deprived (live cross-examination of a witness) because "[n]othing

---

[22] The district court evidently sided with Harvard because its discussion of Sonoiki's breach of contract claim focused on whether the Ad Board Procedures explicitly provided the parts of the process Sonoiki claimed he had reasonably expected but not received.

in the contract provide[d] any basis for th[is] expectation." BC
II, 942 F.3d at 533 (concluding, on the school's appeal from a
granted motion for a preliminary injunction, that the student
suspended for sexual misconduct had not shown he was likely to
succeed on the merits of his breach of contract claim).

However, when reviewing a contract claim at the motion
to dismiss stage, the reasonable expectation standard is focused
on the student's interpretation of the contract's terms, assessing
"what meaning the party making the manifestation, the university,
should reasonably expect the other party to give it." Schaer, 735
N.E.2d at 378 (quoting Cloud, 720 F.2d at 724). This standard
allows for a student's reasonable expectations to be different
from the interpretation the university places on the same terms.
Moreover, a student's expectation can be reasonable even if the
precise expectation is not stated explicitly in the contract's
language but, instead, when the student's expectation, viewed
objectively alongside the express terms of the contract, is based
on the student's fair interpretation of the contract's provisions.
See id.; see also Doe v. Amherst Coll., 238 F. Supp. 3d 195, 217-
18 (D. Mass. 2017) (concluding the plaintiff had alleged sufficient
facts to state a plausible breach of contract claim because the
accused reasonably expected the investigative process would
include steps that could reveal exculpatory as well as inculpatory
evidence even though the contract (while promising a fair process)

did not explicitly state the investigative process would include an examination of both the complainant and accused's actions after the incident at issue).

Therefore, rather than deeming an expectation not plausible because it is not explicitly spelled out as a precise promise in the governing document, the appropriate inquiry is whether an alleged expectation is reasonable and therefore a plausible claim because the reasonable expectation is based on the student's feasible interpretation of the contract language.  We are also mindful that the procedural posture of Sonoiki's case before us means we both accept the factual allegations Sonoiki made as true and "indulge every reasonable inference hospitable to his case."  Schaer, 735 N.E.2d at 378 (quoting Judge v. Lowell, 160 F.3d 67, 77 (1st Cir. 1998) (cleaned up)); see also Amherst Coll., 238 F. Supp. 3d at 215 (noting the court would "make any reasonable inferences favorable to [the plaintiff's] position both with respect to determining what a student may have reasonably expected terms in the [contract] to mean and whether the [school] failed to meet those expectations").

Mindful of how the reasonable expectation doctrine applies to contracts between universities and students, we explore in some detail Sonoiki's specific arguments that we find have merit about how he plausibly alleged Harvard breached its contract with him, asking ourselves if, indulging all inferences in his favor,

Sonoiki's allegations stated both that his expectations were
reasonable and not met.

*a. Allegations about Board Rep Johnson*

        The Ad Board Procedures' Student Information Form
described the role of the Board Rep in detail.  This "liaison" to
the Ad Board would:

- "represent" the student to both the subcommittee and the full
  Ad Board,
- be "present at all meetings and w[ould] make certain that
  [the student was] kept informed throughout the process,"
- "address the subcommittee" during the student's interview "if
  there [we]re relevant facts . . . previously discussed" but
  the student did not bring up on their own,
- "present to the [Ad] Board a full summary of the facts of the
  case in which [the student was] involved,"
- "not advocate for [the student],"
- "w[ould] make certain that [the student's] perspective [wa]s
  clearly presented,"
- "speak on [the student's] behalf and participate[] in
  deliberations about [the student's] case."

In addition, students were encouraged to be "open and honest" with
their Board Rep.  The General Information on Disciplinary Cases
part of the Ad Board Procedures had a consistent description,
emphasizing that the Board Rep's role was to "mak[e] certain the
student's 'voice' [wa]s heard" and encouraged the accused to "work
closely with their Board Representative" to "ensure that the Board
receive[d] a full and balanced account of a case or petition."

