**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **DAMILARE SONOIKI,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HARVARD UNIVERSITY, HARVARD UNIVERSITY BOARD OF OVERSEERS, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE,**<br><br>**Defendants.** | **CIVIL CASE NO. 1:19-cv-12172-LTS**<br><br>**JUDGE LEO T. SOROKIN** |

**AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

> [I]t is clear that Harvard's Ad Board, as it is framed now, is far from an educational process. In reality, it is a penal institution, and it doesn't do anyone any favors to anyone by claiming to be anything else.
>
> It seems clear that the Ad Board remains just as enigmatic and incomprehensible to students – both those who have never gone before that Board and those who have – as it was before the 2010 reforms. Confusion about the role of the Resident Dean, lack of student representation on the board, and lack of knowledgeable advisors can only contribute to a vision of the Ad Board as an immutably disciplinary process.[1]

Plaintiff Damilare Sonoiki ("Plaintiff" or "Damilare") through undersigned counsel, files this Amended Complaint against defendants Harvard University, Harvard University Board of Overseers, the President and Fellows of Harvard College (collectively referred to as "Harvard" or "Defendants"), and respectfully alleges as follows:

[1] Harvard Crimson Staff, *A Penal System: The Ad Board clearly requires further reforms*, THE HARVARD CRIMSON (Oct. 30, 2012), https://www.thecrimson.com/article/2012/10/30/Harvard-Ad Board-penal/.

## INTRODUCTION

1. Damilare files this action because Harvard refused to grant him his degree, even though he satisfied all of the requirements for graduation, was in good standing at the time of his scheduled graduation, and even spoke to his class as part of graduation exercises and walked at his graduation ceremony.

2. Although Harvard did not have jurisdiction over Damilare, Harvard subjected him to an inherently unfair and byzantine series of proceedings before the Administrative Board of Harvard College (the "Ad Board") and the Faculty Council (the "Faculty Council").

3. Harvard's own policies were convoluted and inherently unfair, constituting a breach of the express terms of the parties' contract and a breach of Damilare's reasonable expectations pursuant to the contract. Ultimately, Harvard required Damilare to withdraw and then dismissed him from Harvard, in violation of its own policies.

4. A non-exhaustive list of Harvard's wrongful and unfair actions include:

- Harvard withheld Damilare's undergraduate degree and subjected him to the Ad Board process without jurisdiction;
- The decisions of the Ad Board and the Faculty Council were void because Harvard did not have jurisdiction over Damilare;
- Harvard's Ad Board process was conducted in private, behind closed doors and excluded Damilare from participation;
- Harvard denied Damilare the opportunity be advised by an attorney or advisor of choice during the adjudicatory process, as required by law;
- Harvard denied Damilare the opportunity to know the identities of adverse witnesses against him;
- Harvard failed to provide Damilare with adequate notice of the charges against him;
- Harvard denied Damilare a right to question, let alone cross-examine or confront, witnesses during the Ad Board process;

- Harvard utilized an adjudicatory process riddled with implicit and explicit racial bias;
- Harvard's deliberative bodies that found against Damilare were racially monolithic;
- Harvard failed to hold an initial meeting with Damilare after a third Title IX complaint was filed against him, in violation of Ad Board procedure;
- Harvard's advising process denied Damilare any right to privilege or confidentiality with his Board Representative;
- Harvard's advising process did not afford Damilare a zealous advocate who represented his interests before the Ad Board;
- Harvard solicited complainants and pressured them to bring untimely complaints, years after the alleged events occurred;
- Harvard allowed untimely complaints, that should have been barred under its own Handbook, to proceed;
- Harvard engaged in a protracted, untimely and, therefore prejudicial, adjudicatory process whereby, over eighteen months after initiating the process, it required Damilare to withdraw from the institution and then dismissed him from the institution;
- Harvard used an overbroad and vague sexual misconduct policy—rendering any findings or decisions void for vagueness;
- Harvard denied Damilare full and fair proceedings when it simultaneously investigated and adjudicated three cases against him with the same Ad Board Subcommittee members (the "Subcommittee");
- Harvard's policies did not articulate what deliberative body had the power to make credibility determinations;
- Harvard's deliberative bodies were not independent and did nothing more than rubber-stamp the initial findings;
- Harvard denied Damilare the right to a fair and impartial appeal—rather than the complainants opposing the appeal, Harvard itself opposed Damilare's appeal. Harvard then ruled on the appeal, the opposition of which was drafted by the Dean of Harvard College. The institution, therefore, acted as fact-finder, opponent-advocate and ultimately, judge and jury;

- Harvard failed to establish proper appeal procedures;
- Harvard failed to establish any timeframe to adjudicate appeals; and
- Harvard failed to allow Damilare to appeal his dismissal from Harvard.

5. Harvard impermissibly denied Damilare his degree and, therefore, Damilare suffered harm to his education and career prospects.

6. Harvard lacked jurisdiction to require Damilare to withdraw and ultimately dismiss him.

7. Harvard subjected Damilare to an adjudicatory process that violated federal law, Harvard's own policies, and was inherently biased.

**PARTIES**

8. Plaintiff Damilare Sonoiki resides in the State of Texas.

9. Defendant Harvard University is a private, liberal arts college in Cambridge, Massachusetts.

10. Upon information and belief, Defendant Harvard Board of Overseers is one of the governing bodies of Harvard University. It is composed of 30 members. Upon information and belief, it influences Harvard's strategic decisions, periodically reviews the quality and direction of Harvard University, and may consent to certain actions taken by the President and Fellows of Harvard College. *See* Harvard University, *Harvard's President & Leadership*, https://www.harvard.edu/about-harvard/harvards-president-leadership (last visited Aug. 8, 2022).

11. Upon information and belief, Defendant President and Fellows of Harvard College is one of two government bodies at Harvard University and oversees Harvard's academic, financial, and physical resources and acts as the confidential sounding board for Harvard's President. The President and Fellows of Harvard College is also responsible for approving Harvard

University's "budgets, major capital projects, endowment spending, tuition charges, and other matters." *See id.*

## JURISDICTION AND VENUE

12. This Court has original diversity jurisdiction over this claim under 28 U.S.C. §1332 because the matter in controversy exceeds the sum or value of $75,000 and complete diversity exists between the parties.

13. This Court has personal jurisdiction over Harvard because it conducts business in Massachusetts.

14. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because Harvard resides in this district and a substantial part of the events giving rise to the claim occurred here.

## FACUTAL BACKGROUND

### I. In 2013 Damilare was a Rising Star and Pillar of the Harvard Community

15. Damilare spent his early years in Lagos, Nigeria.

16. When Damilare was six years old, he immigrated with his mother to Houston, Texas through the Diversity Immigrant Visa Program, commonly known as the "Green Card Lottery."

17. Damilare excelled academically and at the age of 14, began attending a prestigious boarding school in Virginia, where he continued to excel earning straight A's and emerging as a leader on campus.

18. In his senior year, Damilare applied to 15 colleges and universities and was accepted to all, including all 8 Ivy League colleges and Stanford University.

19. Damilare chose Harvard, becoming a member of the Harvard Class of 2013.

20. Damilare quickly became a leader within Harvard's student community, writing for the Harvard Crimson (Harvard's student newspaper) and serving as a writer and editor for the Harvard Lampoon (Harvard's humor magazine).

21. Damilare served as the 2011-2012 President of the Harvard Black Men's Forum, where he advocated for the rights of black men and brought awareness to the systemic racism and implicit bias that affected black men at Harvard and beyond.

22. On April 6, 2013, Damilare was a recipient of the Annual Senior Award from The Association of Black Harvard Women ("ABHW"), as part of ABHW's 15th Annual Tribute to Black Men, which celebrate the leadership and contributions of black men at Harvard.

23. Damilare's classmates chose him as the Male Harvard Orator for Class Day—elected by his peers to speak to the graduating class and their families on the day before graduation. Damilare's speech is still online, posted on Harvard's YouTube account. *See* Harvard University, *Harvard Orator: Damilare Sonoiki / Harvard Commencement 2013*, YOUTUBE (June 4, 2013), https://www.youtube.com/watch?v=jaubNt7zvvk&feature=youtu.be (last visited Aug. 8, 2022).

24. To date, the video has over 207,000 views and 1,500 "likes." *See id*.

25. Damilare concentrated in economics and finished with a 3.65 cumulative grade point average. He received multiple job offers during his senior year and, on May 15, 2013, he was accepted into the Harvard Business School under the "2 + 2" program, whereby he would work for 2 or more years before attending Harvard Business School as a member of the class of 2017.

### A. In 2012 and 2013 Harvard Faced Severe Internal Pressure from Student Activists to Deny Respondents Basic Fairness in Title IX Proceedings

26. In 2012 and 2013, Harvard faced significant pressure from undergraduate student activists to adopt policies and procedures that were anti-respondent in sexual misconduct proceedings.

27. A group of students formed "Our Harvard Can Do Better," a campus group with the stated objective of "Dismantling Rape Culture at Harvard."[2]

28. Our Harvard Can Do Better urged all undergraduates to adopt a ballot measure that would deny basic rights and fairness to respondents in Title IX investigations. In urging a "yes" vote, the organization used the following banner:[3]




### B. Amid the Activism, the Harvard Crimson Published a Four-Part Series and Editorial Criticizing the Ad Board Process for Lacking Basic Fairness

29. In October 2012, the Harvard Crimson issued a four-part editorial series decrying Harvard's Ad Board procedures for lacking basic fairness, with each article in the series addressing a different Ad Board failing.

30. Part I, *Ad Board's Educational Mission Under Scrutiny*, questioned the Ad Board's supposedly "pedagogical mission," suggesting that the Ad Board was, in reality, punitive in nature.[4]

---

[2] OUR HARVARD CAN DO BETTER: DISMANTLING RAPE CULTURE AT HARVARD, https://ourharvardcandobetter.wordpress.com (last visited Oct. 21, 2019).
[3] *Id.*, *Image* (Nov. 17, 2012), https://ourharvardcandobetter.wordpress.com/2012/11/17/image/.
[4] Mercer R. Cook & Rebecca D. Robbins, *Ad Board's Educational Mission Under Scrutiny*, THE HARVARD CRIMSON (Oct. 23, 2012), https://www.thecrimson.com/article/2012/10/23/ad-board-scrutiny/.