        Sonoiki advances several arguments about his reasonable
expectations centered on his Board Rep's role and conduct.  He
contends that he had a reasonable expectation his Board Rep would

"advocate on his behalf before the Ad Board" because while one contract provision does state that the Board Rep would not advocate for the student she represents, there are several other provisions describing the Board Rep's role which can be fairly read as contradicting this single blanket disclaimer.  For instance, he alleges that, once he had chosen a Board Rep, given the descriptions of the Board Rep's role outlined in the Student Information Form, he "believed that his communications would be confidential."  But, he says, "they were not."  Continuing, he alleges that the Ad Board Procedures "failed to inform" him that his Board Rep "would convey all relevant communications to the Ad Board, even if the communications were or could be harmful to the [accused]."  Finally, he alleges and argues that his Board Rep failed to keep him informed throughout the disciplinary process because she did not tell him the identity of each witness the subcommittee interviewed.  Harvard responds that these expectations are not reasonable because the Student Information Form's disclaimer of advocacy is unambiguous and in the absence of express promises to maintain confidentiality or to provide information about witness identities this court should reject Sonoiki's positions.[23]

---

[23] The district court agreed with Harvard, concluding Sonoiki did not have a reasonable expectation about either his Board Rep keeping his communications confidential or disclosing all of the

This is our take.  While the Ad Board Procedures disavowed any advocacy role of the Board Rep in one phrase (which Sonoiki acknowledges in his complaint), the various descriptions of the Board Rep's role in relation to the student -- such as represent, speak on behalf of, clearly present the student's perspective -- seemingly contradict this one disclamatory phrase and do sensibly suggest some level of advocacy from the Board Rep would be reasonably expected by the student.  Indeed, the Oxford English Dictionary defines the word "represent" in part like this: "to act or serve as the spokesperson or advocate of."[24]  This expectation can be viewed as particularly reasonable when no other person -- not the student or a lawyer -- could be present at the full Ad Board adjudicatory meeting to advocate firsthand for the student.  Also, the many assurances of trustworthiness and the responsibility of the Board Rep to ensure that the student's side of the story was conveyed and heard could certainly be fairly viewed as overriding or, at a minimum, contradicting the single phrase that the Board Rep would "not advocate for" the student she represented.  When, as here, "an agreement's terms are inconsistent on their face or where the phraseology can support reasonable

---

identities of adverse witnesses because the Ad Board Procedures did not explicitly so provide.

[24] Represent, Oxford English Dictionary Online, https://www.oed.com/view/Entry/162991?rskey=hjq45D&result=2&isAdvanced=false#eid.

difference of opinion as to the meaning of the words employed and the obligations undertaken," the language is ambiguous.  Suffolk Constr. Co. v. Lanco Scaffolding Co., 716 N.E.2d 130, 133 (Mass. App. Ct. 1999) (quoting Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)).  And ambiguous contract language may not be resolved in a motion to dismiss.  See Lass, 695 F.3d at 137.  Sonoiki has therefore plausibly alleged reasonable expectations about the role of his Board Rep and has plausibly alleged that these expectations were violated when his Board Rep did not live up to her role.  See Amherst Coll., 238 F. Supp. 3d at 217-18 (concluding extrinsic evidence may be required to resolve the ambiguity but breach of contract allegations were plausible on the face of the complaint and contract document).

In addition, the contractual terms as described above clearly and strongly encouraged Sonoiki to trust his Board Rep and therefore Sonoiki could reasonably expect that some level of confidentiality flowed from such a trust relationship and was thus a part of the Board Rep's role even though this detail was not explicitly articulated in the Ad Board Procedures.  While a close call, we also conclude that Sonoiki reasonably expected his Board Rep to respect some confidences and plausibly alleged a breach on the basis that his Board Rep also did not live up to this part of her role.

Pointing to the provision in the Ad Board Procedures
which required a student facing disciplinary charges to be kept
fully informed about what each witness said during their interview
and any information obtained from each interview, Sonoiki also
alleges and argues that his Board Rep failed to fulfill her role
because she did not provide him with the identities of all the
adverse witnesses the subcommittee interviewed.  Harvard did not
address these specific allegations in its motion to dismiss but
responds to Sonoiki's argument on appeal with the retort that
Sonoiki knew the identities of some of the adverse witnesses,
seeming to imply this was sufficient to satisfy an accused's
expectations.   The district court concluded Sonoiki was not
entitled to the identities of each witness because the Ad Board
Procedures did not explicitly state that an accused would receive
this information.  The district court acknowledged, however, that
an accused was entitled to see the witnesses' written statements,
if any.