31. Part II, *Ad Board's Advising System Faces Criticism*, railed against the fact that respondents were prohibited from advocating on their own behalf, either directly or indirectly, before the Ad Board, and instead had to rely upon a "deeply inadequate advising process" under which respondents did not enjoy any privilege or confidentiality.[5]

32. In particular, Part II noted that respondents, who could not involve attorneys in the Ad Board process and who choose assistance from generally untrained "personal advisers," had to rely upon resident deans—known in some Harvard policy documents as "Board Representatives"—for guidance. [6]

33. Part IV, *Critics Call for Student Role on Ad Board*, criticized the Ad Board for not including any students on the disciplinary body, saying that it denied respondents trial by a jury of their peers.[7]

34. This series culminated in a Harvard Crimson editorial on October 30, 2012 entitled *A Penal System: The Ad Board Clearly Requires Further Reforms*.[8]

35. The editorial demonstrated Harvard's failure to provide students a "fair and reasonable procedure" by cloaking the Ad Board process in confusion and claiming that fairness was not required because the Ad Board was supposedly "educational" in nature.

---

[5] Mercer R. Cook & Rebecca D. Robbins, *Ad Board's Advising System Faces Criticism*, THE HARVARD CRIMSON (Oct. 24, 2012), https://www.thecrimson.com/article/2012/10/24/Resident-deans-ad-board-role/.

[6] Throughout this complaint, undersigned interchangeably uses the phrases "Resident Dean" and "Board Representative." The use of these two phrases is not meant to confuse the Court. Different documents that made up Harvard's 2013 sexual misconduct process use these terms interchangeably, and an attempt is being made to track the language in the applicable policy document.

[7] Mercer R. Cook & Rebecca D. Robbins, *Critics Call for Student Role on Ad Board*, THE HARVARD CRIMSON (Oct. 26, 2012), https://www.thecrimson.com/article/2012/10/26/critics-student-ad-board/.

[8] Harvard Crimson Staff, *supra* note 1.

### C. This Court and Harvard's own Faculty have also Criticized Harvard's Handling of Title IX Complaints

36. As this Court noted in *Doe v. Brandeis*, 177 F. Supp. 3d 561, 573 (D. Mass. 2016), "Harvard . . . appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process."

37. The Boston Globe published an article on October 4, 2014, wherein 28 Harvard Law School professors decried Harvard's amended 2014 procedures because they "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *Rethink Harvard's sexual harassment policy,* (Oct. 14, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html.

38. Among other noted deficiencies, many of which were holdovers from the 2012-2013 sexual misconduct process, these Harvard Law School professors warned that Harvard's new process denied respondents "any adequate opportunity to discover the facts charged," "to confront witnesses," to "present a defense at an adversary hearing," or to have "adequate representation . . . particularly for students unable to afford representation." *Id.*

## II. Harvard Law Professors Acknowledged that Harvard's Title IX Process was Biased Against Black Men

39. In addition to Harvard adopting policies designed to deny respondents basic fairness, several Harvard Law School professors publicly acknowledged that Harvard's Title IX process was inherently unfair to black male respondents, particularly when they are facing claims of sexual misconduct from white women.

40. In her Harvard Law Review article *Trading the Megaphone for the Gavel in Title IX Enforcement*, 128 Harv. L. Rev. F. 103 (2015), Janet Halley, the Royall Professor of Law at

Harvard Law School and self-described feminist, decried Harvard's Title IX process as implicitly biased against black men. Halley wrote:

> From Emmett Till to the Central Park Five, American racial history is laced with vendetta-like scandals in which black men are accused of sexually assaulting white women that become reverse scandals when it is revealed that the accused men were not wrongdoers at all. *Id*. at 106.

41. These concerns have also been echoed by Jeannie Suk Gersen, the John H. Watson, Jr. Professor of Law at Harvard Law School, in her New Yorker article *Shutting Down Conversations about Rape at Harvard Law*, The New Yorker (Dec. 11, 2015), which stated:

> And if we have learned from the public reckoning with the racial impact of over-criminalization, mass incarceration, and law enforcement bias, we should heed our legacy of bias against black men in rape accusations.

42. Harvard's failure to monitor, train for, and eliminate implicit bias against black men in its Title IX process is especially troubling because, as an institution, Harvard believes in and promotes the study of implicit bias by, among other endeavors, sponsoring Project Implicit, a non-profit dedicated to raising awareness of implicit bias, and hosting the Implicit Association Test, where the public can take free, online implicit bias tests. *See* PROJECT IMPLICIT, https://implicit.harvard.edu (last visited Aug. 8, 2022).

**III. Three Female Friends Filed Title IX Complaints Against Damilare.**

43. Relevant to this dispute, Damilare had consensual sexual experiences with three women: "Ann," "Betty," and "Cindy".[9]

**A. Ann**

44. Damilare and Ann met during the 2010-2011 academic year.

45. At a party in the spring of 2011, they kissed in view one of Ann's friends.

---

[9] Due to the sensitive nature of the averments, pseudonyms have been used to protect the identities of the three female complainants.

46. In September 2011, Damilare and Ann met at a party and left together, stopped at an ATM, walked to a taxi stand, and then took a taxi to Damilare's room where they had a sexual encounter.

47. At no point did Damilare and Ann engage in sexual intercourse against Ann's will, nor was their sexual intercourse accompanied by physical coercion or the threat of bodily injury.

48. In the days that followed, Ann and Damilare communicated cordially via text.

49. Unbeknownst to Damilare, nine months later, on June 25, 2012, Ann went to Harvard's Office of Sexual Prevention and Response and spoke with Sarah Rankin ("Rankin"), who was its director.

50. Ann claimed that she had "blacked out" at the party and regained consciousness while she was having sex with Damilare.

51. However, Ann told Rankin she did not want to file a Title IX claim against Damilare.

**B. Betty**

52. During Damilare's junior year (2011-2012), he became friends with Betty.

53. In the summer of 2012, Damilare and Betty moved into a studio apartment together because they both had internships in New York City.

54. There was one bed and one couch in the studio apartment and Damilare and Betty agreed to sleep in the bed together.

55. Thereafter, Damilare and Betty's relationship became sexual and remained that way for the rest of the summer.

56. None of Betty and Damilare's multiple acts of sexual intercourse were unwanted or accompanied by physical coercion or the threat of bodily injury.

57. Despite living together, sharing a bed, and engaging in multiple sexual encounters, Betty claimed to Cindy that some of Betty's initial sexual experiences with Damilare (in early June 2012) were nonconsensual. However, Betty admitted to continuing to share a bed with and having consensual sex with Damilare for the remainder of the summer.

58. After Damilare and Betty moved out of their studio apartment, they ended their physical relationship and resumed being friends, regularly exchanging emails, texts and instant messages, particularly in August and September of 2012.

59. Despite ending their sexual relationship, however, Damilare and Betty continued to explicitly discuss in-person and electronically sex, their sexual desires, and their shared sexual experiences.

**C. Cindy**

60. Damilare was friends with Cindy, and they both were friends with Betty.

61. Damilare, Cindy and Betty were initially going to live together in the summer of 2012, but changed plans because Cindy's internship was far from Betty and Damilare's internships.

62. Cindy and Damilare were intimate on a couple of occasions, kissing at parties and concerts.

63. In spring 2013, Cindy broke up with her boyfriend, and she and Damilare became flirtatious, primarily over text.

64. On May 7, 2013, both Damilare and Cindy went to the Eliot House Formal but had separate dates. Their respective dates were just friends.

65. As the event ended, Damilare and Cindy spotted each other, socialized, and kissed.

66. Cindy suggested they go somewhere more private and led Damilare down a set of stairs to an area where they found themselves alone and engaged in a consensual sexual encounter.

67. On the morning of May 8, 2013, Cindy went to Harvard's health services center for emergency contraception and sexually transmitted infection prophylaxis.

68. While Cindy was at the health services center, a doctor at the center called Rankin, claiming that Cindy may have been sexually assaulted. Rankin spoke with Cindy, and they planned to meet the next day.

69. Cindy declined to undergo forensic examination for sexual assault, known as a SANE exam, or to call the police.

**D. Harvard Pressured Ann, Betty, and Cindy to File Title IX Complaints**

70. On May 9, 2013, Cindy met with Rankin and told her about her experience with Damilare. Cindy insisted that she was not interested in filing a Title IX complaint.

71. Rankin responded, however, that Cindy should file a Title IX complaint because Damilare had allegedly sexually assaulted another woman.

72. Cindy left without filing a report against Damilare.

73. Rankin subsequently contacted Jay Ellison, the then-Associate Dean of Harvard College and Ad Board Secretary ("Dean Ellison"), about her conversation with Cindy.

74. Dean Ellison urged Rankin to contact Cindy a second time to encourage her to file a Title IX complaint.

75. On May 10, 2013, Rankin contacted Cindy again and pressured her to undergo a SANE exam and submit a formal report.

76. Later that day, Rankin accompanied Cindy to Cambridge Hospital for the purpose of a SANE exam.

77. Cindy never provided the complete SANE examination to Harvard during the investigation.

78. A few days later, Rankin took Cindy to meet with Dean Ellison, who encouraged her to file a Title IX report against Damilare.

79. On May 17, 2013, Rankin called Ann to tell her that Damilare had been involved in other reports of sexual assault and pressured her to file a formal Title IX complaint.

80. That same day, May 17, 2013, Damilare, with no advisor, attorney or support person present, learned from Dean Ellison that he was the subject of informal complaints of alleged sexual assault.

81. Dean Ellison told Damilare that Damilare was in good standing as of that moment, but that if any of the complaints became "formal" prior to his graduation on May 30, 2013, then there would be "further conversations," implying he may not be in good standing by graduation

82. On the evening of May 19 or May 20, 2013, Cindy and Damilare met in person. Cindy explained the encounter might have been a misunderstanding or miscommunication, but after speaking with administrators she was having second thoughts.

83. On May 28, 2013, Cindy filed a Title IX complaint against Damilare, alleging that their sexual experience on the evening of May 7th / morning of May 8th was non-consensual.

84. That same day, May 28, 2013, Ann filed a Title IX complaint against Damilare, alleging that their sexual experience on September 10, 2011 was non-consensual.

85. The next day, May 29, 2013 at 4:00 a.m., Cindy emailed Damilare's ex-girlfriend and encouraged her to join the Title IX process against Damilare.

86. Cindy stated that she and two other women were reporting Damilare to the Ad Board and pressured Damilare's ex-girlfriend to get involved because she "might become a topic of discussion in the Ad Board anyways."

87. Cindy also stated that she "didn't think much about" her experience with Damilare until she learned about other accusations from Rankin.