The Ad Board Procedures actually promise much more than
a copy of the written statements:  during the Initial Review phase,
the student's Board Rep is to inform them about what each witness
says during the interviews and share any information that comes to
light from the interviews.  During the Further Investigation phase,
the Board Rep is to provide the student with "copies of all
documents and other information obtained by the fact finder and

subcommittee."  Based on these requirements, it is reasonable for a college student to infer that the identity of each witness (i.e., the speaker of the information that is to be conveyed to the student) is part of the information that would be conveyed from the Board Rep to the student.  Sonoiki admitted he knew Rankin testified as an adverse witness and he deduced two of the complainants testified for each other, but he contends there were other witnesses whose identities were never disclosed so he had no way to properly defend against the accusation or to otherwise properly respond to their testimonies.[25]  Because the Ad Board Procedures tasked the Board Rep with keeping the accused student fully informed, Sonoiki has plausibly claimed the breach of his reasonable expectation that he would know the identities of *all* testifying witnesses.

b. *Allegations about Dean Ellison*

The Ad Board Procedures' General Regulations plainly stated all Ad Board actions follow the same general procedure for the accused student, beginning with "a conversation between the student, his or her Resident Dean, and the Secretary of the [Ad]

---

[25] As we mentioned earlier, from the record before us we cannot determine whether the DCRs issued at the conclusion of the subcommittee's investigations showed all the names of all the witnesses the subcommittee interviewed during its investigation. Sonoiki alleges he was not told the identity of each witness, and at this stage we must assume the truth of what he's alleging.  See Zell, 957 F.3d at 7.

Board or his or her designee [here, Ellison], during which they discuss the incident, the relevant College rules or standards of conduct, and possible courses of action." In his complaint, Sonoiki alleged Dean Ellison did not follow this process for several reasons including because, when they met in June 2013 to discuss Ann's and Cindy's submitted complaints, Ellison did not advise Sonoiki he was entitled to have his resident dean present. He also targets Ellison's failure to hold an initial meeting with Sonoiki after Betty filed her complaint, as well as Ellison's exertion of pressure on the three women to file their complaints in the first place.[26] On appeal, Sonoiki again brings up Ellison's

---

[26] In his opposition to Harvard's motion to dismiss, Sonoiki argued these actions and inactions showed Ellison was biased against him (particularly Ellison's role in soliciting the complaints) and given this bias, Ellison's active involvement in the Ad Board proceedings jaundiced the overall adjudication of the complaints against him. The district court did not specifically engage with Sonoiki's factual allegations about Ellison, instead skirting them to conclude there was no contract violation based on Ellison's role because Sonoiki had not "provide[d] any factual support for his claim of bias in the disciplinary proceedings against him" and because, based upon the district court's understanding of controlling case law (citing Gorman v. Univ. of R.I., 837 F.2d 7, 15 (1st Cir. 1988)), an administrator serving in both an administrative and adjudicative role where student discipline is concerned does not automatically indicate bias.

On appeal, Sonoiki repeats his argument from his opposition to Harvard's motion to dismiss that Ellison's "conduct is evidence of bias" -- both on the part of Ellison and in the way in which the Ad Board conducted the disciplinary process because Ellison was allowed to vote as a member of the Ad Board after playing a significant role in soliciting the complaints against Sonoiki and allegedly failing to adhere to the specific first steps of the process. The problem with this argument is that Sonoiki did not

- 40 -

alleged solicitation of the complaints and his other "fail[ures] to satisfy his affirmative duties to [Sonoiki]" as ways Harvard breached his reasonable expectations about the adjudicatory process.[27]

_____

allege in his complaint that Ellison's conduct demonstrated bias against Sonoiki or that Ellison should not have participated in the Ad Board proceedings. While we are to draw reasonable inferences from the pleading in Sonoiki's favor, see Zell, 957 F.3d at 7, our close reading of his lengthy complaint reveals his allegations of bias are made in relation to his claims of systemic racial bias and do not allow us to make the leap connecting his specific factual allegations about Ellison's conduct in his complaint to his arguments in his motion papers about administrative bias permeating the proceedings. We must conclude, therefore, that Sonoiki did not plausibly plead a breach of contract claim based on either Dean Ellison's alleged bias against him or Dean Ellison's participation in the Ad Board proceedings.