88. On June 4, 2013, five days after Harvard should have conferred an undergraduate degree on Damilare, Betty filed a Title IX complaint against Damilare. In her complaint, Betty alleged that anywhere between three to five of her sexual encounters with Damilare in June 2012 were non-consensual.

89. But for Rankin pressuring and organizing Ann, Betty, and Cindy to file formal Title IX complaints against Damilare, and but for Dean Ellison pressuring Cindy to file a formal Title IX complaint against Damilare, none would have been filed against him.

**E. In May 2013, Damilare was in Good Standing at Harvard, and he Fully Participated in his Commencement**

90. On May 29, 2013, Damilare spoke before his graduating class as the male Harvard Orator, and on May 30, 2013, Damilare walked in Harvard's graduation ceremony.

91. When Damilare participated in Harvard's graduation ceremony, he had completed all of the requirements to graduate.

92. As of his graduation day on May 30, 2013, no charges had been issued against Damilare by the Ad Board, and he was a student in good standing.

93. Harvard impermissibly withheld Damilare's degree.

## IV. In 2012-2013, Harvard Promised Full and Fair Hearings, but Used Procedures so Confusing that They Violated Harvard's Express Contractual Promises of Fairness

94. In the 2012-2013 academic year, Harvard employed a convoluted and confusing process for adjudicating sexual misconduct claims before the Ad Board and Faculty Council, with the policies and procedures cobbled together across nearly one dozen distinct, but ostensibly interrelated, documents.

95. Harvard's sexual misconduct policy was vague, overbroad, and inherently unfair, and lacked basic definitions necessary for students to understand the elements of a policy violation.

96. By failing to adopt an intelligible and fair sexual misconduct policy, and by annunciating an adjudication process across a series of dense, convoluted, and, at points, seemingly contradictory, documents, Harvard employed a sexual misconduct adjudication process that no student, or even attorney, could hope to understand.

### A. The Handbook Promised Students Full and Fair Hearings Free from Racial Stereotypes

97. The 2012-2013 Harvard Student Handbook (the "Handbook") contained multiple policies that bound the behavior of students and Harvard, including: (i) the Resolution on Rights and Responsibilities (the "Student Rights Policy"); (ii) the Faculty Policy Statement on Racial Harassment (the "Racial Harassment Policy"); (iii) the Faculty of Arts and Sciences Policy on Rape, Sexual Assault, and Other Sexual Misconduct (the "Sexual Misconduct Policy"), and; (iv) the General Regulations for the Administrative Board of Harvard College (the "Ad Board Regulations").

98. The Handbook controlled the contractual relationship between Harvard and its undergraduate students.

99. True and accurate copies of the Students Rights Policy, Racial Harassment Policy, and Sexual Misconduct Policy, which were also present in the 2011-2012 Handbook, are attached as Exhibit 1.[10]

100. A true and accurate copy of the Ad Board Regulations, which were also present in the 2011-2012 Handbook, are attached as Exhibit 2.

101. Under the Student Rights Policy, Harvard promised that it would give all of its students a "full and fair hearing to reasoned expressions of grievances." Ex. 1 at p. 2.

102. The Student Rights Policy also required both Harvard "students and officers alike" to "uphold the rights and responsibilities expressed in this [Student Rights Policy] if the University is to be characterized by mutual respect and trust." *Id.* at p. 3.

103. In relevant part, the Student Rights Policy states:

> Moreover, it is the responsibility of all members of the academic community to maintain an atmosphere in which violations of rights are unlikely to occur and to develop processes by which these rights are fully assured. In particular, it is the responsibility of officers of administration and instruction to be alert to the needs of the University community; **to give full and fair hearing to reasoned expressions of grievances**; and to respond promptly and in good faith to such expressions and to widely expressed needs for change. In making decisions which concern the community as a whole or any part of the community, officers are expected to consult with those affected by the decisions. Failure to meet these responsibilities may be profoundly damaging to the life of the University. Therefore, the University community has the right to establish orderly procedures consistent with the imperatives of academic freedom to assess the policies and assure the responsibility of those whose decisions affect the life of the University.
>
> No violation of the rights of members of the University, nor any failure to meet responsibilities, should be interpreted as justifying any violation of the rights of members of the University. **All members of the community—students and officers alike—should uphold the rights and responsibilities expressed in this Resolution if the University is to be characterized by mutual respect and trust.**

[10] The 2011-2012 Handbook is relevant because Damilare's consensual sexual experience with Ann took place in 2011.

*Id*. at pp. 2-3. (emphasis added).

104. Likewise, under the Racial Harassment Policy, Harvard promised that it would create an environment free from racial harassment, specifically that Harvard would not permit the abuse of students through the use of racial stereotypes.

105. The Racial Harassment Policy, in relevant part, states:

> Harvard College seeks to maintain an instructional and work environment free from racial harassment. The College defines racial harassment as actions on the part of an individual or group that demean or abuse another individual or group because of racial or ethnic background. Such actions may include, but are not restricted to, using racial epithets, making racially derogatory remarks, and **using racial stereotypes**. *Id.* at 5. (emphasis added).

**B. In its Handbook, Harvard Employed a Vague, Overbroad, and Unfair Sexual Misconduct Policy that Neither Required nor Defined "Consent"**

106. Although its Student Rights Policy and Racial Harassment Policy clearly promised students full and fair hearings free from abusive racial stereotypes, Harvard's Sexual Misconduct Policy was unclear, unfair, and lacked even the most rudimentary definitions necessary to adjudicate claims of sexual assault.

107. The Sexual Misconduct Policy applied only to sexual misconduct allegations made "against a student at Harvard College." *Id.* at p. 10.

108. Under the Sexual Misconduct Policy, Harvard stated that it would subject undergraduate students at Harvard College to disciplinary proceedings through the Ad Board if they engaged in what Harvard defined as "sexual misconduct." *Id.* at p. 13.

109. According to the Sexual Misconduct Policy, there are three categories of "sexual misconduct": (i) Rape; (ii) Indecent Assault and Battery, and; (iii) Other. *Id.*at pp. 10-11.

110. Harvard defined "sexual misconduct" via "rape" as follows:

> Rape includes any act of sexual intercourse that takes place against a person's will or that is accompanied by physical coercion or the threat of bodily injury. Unwillingness may be expressed verbally or physically. Rape may also include intercourse with a person who is incapable of expressing unwillingness or is prevented from resisting, as a result of conditions including, but not limited to, those caused by the intake of alcohol or drugs. Rape includes not only unwilling or forced vaginal intercourse, but also the sexual penetration of any bodily orifice with a body part or other object. *Id.*

111. Nowhere in the Sexual Misconduct Policy, however, did Harvard define the terms "physical coercion," "threat of bodily injury," or "unwillingness," all of which were essential components of the definition of "rape."

112. Harvard's definition of "rape" did not include, require, or define the concept of "consent," even though it is a central feature of modern sexual misconduct policies.

113. Because Harvard's 2012-2013 Sexual Misconduct Policy lacked even the most rudimentary and necessary definitions, it was void for vagueness and overbreadth.

114. As a result, even if the Ad Board had jurisdiction over Damilare, which it did not, any finding in violation of the Sexual Misconduct Policy would have been unfair and improper.

## V. Harvard's Ad Board Did Not Contain a Black Male Voice

115. The Ad Board, which was established by Harvard's Faculty of Arts and Sciences in 1890, is a body that consists of, approximately, 30 individuals.

116. During the 2012-2013 school year, none of the Ad Board's 30 members were black men. Upon information and belief, the only black member during 2012-2013 school year was the female Chair, who did not ordinarily vote on matters before the board.

117. During the 2013-2014 school year, the Ad Board had 31 members, again, none of whom were black men.

118. Upon information and belief, only one individual on the 2013-2014 Ad Board was black.

119. The lack of black male members on the Ad Board compromised its ability to prevent racial bias or have a representative voice on the panel.

120. Upon information and belief, the Ad Board did not receive implicit bias training.

## VI. Harvard's Confusing and Unlawful Disciplinary Procedures Existed Across Ten Different Documents and Demonstrate Violation of Harvard's Express Promises of Fairness

121. The Ad Board's procedures in 2012-2013 were not consolidated in the Ad Board Regulations.

122. Instead, the Ad Board Regulations as listed in the Handbook explicitly advised respondents to seek additional information as required from the Ad Board website or from various individuals within Harvard's administration. Ex. 2 at pp. 1, 4-5.

123. The Ad Board's policies and procedures for handling sexual misconduct complaints, including the appeals process to the Faculty Council and Harvard's general obligations to students under the Handbook, were cobbled together across no less than **<u>ten (10) different documents and policies</u>**, specifically:

- The Student Rights Policy;
- The Racial Harassment Policy;
- The Sexual Misconduct Policy;
- The Ad Board Regulations;
- A document entitled "The Administrative Board of Harvard College: Information for students facing allegations in a peer dispute case" (the "Student Information Form");
- A document entitled "The Administrative Board of Harvard College: General Information on Disciplinary Cases" (the "General Information Form");
- A chart entitled "Administrative Board: Disciplinary Process for allegations involving a peer dispute" (the "Ad Board Chart"),

- A document entitled "The Administrative Board of Harvard College: Reconsideration and appeals" (the "Appeals Form");
- A chart entitled "Administrative Board: Reconsideration and Appeals Process" (the "Appeals Process Chart").
- The Faculty Council's procedural rules, known as the Rules of Faculty Procedure (the "Faculty Rules").

124. True and accurate copies of the Student Information Form, the General Information Form, the Ad Board Chart, the Appeals Form, the Appeal Process Chart, and the Faculty Rules are attached, respectively, as Exhibits 3 through 8.

125. Harvard's failure to consolidate its Ad Board procedures into a single document, or indeed few enough documents to be counted on one hand, resulted in an inherently unfair and opaque procedure that is difficult for seasoned attorneys to understand, much less an undergraduate student without the benefit of counsel.

126. These documents were dense, unclear, and, at points, seemingly contradictory.

127. The Handbook, inclusive of the Ad Board Regulations, presumably controlled and limited all other documents.

128. As stated in the General Information Form, the "Administrative Board's decisions were governed by the rules and regulations contained in the *Handbook for Students*, and guided by standard responses and considerations of equity." Ex. 4 at p. 2.

129. Accordingly, although the Ad Board Regulations as outlined in the Handbook governed the Ad Board procedure, these ten documents, taken together, resulted in a deeply confusing, multi-phase process devoid of basic fairness and good faith.