[27] Responding to these allegations, Harvard asserts, in a footnote, that Sonoiki's claims relying on Ellison's alleged failure to hold the initial meeting about Betty's complaint and to tell Sonoiki his resident dean could be at the initial meeting about Ann's and Cindy's complaints are time-barred. In Massachusetts, breach of contract actions must be brought within six years, see Mass. Gen. Laws ch. 260, § 2, and Harvard, citing Melrose Hous. Auth. v. N.H. Ins. Co., 520 N.E.2d 493, 497 (Mass. 1988), says any breach relating to this part of the disciplinary process accrued more than six years prior to the initiation of this lawsuit. Harvard dropped the same footnote in its motion to dismiss, but neither Sonoiki nor the district court addressed this argument. We can see why. The Ad Board Procedures describes a complete disciplinary process which doesn't end until an appeal is completed. Sonoiki points to Dean Ellison's actions (or lack thereof) as examples about how the whole process is flawed. Harvard is isolating two of the ways Sonoiki claims Harvard breached its contract with him but is not acknowledging that Sonoiki asserts a single breach of contract claim arising out of the entire adjudicatory process, resulting in his dismissal from Harvard without a degree. This process ended with the denial of Sonoiki's appeal to the Faculty Council and this denial occurred well within the statute of limitations for his breach of contract

We examine anew Sonoiki's pleading and the Ad Board Procedures to determine whether he has plausibly alleged Ellison's conduct breached his reasonable expectations based on the explicit and implicit promises in the contract.  Sonoiki reasonably expected the Ad Board to conduct the proceedings in accordance with the procedures laid out in writing as well as in accordance with his fair interpretation of the contractual terms.  See BC I, 892 F.3d at 80; Schaer, 735 N.E.2d at 378.  He alleged Ellison's conduct at the beginning of the process (failing to tell Sonoiki the resident dean is a part of the initial meeting and failing to hold an initial meeting after Betty's complaint landed) breached the Ad Board Procedures.  To the extent the steps the Secretary of the Ad Board must take or avoid in order to comply with the procedures laid out in the Ad Board Procedures contract are ambiguous, we reiterate that ambiguities in a contract are not to be resolved through a motion to dismiss.  See Lass, 695 F.3d at 137; Amherst Coll., 238 F. Supp. 3d at 217-18.  Therefore, at the pleadings stage, Sonoiki's allegations, taken as true, state a plausible breach of contract claim.  See BC I, 892 F.3d at 80.[28]

----

claim.  Had Sonoiki filed an appeal after the Ad Board's adjudication, Harvard would likely have called the appeal unripe.

[28] Sonoiki also argues several other ways he says Harvard breached the Ad Board Procedures by not meeting his reasonable expectations about the adjudication process.  These expectations included that Harvard would not have adjudicated the complaints filed by Ann and Betty at all because the incidents they alleged

**B**

**Denial of Basic Fairness**

Sonoiki's denial of basic fairness claim is closely related to his breach of contract claim; indeed, the factual underpinnings for these two claims are the same. In his complaint, he alleges Harvard owed him a duty under its contract to conduct the disciplinary proceedings with basic fairness but breached this duty and denied him basic fairness when it breached the Ad Board Procedures contract in the ways alleged in his breach of contract claim.[29] In his arguments before us, Sonoiki asserts that, "[a]t

occurred more than a year before they submitted their complaints, that Ellison would not have pressured the three women to file a complaint in the first place, that Harvard would have adjudicated all three complaints faster but not simultaneously and using the same subcommittee and fact finder, that the DCRs would not have included credibility determinations, that his three appeals from the Ad Board decisions would not have been considered collectively, that the Ad Board would not have been an "adversary party" in his appeals from the Ad Board's final decisions, and that the proceedings would have been conducted fairly. For the reasons we explained above, Sonoiki has plausibly pled that Harvard breached some of his reasonable expectations and therefore has successfully argued that his breach of contract claim should not have been dismissed in its entirety on Harvard's motion to dismiss for failure to state a claim. We have reviewed these other arguments and determined that they have no merit. See Jeffrey v. Desmond, 70 F.3d 183, 187 (1st Cir. 1995) (acknowledging other arguments and announcing none had merit without explaining the reasoning therefor); Dep't of Revenue v. Ryan R., 816 N.E.2d 1020, 1027 (Mass. App. Ct. 2004) (stating the arguments not addressed in the opinion had not been overlooked).