**A. The Ad Board's Jurisdiction was Limited to Current Students and Did Not Permit Harvard to Withhold a Degree from an Uncharged Student**

130. The Ad Board Regulations expressly limited the Ad Board's jurisdiction in 2013 to only current Harvard undergraduate students and did not give Harvard authority to withhold degrees from uncharged students in good standing.

131. The Ad Board Regulations are clear that Harvard's powers were separated by two distinct moments in time: before a student is charged with a policy violation, and after a student has been charged with a policy violation.

132. The issuance of charges against a student required an affirmative action by the Ad Board; mere complaints of wrongdoing did not constitute a charge.

133. Indeed, the Ad Board Regulations stated that the "College will decide whether to issue a charge and, if so, against whom and for what." Ex. 2 at p. 4.

134. Under the Ad Board Regulations, the Ad Board could issue a charge against a respondent at the conclusion of an initial pre-charge investigation. *Id.*

135. Specifically, the Ad Board Regulations stated:

> Based on that information and any other information obtained through investigation, the Board will decide whether to issue a charge. If a charge is issued, the investigation will continue further and the Board will decide the case. *Id.*

136. Alternatively, the Ad Board could issue a charge against a respondent *sua sponte*.

137. Per the Ad Board Regulations, "[t]he Administrative Board may independently initiate a charge against a student, and usually does so when a student has been charged with a crime in a court of law." *Id.*

138. Regardless, charges could be issued only by affirmative Ad Board action.

139. The Ad Board Regulations permitted Harvard to withhold a student's degree only ***after*** it took the affirmative step, either *sua sponte* or upon the conclusion of an initial investigation, to issue charges.

140. Specifically, the Ad Board Regulations stated: "A degree will not be granted to a student **who is not in good standing or against whom a disciplinary charge is pending**." *Id.* at p. 5 (emphasis added).

141. The Student Information Form stated that a "student cannot receive a degree before a pending disciplinary case is resolved, or before his or her status in the College is restored to good standing, and ordinarily may not participate in commencement or related activities or exercises." Ex. 3 at p. 7.

142. A student cannot have a pending disciplinary case without a charge.

143. The Ad Board Regulations expressly stated:

> [A] student is considered in good standing when he or she is not on probation and has not been required to withdraw, dismissed, or expelled from the College for either academic or disciplinary reasons. Warnings and admonitions do not affect a student's good standing. Ex. 2 at p. 5.

144. Mere allegations against a student and the start of a pre-charge investigation did not put a student outside the bounds of "good standing."

145. Accordingly, Harvard, in 2013, had no authority to withhold a degree from a student who was not subject to a charge from the Ad Board, who was in good standing, and who met all of Harvard's academic requirements for graduation.

146. Thus, any sexual misconduct adjudication proceedings and findings against a student who was impermissibly denied a Harvard undergraduate degree were conducted without jurisdiction and are void.

**B. Under Harvard's Rules, Complaints Were Required to be Timely Submitted**

147. Under the Ad Board Regulations, complaints "must ordinarily be brought to the College in a timely manner." Ex. 2 at p. 4.

148. The Ad Board Regulations also stated that disciplinary cases are "ordinarily considered . . . as quickly as is reasonably possible," while the Student Information Form stated that the "entire process, from start to end, ordinarily takes between 3 to 6 weeks." *Id.*; Ex. 3 at p. 1.

**C. Harvard's Process was Deeply Flawed, Denying a Respondent a Trusted Advisor with whom He Shared Confidentiality**

149. Multiple governing documents encouraged a respondent to discuss sensitive matters with his Board Representative, without any warning that the respondents did not enjoy confidentiality, these documents actively promoted a false sense of security for the respondent.

**i. *Ad Board Regulations***

150. Under the Ad Board Regulations, a respondent was entitled to a "qualified adviser in addition to one's Resident Dean." Ex. 2 at p. 2.

151. The Ad Board Regulations did not define the roles and responsibilities of the "qualified adviser" or "Resident Dean."

152. In other Harvard documents, the "Resident Dean" was referred to as the "Board Representative" and the "qualified adviser" or "adviser" is referred to as the "personal adviser."

153. The Ad Board Regulations did not warn students that their communications were not confidential.

154. The Ad Board Regulations also failed to inform students that their Resident Dean/ Board Representative would convey all relevant communications to the Ad Board, even if the communications were or could be harmful to the respondent.

155. The Ad Board Regulations were therefore deceptive when they actively encouraged students to speak with their Resident Dean/Board Representative on even the most sensitive subjects, stating: "Students may consult with their Resident Deans about any concerns they have. In addition to academic questions . . . students frequently raise questions of a more personal nature with their Resident Dean." *Id.* at p. 3.

156. Even though the Ad Board encouraged students to consult with a Resident Dean/Board Representative, a student's Resident Dean/Board Representative acted as a liaison, not an advocate.

***ii. Student Information Form***

157. According to the Student Information Form, the Board Representative is the respondent's "official representative on the Administrative Board" and "serves as a liaison with the College in any Board matter." Ex. 3 at p. 3.

158. The Student Information Form presented this information to a respondent under the heading "Choosing Your Representation." *Id.*

159. Per the Student Information Form, the Board Representative, who is an Ad Board member and typically the respondent's Resident Dean of Freshmen or the Allston Burr Resident Dean, "will be present at all meetings," "will make certain that [the respondent is] kept informed throughout the process," and "will make certain that [the respondent's] perspective is clearly presented . . . [and] speak on [the respondent's] behalf." *Id.*

160. Although the Student Information Form told a respondent that the Board Representative "will not advocate for you," this form did not warn that the Board Representative could present damaging information to the Ad Board when presenting "a full summary of the facts of the case in which you are involved." *Id.*

161. Indeed, the Student Information Form expressly told a respondent that he "should be open and honest when talking with [his Board Representative]." *Id.*

***iii. General Information Form***

162. The General Information Form gave a respondent the same orders and false sense of security.

163. According to the General Information Form, the Board Representative was "an official representative on the Administrative Board who would act as [the respondent's] liaison in any Board matter." Ex. 4 at p. 1.

164. Per the General Information Form, the "role of the Board representative is to present to the Board a full summary of the facts of any petition or case, making certain the student's 'voice' is heard." *Id.*

165. Again, the General Information Form did not warn a respondent that his Board Representative communications are not confidential, or that prejudicial information could be relayed by the Board Representative during the presentation of "a full summary of the facts" to the Ad Board.

166. Despite withholding this crucial information concerning respondent rights, the General Information Form told a respondent that he "should work closely with [his] Board representative." *Id.*

167. The General Information Form did not "allow for the direct participation of parents, attorneys, or those who are not officers of the University affiliated with the Faculty of Arts and Sciences." *Id.* at p. 2.

**D. In Violation of the 2013 VAWA Amendments, Harvard Denied a Respondent the Ability to Have an Advisor of Choice**

168. On March 7, 2013, Congress and President Obama enacted the VAWA Amendments, which placed additional obligations upon universities in the sexual misconduct adjudication process.

169. According to 20 U.S.C. § 1092(f)(8)(B)(iv)(II), Harvard had to provide both the accuser and the accused, "the same opportunities to have others present during an institutional disciplinary proceeding, **including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice**." (emphasis added).

170. Harvard expressly refused respondents this essential right.

171. Indeed, a respondent was expressly prohibited from submitting any initial statements written by attorneys or other forms of counsel. Ex. 3 at p. 3.

172. This prohibition, however, was not placed on the complainant, who could submit complaints drafted by legal counsel.

173. Accordingly, any and all of the governing documents that prohibit choice of representation violated federal law.

**E. Harvard's Ad Board Regulations Were Unclear Regarding Voting Procedures**

174. It was unclear how the Subcommittee voted to recommend a charge to the Ad Board, and it was entirely possible that a recommendation could have been made based on a vote of a single Subcommittee member.

175. According to the Student Information Form, the Ad Board could choose one of three options when considering a charge recommendation: (i) issue a charge; (ii) decline to issue a charge, or (iii) postpone the charging decision pending receipt of specific additional information. Ex. 3 at p. 5.

176. According to the Student Information Form, the Ad Board may vote to issue a charge when: "(1) the allegations, if true, might constitute a violation of the rules of the Faculty of Arts and Sciences; and (2) further investigation is likely to enable the [Ad Board] to resolve the case." *Id.*

177. Again, there was no presumption of innocence, and the Ad Board's standard for issuing charges may have been below the stated standard of "sufficiently persuaded."

178. Further, there was no minimum vote requirement to issue a charge, and it was possible that a charge could have been issued with only a plurality vote under an undefined standard of proof.

179. According to the General Information Form, the parties' Board Representatives abstain "from voting on all matters directly related to students whom he or she represents," and, typically, the "Chair of the Board abstains from voting in all matters as well." Ostensibly, this prohibition included voting on whether to issue charges. Ex. 4 at p. 1.

180. However, the two Ad Board members who served on the Subcommittee were permitted to vote on whether to issue charges.

181. These two Ad Board members were the only voting Ad Board members with first-hand knowledge of the fact-finding process and most likely were afforded greater deference than less-involved peers.

182. Similarly, the Ad Board Regulations and General Information Form were completely silent on the procedure for the post-charge investigation process, and the Ad Board Regulations merely stated that if "a charge is issued, the investigation will continue further and the Board will decide the case." Ex. 2 at p. 4.

183. The only document that substantively addressed the post-charge investigation process was the Student Information Form.

184. According to the Student Information Form, once the Ad Board issued a charge, the Subcommittee continued its investigation by conducting additional interviews with the complainant, respondent, and possibly other witnesses. Ex. 3 at p. 5.

185. During this post-charge process, the respondent's Board Representative was under an affirmative obligation to attend all meetings, to keep the respondent "informed of the progress of the case," to provide copies of all documents submitted to the Subcommittee, and to notify their party of all "other information obtained by the [Subcommittee]." *Id.*

186. At no point in this post-charge process was there a mechanism for the respondent to ask questions of the complainant or adverse witnesses, or propose questions to the Subcommittee or Ad Board to ask of the complainant or adverse witnesses.

187. Other than those individuals on the Subcommittee, no other voting Ad Board members were involved in the fact-gathering process.

**F. The DCR—a Crucial Document that Guided the Entire Process—was Created by the Subcommittee without Sufficient Guidance and Standards**

188. The Ad Board Regulations and General Information Form were completely silent on the next, crucial phase of the Ad Board process—the Disciplinary Case Report (the "DCR").