[29] During the motion practice below, the arguments for and against dismissal of this case sometimes addressed Sonoiki's allegations as breach of contract claims, sometimes as denial of basic fairness claims, and sometimes as both. The district court, after concluding Sonoiki had not plausibly pled a breach of

multiple points, Harvard promised [him] a fair proceeding" (though does not tell us where) and therefore an express promise of fairness was part of the contract. A close review of the Ad Board Procedures reveals fairness is mentioned four times:

(1) in the FAS Resolution on Rights and Responsibilities ("[I]t is the responsibility of all members of the academic community . . . to give full and fair hearing to reasoned expressions of grievances . . . .");

(2) in the General Regulations regarding Harassment ("The College's investigation and adjudication process is designed to be careful and fair.");

(3) in the Ad Board's General Information on Disciplinary Cases ("The procedures for resolving disciplinary cases are designed to ensure that students are given a fair opportunity to be heard."); and

(4) in the Ad Board's General Information on Disciplinary Cases ("Every effort is made to provide fair treatment of each undergraduate relative to all other undergraduates.")

Both Massachusetts and First Circuit case law in this realm of school disciplinary proceedings show that although denial of basic fairness is a recognized theory of recovery, the precise contours of such a claim are yet to be clearly defined. We can, however, distill the following: the denial of basic fairness is closely intertwined with the breach of contract concept. When we

_____

contract claim, also concluded Sonoiki had not plausibly pled a claim for the denial of basic fairness because Harvard had met its obligations for basic fairness by complying with the processes set forth in the Ad Board Procedures. In his appellate briefing, many of Sonoiki's arguments about the purported denial of basic fairness overlap with the reasonable expectations he argued he had plausibly alleged in his breach of contract claim.

are evaluating a student's claim that a private school's procedures for adjudicating a disciplinary complaint denied the student basic fairness, we consider "whether the procedures followed were 'conducted with basic fairness,'" BC II, 942 F.3d at 533 (quoting Schaer, 735 N.E.2d at 380), meaning that, at a minimum, the school complied with the express procedures laid out in the policies that formed the contract, BC I, 892 F.3d at 88.  In this way, fairness can in a sense be viewed as one of the reasonable expectations a student has about the disciplinary process.

Moreover, courts have acknowledged that a school's "independent duty to provide basic fairness" is rooted in "the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law." BC I, 892 F.3d at 87 (citing Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004)).  Although this court has noted that the implied duty becomes "superfluous" in the face of an express promise for fairness, BC I, 892 F.3d at 88 (citing Cloud, 720 F.2d at 725), this court has also clearly recognized in Massachusetts law a denial of basic fairness claim as distinct from a breach of contract claim, see BC I, 892 F.3d at 87.

At the end of the day, however, this court defers to "the choices of student discipline proceedings made by private academic institutions," BC II, 942 F.3d at 535, and adheres to the principle in Massachusetts law that courts are "chary about

interfering with academic and disciplinary decisions made by private colleges and universities," id. (quoting Schaer, 735 N.E.2d at 381) (cleaned up).[30]

Sonoiki does argue before us that the district court was wrong to conclude Harvard had followed its articulated processes and that "mere policy adherence" is insufficient to satisfy basic fairness. Citing BC II, Sonoiki asserts this court has been "clear that a school's mere policy adherence does not, in and of itself, resolve a basic fairness cause of action," but a review of BC II reveals this statement reads too much into what this court actually wrote, which was simply a comment that neither party in that case had asserted that straight adherence to the articulated policy would in fact preclude a successful denial of basic fairness claim. See 942 F.3d at 535.

Sonoiki also argues a few specific ways he says Harvard breached its promise to provide basic fairness. We have already either addressed or mentioned a few of these claims (see supra notes 25 & 27), including:

- adjudicating his case using the "sufficiently persuaded" evidentiary standard;

---

[30] Although Sonoiki has not alleged a constitutional due process violation claim, we also note (for the sake of a complete summary about what we can distill from prior cases about the denial of basic fairness theory) that, in the context of private academic institutions, we've been clear that the fairness owed is not the same as the due process required for public institutions. BC II, 942 F.3d at 533-34.