189. The only documents that even mentioned the DCR were the Ad Board Chart and the Student Information Form.

190. The Ad Board Chart, however, did not contain any substantive explanation about the DCR, stating only that the "fact finder and the Subcommittee write a Disciplinary Case Report (DCR) that is sent by the Secretary to the Students." Ex. 5.

191. The DCR was discussed in only three sentences in the Student Information Form.

192. These three sentences, in their totality, read:

> At the conclusion of its investigation, the Subcommittee will issue a confidential report, called a Disciplinary Case Report ("DCR"), to the full Board. The DCR describes the facts and circumstances of the case and may include a recommendation for disciplinary action. DCRs include copies of all statements and other documents obtained by the fact finder or Subcommittee and deemed relevant to the allegations (such as police reports, court documents or other records).
>
> Ex. 3 at p. 5.

193. Nowhere in these three sentences did Harvard enunciate the standard of proof to be adopted by the Subcommittee when issuing the DCR.

194. Nowhere in these three sentences did Harvard state that the Subcommittee must provide the respondent a presumption of innocence when issuing the DCR.

195. Nowhere in these three sentences did Harvard enunciate the Subcommittee's voting mechanism for issuing the DCR or possibly recommending disciplinary action.

196. Nowhere in these three sentences did Harvard explain how the Subcommittee may recommend one sanction over another.

197. Nowhere in these three sentences did Harvard provide guidance or direction to the Subcommittee on how it should structure the DCR or refer to the parties.

198. Nowhere in these three sentences did Harvard authorize the Subcommittee to make determinations of credibility in the DCR.

### G. Harvard Prohibited Respondents from Appearing Before the Ad Board

199. Under Harvard's policies, the respondent was not permitted to personally appear before the Ad Board, to listen to the statements of his Board Representative, or even have an advocate at the Ad Board meeting.

200. According to the Student Information Form, this Board Representative "will present to the Board a full summary of the facts of the case in which [the respondent is] involved" and "make certain that [the respondent's] perspective is clearly presented." *Id.* at p. 3.

201. The Board Representative, however, was not the respondent's advocate. *Id.*

202. Furthermore, in disclosing a "full summary of the facts," it was possible that a Board Representative could tell the Ad Board damaging information that the respondent, under the belief that his communications were confidential, shared.

203. Because the respondent was prohibited from physically attending the Ad Board meeting, the respondent had no way of knowing what information the Board Representative disclosed, or if the Board Representative even made sure that the respondent's "perspective" was "clearly presented."

204. The Ad Board meeting was cloaked in secrecy.

205. The Ad Board regulations did not explain how the Ad Board was to conduct this meeting, and the General Information Form was likewise silent.

206. The Student Information Form, again, summarized the entire Ad Board meeting process in three sentences.

207. Under the hearing "Presentation of the Case," the Student Information Form states:

> Every Board hearing of a peer dispute case begins with *an oral summary of the allegations* by the Subcommittee and the fact finder. Members of the Board will have read the DCR and the written responses you and the respondent submitted, if any, before discussing and deciding the case. Any

> member of the Board may offer a recommendation for action, or *motion* (there is sometimes a range of motions offered), and, after the discussion, the Chair will call for a vote. *Id.* at p. 6. (emphasis in original).

208. At no point in this process may the respondent appear, or ask or answer questions.

**H. Following Creation of the DCR, the Proceedings Were Unduly Complex and Utterly Devoid of Transparency**

209. At some point during the Ad Board meeting, the Ad Board votes.

210. The Ad Board members who participated on the Subcommittee and issued the DCR were permitted to vote.

211. Given their unique status as the authors of the DCR and the only voting individuals with first-hand knowledge of the underlying investigation, these two Ad Board members likely held disproportionate sway on the Ad Board.

212. According to the Student Information Form and General Information Form, the Ad Board would take disciplinary action only when its membership was "sufficiently persuaded" that a policy violation occurred. *Id.* at p. 6; Ex. 4 at p. 2.

213. No policy document made it clear that a vote for a finding of responsibility was separate and apart from a vote for sanctions.

214. Thus, under Harvard's own policies, it was possible for the Ad Board to skip over a discrete vote on whether a policy violation occurred and, instead, proceed directly to a *combined* vote on responsibility plus sanctions.

215. The Ad Board could consider a multitude of sanctions against a respondent.

216. As the Ad Board had jurisdiction only over current Harvard students, none of the potential sanctions listed in any Harvard policy listed the revocation of a former student's degree.

217. According to the Ad Board Regulations, one of the most serious sanctions involved the Ad Board issuing a requirement to withdraw, with a recommendation to the Faculty Council for dismissal. Ex. 2 at pp. 5-7.

218. According to Harvard's policies, the Ad Board's sanction of withdrawal with a dismissal recommendation to the Faculty Council encompassed, on paper at least, two distinct concepts.

219. Per the Ad Board Regulations, a requirement to withdraw resulted in an undergraduate student being removed from Harvard by the Ad Board itself for two to four terms, and a "student who has twice been required to withdraw from the College will ordinarily not be readmitted" by the Ad Board. *Id.* at p. 7. (emphasis removed).

220. Readmission to Harvard by the Ad Board after a requirement to withdraw was not guaranteed, and, per the Student Information Form, "[o]rdinarily, a second requirement to withdraw, whether for a disciplinary case or academic review, is final." Ex. 3 at p. 7.

221. In addition to requiring a respondent to withdraw, the Ad Board could also recommend that the Faculty Council dismiss the respondent.

222. Per the Ad Board Regulations, dismissal meant that "a student's connection with the University is ended by a vote of the Faculty Council." Ex. 2 at p. 7. The Ad Board Regulations further stated that readmission to Harvard following a dismissal is rarely granted, and only by a vote of the Faculty Council. *Id.*[11]

223. The Student Information Form confirmed that the Ad Board itself could not dismiss a student, and, instead, may only recommend dismissal to the Faculty Council. Ex. 3 at p. 7.

[11] Expulsion precludes the respondent from ever being eligible to be readmitted to Harvard University.

224. At some point, in a process not explained in any document, the recommendation for dismissal was transferred from the Ad Board to the Faculty Council for consideration.

225. Nowhere in the Ad Board Regulations or the Handbook did Harvard explain how the Faculty Council determined whether to dismiss a respondent.

226. Likewise, nowhere in any document was there any process to appeal a decision made by the Faculty Council.

227. Upon information and belief, Harvard did not permit respondents to appeal any decision of the Faculty Council.

**I. Harvard's Appeal Process Was Equally Confusing and Lacked an Avenue to Appeal Dismissal by the Faculty Council**

228. To the extent Harvard had an appeals process, it was limited only to the Ad Board's decision, not the final decision of the Faculty Council.

229. Further, the Ad Board Regulations were almost completely silent on this appeals process stating only the following:

> A student may ask that any decision of the Administrative Board be reconsidered when there is additional or new relevant information available. A student has the option to appeal some disciplinary decisions of the Administrative Board in the Faculty Council. Information on this process may be obtained from the student's Allston Burr Resident Dean, Resident Dean of Freshmen, the Secretary of the Administrative Board (University Hall, First Floor), or the Secretary of the Faculty (University Hall, Ground Floor). Ex. 2 at p. 5.

230. The Appeals Form and the Appeals Process Chart were the only known documents that set forth Harvard's 2013 process for appealing Ad Board decisions.

231. The Appeals Form, however, was exceptionally sparse, and directed respondents to obtain additional information about the appeals process form the Secretary of the Faculty. Ex. 6.

232. Accordingly, the most comprehensive document outlining Harvard's Ad Board appeal process was a one-page flow chart.

233. Per the Appeals Form and Appeals Process Chart, a respondent could ask the Ad Board to reconsider its decision if new materially relevant information became available, or if there was reasonable evidence of procedural error. This was called Harvard's "Reconsideration Process." Exs. 6-7.

234. When the Ad Board's sanction was a requirement to withdraw, the respondent could appeal the Ad Board's decision to the Faculty Council. This avenue was called Harvard's "Appeal Process." *Id.*

235. In the Appeal Process, respondents could appeal the Ad Board decision to the Faculty Council on the following bases: (i) the Ad Board made a procedural error; (ii) the Ad Board came to the wrong conclusion about whether rules were violated, or; (iii) based upon a review of the annual disciplinary statistics of the Ad Board, the sanction imposed was inconsistent with the Ad Board's usual practice and was, therefore, inappropriate. *Id.*

236. In 2013 and 2014, the Faculty Council was governed by the Faculty Rules.[12]

237. Within the Faculty Council was the Docket Committee, which was composed of three voting members of the Faculty Council. Ex. 8 at Sect. 2.

238. Under the Appeal Process, the respondent submitted his appeal to the Secretary of the Faculty, who forwarded the appeal to the Ad Board Chair, who was also the Dean of Harvard College. Ex. 7.

[12] Although the Ad Board proceeded against Damilare in 2013, Damilare's appeal was not filed until 2014.

239. The Ad Board Chair / Dean of Harvard College then issued a written statement objecting to the respondent's appeal and submitted this objection, along with the original Ad Board case materials, to the Secretary of the Faculty. *Id.*

240. Under this Appeal Process, the Ad Board and the Ad Board Chair / Dean of Harvard College were not neutral adjudicatory bodies.

241. Instead, Harvard transformed itself into an interested party that objected to appeals submitted by respondents.

242. The respondent then received the objection of the Ad Board Chair / Dean of Harvard College and submitted a response the Secretary of Faculty. *Id.*

243. The Secretary of the Faculty then sent the documentation to the Docket Committee, who decided whether the case merited an appeal. *Id.*

244. If the grounds for an appeal were met, the Docket Committee forwarded the case material to the Faculty Council. *Id.*

245. Neither the Appeals Process Chart, nor the Appeals Form, nor the Faculty Rules explained how the Docket Committee determined if "the grounds for an appeal are met," how the Docket Committee voted, or what standard of review was employed.

246. Upon information and belief, Harvard never codified the Docket Committee's 2013 or 2014 appeal review procedures in a written document, and the Docket Committee never employed an articulated standard of review.

247. If the Docket Committee forwarded the respondent's appeal to the Faculty Council, then the Faculty Council would review the appeal and decide the outcome. *Id.*

248. According to the Faculty Rules, "[u]nless otherwise stated, votes will carry with a simple majority of members present and voting." Ex. 8 at Sect. 19.