- adjudicating the three complaints simultaneously, using the same subcommittee to investigate each and allowing "disparate claims to reinforce one another";
- adjudicating untimely complaints filed months or years after the incidents at issue;
- forcing him to rely on an administrator throughout the adjudication process while preventing him from knowing how his Board Rep translated and communicated his position during the Ad Board's consideration of and deliberation over the DCRs; and
- allowing a biased administrator (Dean Ellison) to participate and vote in the proceedings.

In addition to these claims, Sonoiki says the Ad Board proceedings lacked basic fairness because he was not allowed to hire an attorney to serve as his personal advisor and because the Ad Board was infected with implicit bias by not having any black male members and by not requiring the existing members to undergo implicit bias training. Harvard counters that Sonoiki cannot prevail on his basic fairness claim at all because he was not deprived of basic processes such as notice of the charges against him or subjected to a deficient investigatory process.

In our view, Sonoiki has failed to plausibly allege his basic fairness claim because he has not tied his arguments about the ways he alleges he was deprived of basic fairness to what the Ad Board Procedures actually says about fairness. That is, he has not shown us how these allegations breached the promises of basic fairness in the contract. Sonoiki has also not otherwise told us whether or how the implied duty might be triggered in addition to the contractual promises to provide fairness. We have previously

acknowledged that "Massachusetts law permits its colleges and universities flexibility to adopt diverse approaches to student discipline matters . . . [and] [f]ederal courts are not free to extend the reach of state law." BC II, 942 F.3d at 535 (also stating this court defers to -- and will not interfere with -- private schools' choices about how to structure disciplinary proceedings). For all of these reasons, we affirm the dismissal of the denial of basic fairness count of Sonoiki's complaint.

**C**

### Breach of the Covenant of Good Faith and Fair Dealing

Sonoiki also tries to advance a distinct count for breach of the implied covenant of good faith and fair dealing by briefly arguing this count should have survived along with the breach of contract count. However, our prior discussion of his denial of basic fairness claim clearly indicates that the denial of basic fairness concept is rooted in the implied promise of good faith and fair dealing, see BC I, 892 F.3d at 87 (citing Uno Rests., Inc., 805 N.E.2d at 964), meaning the denial of basic fairness is the student disciplinary adjudications' version of claiming a breach of the implied covenant of good faith and fair dealing.[31]

---

[31] The district court also acknowledged this court's approach to good-faith-and-fair-dealing claims "in the academic context to be concomitant with the basic fairness analysis" and dismissed this count because it could not stand alone without the breach of contract and/or denial of basic fairness claim.

Sonoiki does not allege a distinct factual basis for this count, and we see no difference between this claim and his claim for the denial of basic fairness.  These two theories are therefore not distinct claims, and we also affirm the dismissal of this count.

### D

### Estoppel and Reliance

Count 4 of Sonoiki's complaint alleged he had "relied to his detriment on Harvard's express and implied promises and representations."  The district court identified this count as essentially a claim for promissory estoppel and concluded this count failed to state a plausible claim because the parties were not disputing that a contract existed between them and governed their relationship.  Sonoiki argues the district court erred by not considering this claim as an alternative liability theory.  We disagree.  Pursuant to Massachusetts law, "[w]here an enforceable contract exists, a claim for promissory estoppel will not lie." Malden Police Patrolman's Ass'n v. Malden, 82 N.E.3d 1055, 1064 (Mass. App. Ct. 2017); see NTV Mgmt., Inc. v. Lightship Glob. Ventures, LLC, 140 N.E.3d 436, 441 n.5 (Mass. 2020) (declining to consider whether plaintiff could recover on other theories alleged after holding plaintiff could recover for breach of contract).

There is no dispute that a valid contract governed the parties' relationship. We therefore affirm the dismissal of this count.[32]

## IV

### FINAL WORDS

For the reasons we've discussed above, the district court's judgment dismissing Sonoiki's complaint is reversed in part and affirmed in part. Costs awarded to Appellant.

---

[32] Sonoiki also argues that this count should have survived Harvard's motion to dismiss because Harvard's "proceedings were unenforceable due to a fatal ambiguity in its evidentiary standard." We upheld the district court's dismissal of Sonoiki's claims about the sufficiently persuaded standard so this argument goes nowhere.