249. The Faculty Rules, however, did not include any standard of review for the Faculty Council when it was operating as an appellate body considering a respondent's appeal, or as an initial adjudicatory body considering only the Ad Board's recommendation to dismiss. Upon information and belief, no standard of review existed.

250. The Ad Board Regulations, the Student Information Form, the General Information Form, the Ad Board Chart, the Appeal Form, and the Appeals Process Chart were all silent on these issues.

251. At no point was the respondent permitted to appear before the Faculty Council, even when it was operating as an initial adjudicatory body, to propose, ask, or answer any questions.

252. Further, the Faculty Council did not engage in any fact-finding whatsoever, even when it was solely considering a recommendation to dismiss.

253. Once the Faculty Council made its decision, on whatever basis it employed, the respondent was supposed to be notified of the outcome by the Secretary of the Faculty. Ex. 7.

254. The respondent had no ability to appeal any decision made by the Docket Committee or Faculty Council.

255. Given the extreme opacity and convoluted nature of Harvard's decision-making and appeals process, including the inability of respondents to advocate for themselves at any point, the Faculty Council was nothing more than a rubber-stamp for the Ad Board, and the Ad Board was nothing more than a rubber-stamp for the Subcommittee.

256. Such a confusing and convoluted process inherently denied a respondent basic fairness.

## VII. Harvard Subjected Damilare to a Confusing and Convoluted Disciplinary Process

257. With a full appreciation for the inherently unfair nature of the Ad Board and Faculty Council process, it is imperative that this Court understand that Harvard subjected Damilare to this procedural monstrosity without jurisdiction.

### A. Harvard had no Authority to Deny Damilare His Undergraduate Degree on May 30, 2013

258. In May 2013, Harvard, through Rankin, sought out and organized women to file sexual misconduct claims against Damilare.

259. That same month, Damilare was set to graduate and receive his undergraduate degree from Harvard on May 30, 2013.

260. On May 28, 2013, Ann and Cindy, under pressure from Rankin, filed sexual misconduct complaints against Damilare.

261. Ann's complaint was filed 626 days after her sexual experience with Damilare, and 337 days after she first met with Rankin.

262. On May 29, 2013, Harvard permitted Damilare to speak as the male Harvard Orator for Class Day.

263. On May 30, 2013, Damilare walked in Harvard's graduation ceremony, and, on that day, should have received his undergraduate degree.

264. As of May 30, 2013, Damilare had completed all of the academic requirements to receive his undergraduate degree from Harvard.

265. As of May 30, 2013, Damilare was in good standing at Harvard.

266. As of May 30, 2013, the Ad Board had not brought any charges against Damilare.

267. Accordingly, under the Ad Board Regulations, Harvard had no authority to withhold Damilare's undergraduate degree from him on May 30, 2013.

268. Because Damilare should have been a former student as of his graduation day, Harvard had no jurisdiction to subject Damilare to the Ad Board process, and the findings of the Ad Board and Faculty Council are void.

269. The loss of his degree cost Damilare his place as a Harvard Business School admit.

270. On May 5, 2014, Damilare received a job offer with a base compensation of $150,000.00 per year and an annual bonus of $100,000.00 to $200,000.00. On May 16, 2014, the offer was rescinded due to issues surrounding Damilare's lack of a college diploma.

271. Even after Damilare left Wall Street for a new industry, many in the new industry were connected to Harvard, and he was confronted about the reason he did not have a degree.

272. Damilare has lost further opportunities in connection with his exclusion from the Harvard alumni community.

### B. Despite Lacking Jurisdiction, Harvard Subjected Damilare to Unfair Proceedings

273. On June 3, 2013, four days after Damilare should have received his degree, Damilare met with Dean Ellison about the claims made against him.

274. Damilare, then only 21 years old, had no personal adviser, attorney, or any support system with him at this meeting.

275. Further, at no point did Dean Ellison advise Damilare that he was entitled to have anyone else present at this meeting, even though the Ad Board Regulations clearly stated that this initial conversation had to take place between Damilare, Dean Ellison, and Damilare's Resident Dean / Board Representative. Ex. 2 at pp. 3-4.

276. At the meeting, Dean Ellison informed Damilare he could not have an attorney as his personal adviser.

277. Harvard's prohibition on Damilare obtaining counsel violated federal law, 20 U.S.C. § 1092(f)(8)(B)(iv)(II), and made Damilare believe that he was not subject to a punitive proceeding but rather an "educational" proceeding, as stated in the General Information Form.

278. When Damilare was finally assigned a Board Representative, Damilare believed that his communications would be confidential; however, they were not.

279. On June 4, 2013, five days after Damilare should have received his degree and the day after his initial meeting with Dean Ellison, Betty, under pressure from Rankin and Cindy, filed her complaint.

280. Damilare never had an initial conversation with Dean Ellison about Betty's complaint, even though, under the Ad Board Regulations, such a meeting was required to mark the start of the Ad Board process. Ex. 2 at pp. 3-4.

### C. Harvard Subjected Damilare to Unfair Proceedings that Were Almost Exclusively White and Inherently Tainted with Bias

281. The exclusively white Subcommittee simultaneously investigated the claims of Ann, Betty, and Cindy against Damilare.

282. Harvard did not appoint separate Subcommittees to investigate each discrete case.

283. Owing to these simultaneous and overlapping investigations, Harvard denied Damilare a fair investigatory process, as each case undoubtedly influenced the Subcommittee as it reviewed the other matters.

284. In late May and early June 2013, Damilare and the complainants each submitted their initial statements and responses to the Subcommittee. The Subcommittee then began the parties' initial interviews.

285. Laura Johnson ("Johnson"), the Allston Burr Resident Dean for Currier House, served as Damilare's Board Representative.

286. All three complainants chose Rankin as their personal adviser.

287. Rankin also later appeared as a witness for Ann and Cindy.

288. Both Betty and Cindy, who were close friends, chose Laura Brandt as their Board Representative.

289. Ann chose Lisa Boes as her Board Representative.

290. Following her involvement in Damilare's proceeding, Lisa Boes transferred to Brandeis University and became its Dean of Academic Services.

291. In her new role at Brandeis, Lisa Boes distinguished herself for her involvement in the sexual misconduct proceeding made famous by this Court in *Doe v. Brandeis*, 177 F. Supp. 3d 561 (D. Mass. 2016).

292. In *Doe v. Brandeis*, Lisa Boes faced allegations that she violated Brandeis's sexual misconduct policy, and this Court ultimately allowed a negligence claim to proceed against Brandeis on the theory that "Brandeis knew, or should have known, that Boes had a propensity to commit procedural errors in handling disciplinary proceedings." *Id.* at 614.

### D. The Subcommittee Conducted Contaminated Interviews with the Complainants and the Ad Board Charged Damilare

293. On June 17, 2013, the Subcommittee began pre-charge interviews.

294. At the time, Damilare, who should have had a degree in hand, had begun work at Goldman Sachs in New York City and could not participate in the interviews in-person.

295. At 2:00 p.m. on June 17, the Subcommittee interviewed Ann in person, and, one hour later, at 3:00 p.m., the Subcommittee interviewed Cindy.

296. At 4:00 p.m., the Subcommittee interviewed Damilare via Skype about Ann's claims, and at 5:00 p.m. the Subcommittee interviewed him about Cindy's claims.

297. Two days later, on June 19, 2013, the Subcommittee interviewed Betty at 10:00 a.m. and then interviewed Damilare at 11:00 a.m.

298. The parties' respective Board Representatives attended each interview, and Rankin supported each complainant in-person at their interviews.

299. At no point could Damilare ask questions of the complainants or propose questions to the Subcommittee.

300. In fact, pursuant to the Student Information Form, Damilare had no right to confront the complainants.

301. On June 25, 2013, the Subcommittee issued three written recommendations that the Ad Board issue charges against Damilare for sexual misconduct in the cases of Ann, Betty, and Cindy.

302. Although Damilare was identified by name in each of these charge recommendations, Ann, Betty, and Cindy remained unidentified in documents.

303. Further, none of these charge recommendations clarified if Damilare was being charged with sexual misconduct for "rape," "indecent sexual assault and battery," or the miscellaneous catch-all provision, even though the three categories had markedly different *prima facie* elements.

304. That same day, June 25, 2013, Damilare responded to the Subcommittee's three charge recommendations.

305. Even later that same day, the Ad Board voted to issue charges of "sexual misconduct" against Damilare in each case and referred the matter for additional fact finding.

306. Damilare was not permitted to appear at the Ad Board meeting or to have anyone advocate on his behalf.

307. It is unknown who was present at the Ad Board meeting and who voted to issue charges against Damilare.

308. It is unknown what standard of review the Ad Board employed in issuing charges or what the final vote actually was.

309. Because the Ad Board never had jurisdiction over Damilare, who was impermissibly denied his degree, the Ad Board's charge was void, as was the Subcommittee's recommendation for charges.

### E. Harvard Refused to Reveal the Identity of Adverse Witnesses to Damilare

310. Although Harvard promised Damilare a quick investigation, to be completed within three to six weeks, Harvard dragged out Damilare's investigation for months.

311. Further, during this time, Damilare was regularly working 80-100 hour weeks at his new job in New York City.

312. Throughout June, July, August, and even September 2013, the Subcommittee sought and accepted written statements from witnesses, including Rankin.

313. Although the Subcommittee provided Damilare with copies of these written statements, the Subcommittee never identified by name any of the adverse student witnesses against him.

314. The only identified adverse witness was Rankin, who, while serving as the personal adviser to all three complainants, submitted written statements on behalf of Ann and Cindy.

315. Upon review of these anonymous written statements, however, it became clear that Betty and Cindy were serving as witnesses for each other's investigations.

316. Upon information and belief, Cindy was "Witness 1" in Betty's case, and Betty was "Witness 8" in Cindy's case.

317. At no point did the Subcommittee permit Damilare to ask, or even suggest, questions for these anonymous adverse witnesses.

318. Further, although Damilare attempted to find comprehensive evidence of his innocence, his efforts were significantly stymied without the assistance of an advocate.

319. The significant passage of time hindered Damilare from locating exculpatory evidence. Many messages with Betty and Cindy were inadvertently erased, and Damilare could not obtain security camera footage of Ann and himself on September 10, 2011.

320. The Subcommittee also permitted the complainants to submit incomplete and cherry-picked transcripts of their electronic communications.

321. In August, September, and October 2013, the Subcommittee interviewed the parties and the majority of the witnesses who had submitted written statements.

322. The Subcommittee conducted interviews in all three cases at substantially the same time and interviewed Betty for Cindy's case, and vice versa.

323. The Subcommittee prohibited Damilare from attending or listening to any of its interviews with the complainants or adverse witnesses.

324. Also, neither the Subcommittee, nor Johnson informed Damilare when the Subcommittee's interviews were scheduled to take place.

325. Damilare did not know what questions the Subcommittee had asked of the complainants and adverse witnesses.

326. Upon information and belief, Johnson never asked Damilare if he had any questions for the Subcommittee to ask the complainants and adverse witnesses.

### F. The Subcommittee Issued Recommendations that Damilare Violated School Policy in Three Separately Issued DCRs

327. On November 13, 2013, Johnson provided Damilare with the Subcommittee's three DCRs in a single email.

328. Clearly, the Subcommittee, in addition to conducting the investigations for all three cases simultaneously, wrote the DCRs at the exact same time as well.

329. Without the assistance of legal counsel, Damilare was instructed by Johnson to submit responses to all three DCRs by November 18, 2019.

330. Damilare, with no guidance or legal counsel, had to review and respond to each of the three DCRs, which totaled 60 pages, in a matter of five days.

331. Each of the DCRs recommended that the Ad Board require Damilare to withdraw and recommend dismissal to the Faculty Council.

332. Given the fact that the Subcommittee was the only body with the ability to ask questions of the parties and determine credibility, the Subcommittee should not have made any conclusions without Damilare having the ability to confront the complainants and adverse witnesses.

333. Additionally, the Subcommittee, while making credibility determinations, overlooked material inconsistencies and conflicts of interests among the anonymous adverse witnesses.

334. For example, in the DCR concerning Betty, the Subcommittee did not mention that Cindy, who was Betty's "Witness 1," may have had significant motivation to testify in Betty's favor or that she encouraged Betty to file a complaint in solidarity.

335. Likewise, Betty's DCR did not address the fact that Betty and Cindy gave conflicting accounts of what had allegedly occurred between Betty and Damilare, with Betty

claiming that she had slept on the couch after an alleged incident, and Cindy claiming that Betty had forced Damilare onto that same couch.

336. Without the assistance of any counsel, Damilare submitted responses to the three DCRs on Monday, November 18, 2013 at 6:44 a.m., and then headed to his fulltime job.

**G. The Ad Board Rubber-Stamped the Subcommittee's Recommendation**

337. On November 19, 2013, the 2013-2014 Ad Board met and simultaneously discussed all three cases against Damilare.

338. Damilare was not given the opportunity to attend the Ad Board meeting or to advocate on his behalf.

339. At no point was Damilare given the opportunity to suggest questions to the Ad Board to ask of the parties and witnesses.

340. Although Johnson attended the Ad Board meeting as Damilare's Board Representative, she was not an advocate for Damilare, and she was specifically barred under Harvard's policies from serving in an advocate capacity.

341. Further, because Harvard prohibited Damilare from attending the Ad Board meeting, he had no way of knowing if Johnson accurately presented his position, or if she divulged confidential information.

342. However, the Subcommittee could present not just its factual findings to the Ad Board, but also its conclusions on Damilare's credibility.

343. Because Damilare did not have an advocate in front of the Ad Board, none of the Subcommittee's impermissible determinations of credibility could be challenged.

344. Further the Ad Board did not seek or permit any witness testimony, so it could not make its own determinations on the facts or witness credibility.

345. Moreover, it is unknown if the identities of the witnesses were provided to the Ad Board, so it is possible that the Ad Board was never informed that Betty and Cindy were witnesses for each other.

346. Finally, the Ad Board's members on the Subcommittee—i.e. the only Ad Board members with first-hand knowledge of the investigation process, and who had already declared Damilare to be un-credible—could vote at the Ad Board meeting and ask and answer questions.

347. As such, these Ad Board members who served on the Subcommittee likely held disproportionate sway in the Ad Board's vote.

348. Without the benefit of a single advocate or the ability to challenge the Subcommittee's impermissible credibility determinations before the Ad Board, Damilare's fate was sealed.

349. On November 19, 2013, the Ad Board simultaneously rubber-stamped the Subcommittee's recommendations in all three cases, requiring Damilare to withdraw from Harvard and recommending his dismissal to the Faculty Council.

350. It is unknown what the final vote was, how Ad Board members were "sufficiently persuaded," or if the Ad Board gave Damilare a presumption of innocence.

351. On November 25, 2013, nearly six months after Harvard impermissibly withheld his undergraduate degree, Johnson informed Damilare of the Ad Board's decision.

352. With only the most threadbare attempt at separating the three cases, Johnson provided Damilare with three, nearly identical outcome letters.

353. The third letter, which was for Cindy's case, noted that Damilare's requirement to withdraw was "third and final," and that he was unlikely to ever be readmitted to Harvard.

354. Because the Ad Board never had jurisdiction over Damilare, who was impermissibly denied his degree, the Ad Board's findings of responsibility were void, as were the Subcommittee's DCR recommendations.

### H. Damilare Appealed the Ad Board's Decisions and in an Opaque Process, the Faculty Council Dismissed Damilare from Harvard

355. On May 19, 2014, Damilare appealed the Ad Board's decisions to the Faculty Council.

356. Among Damilare's many objections, he specifically objected to the Subcommittee and the Ad Board denying him a fair process by simultaneously investigating and deciding all three cases.

357. Damilare also objected to the fact that: (i) he did not receive adequate guidance or information from Johnson; (ii) he could not question or even propose questions to the complainants or adverse witnesses, and; (iii) the Subcommittee made impermissible and baseless credibility determinations.

358. Over six months later, on September 26, 2014, Rakesh Khurana, the Dean of Harvard College and Ad Board Chair, submitted his objections to Damilare's appeals.

359. In objecting to Damilare's appeals, Dean Khurana turned the Ad Board from an allegedly independent adjudicatory body into an interested party against Damilare.

360. Shortly thereafter, Damilare submitted his replies to Dean Khurana's objections.

361. Presumably, Damilare's appeals were delivered to the Docket Committee.

362. It is unknown, however, who sat on the Docket Committee, when the Docket Committee reviewed Damilare's appeals, or if the Docket Committee provided the appeals to the Faculty Council for consideration.

363. No one from Harvard ever told Damilare if his appeals had been forwarded from the Docket Committee to the Faculty Council for consideration.

364. Damilare was not permitted to appear before the Docket Committee or Faculty Council or propose questions to the Docket Committee or Faculty Council.

365. Further, the Faculty Council did not engage in any fact-finding, in either its capacity as an appellate body, or as an initial adjudicatory body determining whether to dismiss Damilare.

366. On December 10, 2014, the Faculty Council met and dismissed Damilare from Harvard.

367. It is unknown what the vote was to dismiss Damilare, if the Faculty Council received or considered Damilare's appeals, or what standard of review the Faculty Council employed.

368. Ultimately, without allowing any advocacy or conducting any fact-finding, the Faculty Council simply rubber-stamped the Ad Board's recommendation, which was nothing more than a rubber-stamp of the Subcommittee's recommendation.

369. Damilare had no ability to appeal the Faculty Council's dismissal, or the unknown decision of the Docket Committee.

370. Damilare's dismissal became effective on December 12, 2014, and he never received his Harvard undergraduate degree.

371. Because the Faculty Council never had jurisdiction over Damilare, who was impermissibly denied his degree, the decisions of the Faculty Council and Docket Committee were void.

**COUNT ONE**
**Breach of Contract**

372. Damilare incorporates by reference all of the preceding paragraphs of this Amended Complaint as though fully rewritten herein.

373. It is well-established in Massachusetts that the relationship between a student and a school is contractual. The contract can include the university's policies relating to conduct and disciplinary proceedings. In determining whether a university breached any provision of its educational contract, the Court will determine whether the university's actions met the reasonable expectations of the student.

374. Harvard offered enrollment to Damilare, and Damilare accepted that offer and paid Harvard tuition.

375. Damilare then satisfied all of the obligations required of Harvard to receive his undergraduate degree, and, in addition, earned exemplary grades and served in multiple leadership capacities, particularly for Harvard's black community.

376. Damilare enrolled at Harvard with the understanding and reasonable expectation that Harvard would enforce the provisions and policies in Harvard's official publications, including the Handbook (inclusive of the Students Rights Policy, Racial Harassment Policy, Sexual Misconduct Policy, and Ad Board Regulations), as well as all other official documents, including the Student Information Form, General Information Form, Ad Board Chart, Appeals Form, Appeals Process Chart, and Faculty Rules.

377. As such, an express contract, or alternatively, a contract implied in law or in fact, was formed between Damilare and Harvard.

378. The contract between Damilare and Harvard required that Harvard act fairly, expressly promising fairness in four distinct instances:

**i.** In the FAS Resolution on Rights and Responsibilities ("[I]t is the responsibility of all members of the academic community…to give full and fair hearing to reasoned expressions of grievances");

**ii.** In the General Regulations regarding Harassment ("The College's investigation and adjudication process is designed to be careful and fair.");

**iii.** In the Ad Board's General Information on Disciplinary Cases ("The procedures for resolving disciplinary cases are designed to ensure that students are given a fair opportunity to be heard."): and

**iv.** In the Ad Board's General Information on Disciplinary Cases ("Every effort is made to provide fair treatment of each undergraduate relative to all other undergraduates.)"

379. Based on the aforementioned facts and circumstances, Harvard materially breached the express and/or implied agreement(s) with Damilare and subjected him to a blatantly arbitrary and capricious disciplinary process. A non-exhaustive list of Harvard's material breaches includes all of those wrongs listed in Paragraph 4, and as enumerated below:

***A. Failure to Have Jurisdiction to Force Damilare to Withdraw and to Dismiss Him***

380. Under its policies, Harvard had authority to act against only those persons lawfully within its jurisdiction.

381. The Faculty Council's dismissal, the Faculty Council and/or Docket Committee's rejection of Damilare's appeal, the Ad Board's requirement to withdraw and recommendation of dismissal, and the Subcommittee's DCR recommending a requirement to withdraw and recommendation of dismissal were all rendered without necessary jurisdiction in violation of Harvard's policies.

382. Harvard lost jurisdiction over Damilare on the day he was entitled to receive his undergraduate degree and become a former student, even though Harvard impermissibly withheld Damilare's undergraduate degree.

383. The Ad Board Regulations are clear that Harvard could withhold an undergraduate student's degree only if that student was not in good standing or Ad Board charges were pending, neither of which had occurred by Damilare's graduation day. Ex. 2 at p. 5.

384. A disciplinary case alone does not render a student not in good standing and Damilare was otherwise in good standing on graduation day.

385. Damilare was a student in good standing on graduation day.

386. Damilare reasonably believed he would receive his degree as he spoke at commencement and his speech was posted online on June 4, 2013 by Harvard. *See* Harvard University, *Harvard Orator: Damilare Sonoiki / Harvard Commencement 2013*, YOUTUBE (June 4, 2013), https://www.youtube.com/watch?v=jaubNt7zvvk&feature=youtu.be.

387. The aforementioned decisions of the Faculty Council, Docket Committee, Ad Board, and Subcommittee were rendered without proper jurisdiction over Damilare in violation of Harvard's policies.

388. Accordingly, each action described in the preceding paragraphs constituted a separate and distinct breach of contract because the ultimate decisions were rendered without jurisdiction.

### ***B. Failure to Issue Findings Under an Intelligible Standard of Review or With Basic Definitions***

389. Harvard subjected Damilare to a disciplinary process that lacked basic definitions and a measurable standard of proof.

390. Although the Ad Board found Damilare responsible for "sexual misconduct," and the Faculty Council dismissed Damilare for "sexual misconduct," it is unknown if Damilare's alleged "sexual misconduct" was for rape, indecent assault and battery, or miscellaneous, which, under Harvard's Sexual Misconduct Policy, contain wildly different *prima facie* elements.

391. Further, Harvard's Sexual Misconduct Policy lacked rudimentary definitions for necessary elements, such as "physical coercion," "threat of bodily injury," or "unwillingness," and did not include, require, or define the concept of "consent."

392. As a result of Harvard's use of an overbroad and vague Sexual Misconduct Policy, the decisions of the Ad Board and Faculty Council are rendered void for vagueness.

393. Additionally, at no point did Harvard's adjudicatory bodies implement a measurable and defined standard of review.

394. The Ad Board issued its ruling requiring Damilare's withdrawal from Harvard and recommending dismissal under the insufficient and unrecognizable standard of "sufficiently persuaded," which did not afford Damilare a presumption of innocence.

395. Additionally, the Subcommittee issued its DCRs recommending withdrawal with a requirement for dismissal without operating under a measurable and defined standard of review.

396. Similarly, neither the Docket Committee nor the Faculty Council operated under a measurable and defined standard of review.

### *C. The Subcommittee's Impermissible Issuance of Credibility Determinations*

397. Under Harvard's policies, the Subcommittee did not have the authority to issue DCRs with credibility determinations.

398. Indeed, with the exception of only three sentences in the Student Information Form, Harvard's policies were substantively silent on the contents of the DCRs.

399. Given that neither the Ad Board, nor the Docket Committee, nor the Faculty Council engaged in any fact-finding, the DCRs should not have contained any determinations of credibility, as their contents would hold disproportionate sway among the adjudicatory bodies.

400. In effect, the DCRs impermissibly poisoned the adjudicatory bodies against Damilare.

401. Additionally, prior to the issuance of the DCRs, the Subcommittee should have permitted Damilare to pose questions, either directly or indirectly, to the complainants and adverse witnesses.

### *D. Failure to Provide Fundamental Fairness*

402. Harvard's policies promise that students are entitled to a "full and fair hearing" of grievances and to operate free from racial stereotypes.

403. Notwithstanding, Harvard deprived Damilare fundamental fairness in the disciplinary process when it: (i) denied him the opportunity to advocate before the Ad Board, Docket Committee, or Faculty Council or to ask or answer questions, or to propose questions for anonymous adverse witnesses; (ii) denied Damilare the ability to hear the statements of his Board Representative before the Ad Board, who may have divulged prejudicial information that was divulged in confidence; (iii) denied him the ability to have any advocate before an adjudicatory body, including the Ad Board; (iv) intentionally caused Damilare to believe that his

communications with his Board Representative were confidential, when, in truth, there was no privilege; (v) denied Damilare the right to consult with a personal adviser of his choice throughout the Ad Board process, in violation of federal law; (vi) denied Damilare the ability to know the identities of the adverse witnesses against him before the Ad Board and Faculty Council rendered their decisions; (vii) subjected Damilare to an adjudicatory process riddled with implicit racial bias as, upon information and belief, there were no black persons on the Subcommittee, no black men on the Ad Board, and, at most, one black man on the Faculty Council; (viii) turned the Ad Board into an interested and adversarial party against Damilare during the appeal process; (ix) subjected Damilare to contaminated and biased proceedings because the three cases of Ann, Betty, and Cindy were considered and adjudicated simultaneously; (x) subjected Damilare to an inherently unfair adjudicatory process that was confusingly strewn across no less than 10 convoluted, dense, and seemingly contradictory policies, many of which directed Damilare to seek unwritten procedural information from individuals; and (xi) subjected Damilare to proceedings that were not independent and impartial, because the adjudicatory bodies conducted no independent fact-finding, thus causing the Faculty Council to rubber-stamp the recommendation of the Ad Board, and the Ad Board to rubber-stamp the recommendation of the Subcommittee in the DCR.

***E. Failure to Provide Right to an Effective Appeal***

404. Harvard denied Damilare the right to an effective appeal when it subjected him to a confusing, opaque, and inherently imbalanced appeal process.

405. When Damilare appealed the decision of the Ad Board to the Faculty Council, the Dean of Harvard College/Ad Board Chair submitted written objections to Damilare’s appeals. These objections turned the Ad Board from an allegedly independent neutral arbiter into an interested adverse party.

406. Additionally, there were no timeframes for this appellate process, it is unknown how, when or if the Docket Committee acted upon Damilare's appeals, it is unclear if the Faculty Council received or ruled upon Damilare's appeals, and no aspect of the appellate process occurred under a defined standard of review.

407. Finally, Damilare had no ability to appeal the Faculty Council's dismissal of him from Harvard, even though that decision may have been rendered when the Faculty Council was acted as an initial adjudicatory body upon the Ad Board's recommendation.

### *F. Failure to Rule Upon Timely Complaints or Issue Rulings in a Timely Manner*

408. Harvard found Damilare responsible for complaints that were not timely filed and subjected him to an impermissibly lengthy disciplinary process.

409. Although Harvard's policies required the submission of timely complaints, Ann's complaint was not timely filed, given that she submitted it 626 days after her sexual experience with Damilare, and 337 days after she first met with Rankin.

410. Likewise, Betty's complaint was also not timely filed, given that it was not submitted until several days after Damilare should have received his Harvard undergraduate degree.

411. Moreover, Harvard violated its own policies, which promised a reasonably quick procedure lasting roughly three to six weeks, when it subjected Damilare to a disciplinary process that lasted 18 months.

412. As a direct and foreseeable consequence of the above material breaches of contract by the Harvard, Damilare sustained damages, including without limitation, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

### *G. Administrative Bias Demonstrated by Dean Ellison Permeated the Proceedings*

413. Dean Ellison, Secretary and voting member of the Ad Board, demonstrated bias against Damilare through his actions and inactions described herein, and Dean Ellison's later participation in Ad Board proceedings influenced such proceedings and constituted a breach of contract.

414. Dean Ellison, without limitation, demonstrated bias against Damilare by: (i) personally soliciting and orchestrating Ann's and Cindy's Title IX complaints against Damilare; (ii) urging Rankin to contact Cindy a second time and encouraging Cindy to file a Title IX Complaint; (iii) personally meeting with Cindy to encourage her to file a Title IX Complaint against Damilare; (iv) encouraging Rankin to contact Ann to pressure her to file a formal complaint; (v) failing to tell Damilare that he had the right have his Resident Dean with him at the initial meeting; (vi) failing to permit Damilare's Resident Dean to be present during his June 2013 meeting regarding Ann's and Cindy's submitted complaints (the Ad Board Regulations clearly stated that this initial conversation had to take place between Damilare, Dean Ellison, and Damilare's Resident Dean / Board Representative. Ex. 2 at pp. 3-4.); (vii) failing to hold an initial meeting after Betty's complaint was filed in violation of Ad Board procedure; and (viii) after violating Ad Board procedures and demonstrating bias, participating in, influencing, and voting during the Ad Board process adjudicating the Title IX Complaints against Damilare.

415. Dean Ellison's actions and inactions during his involvement in the investigation, combined with his failure to follow Ad Board Regulations, demonstrated impermissible administrative bias against Damilare.

416. Harvard breached its contract with Damilare when it permitted Dean Ellison to participate in, to influence, and to cast his vote as Secretary of the Ad Board during the proceedings after demonstrating said bias against Damilare.

417. As a result of the foregoing, Damilare is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorney fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Damilare Sonoiki respectfully requests for relief and judgment as follows:

(A) On the first cause of action for breach of contract, a judgment awarding damages in an amount to be determined at trial in excess of Seventy-Five Thousand Dollars ($75,000.00), including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospect, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(B) A declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by Harvard, via the Subcommittee, Ad Board, Docket Committee, and Faculty Council, are void and reversed; (ii) Harvard award Damilare his undergraduate degree; (iii) Damilare's disciplinary record be reversed and expunged, and that Harvard publicly state it has reversed and expunged Damilare's disciplinary record; (iv) Harvard be required to verify this reversal and expungement of Damilare's record by providing Damilare with a notarized letter confirming that the findings and sanction have been reversed and expunged; (v) Any record of complaints made against Damilare be permanently destroyed; and (vi) Awarding Damilare such and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

Plaintiff Damilare Sonoiki demands a trial by jury of all triable issues in the present matter.

Respectfully Submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ Susan C. Stone*
SUSAN C. STONE (OH 64445) (*pro hac vice*)
KRISTINA W. SUPLER (OH 80609) (*pro hac vice*)
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: scs@kjk.com; kws@kjk.com

**NESENOFF & MILTENBERG, LLP**

*/s/ Tara J. Davis*
TARA J. DAVIS (BBO # 675346)
101 Federal Street, 19th Floor
Boston, Massachusetts 02110
Telephone: (617) 209-2188
Facsimile: (212) 736-2260
Email: Tdavis@nmllplaw.com

*Counsel for Plaintiff Damilare Sonoiki*

**CERTIFICATE OF SERVICE**

I hereby certify that I served a true copy of the above document upon all parties with an interest in this matter by electronically filing it through this Court's CM/ECF filing system this August 11, 2022.

*/s/ Susan C. Stone*
SUSAN C. STONE (OH 64445) (*pro hac vice*)