UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAMILARE SONOIKI,

                Plaintiff,

    v.

HARVARD UNIVERSITY, et al.,

                Defendants.

Civil Action No. 1:19-cv-12172-LTS

Leave to file redacted granted
May 31, 2023

## MEMORANDUM OF LAW IN SUPPORT OF HARVARD'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendants Harvard University, Harvard University Board of Overseers, and President and Fellows of Harvard College (together, "Harvard") submit this Memorandum in support of their Motion for Summary Judgment (the "Motion").

## INTRODUCTION

On May 28, 2013, two days before he was slated to graduate from Harvard College, two women separately accused Plaintiff Damilare Sonoiki of engaging in non-consensual sex with them. A third woman filed a complaint against Plaintiff several days later. These complaints initiated disciplinary cases against Plaintiff before Harvard College's Administrative Board ("Ad Board"). After thorough investigations, the Ad Board found the complaints substantiated and dismissed Plaintiff for serious violations of Harvard's policy against sexual misconduct.

Despite the lack of a Harvard degree, Plaintiff worked for more than a year at Goldman Sachs, where he engaged in an unlawful insider-trading scheme. Plaintiff then moved to California, and again, despite the lack of degree, was gainfully employed for several years, including as a writer for hit shows including *The Simpsons* and *Black-ish*. After Plaintiff was charged with insider trading in 2018, Plaintiff lost his writing jobs.

Plaintiff then filed this lawsuit alleging numerous claims against Harvard, most of which were dismissed by this Court and affirmed on appeal. The one remaining claim alleges that Harvard failed to follow its own disciplinary procedures in certain respects. Now, after full discovery, the undisputed evidence confirms that Plaintiff's remaining theories fail, too.

Plaintiff's main theory is that he had a reasonable expectation, based on Harvard's written disciplinary procedures, that Harvard had no "jurisdiction" to withhold his degree when two complaints of sexual misconduct were filed against him before graduation: he argues that

Harvard could only withhold a degree if it had issued a formal "charge" against him. But a formal charge cannot issue until a preliminary investigation of the complaints, including interviews of (and written statements by) the complainant and accused—which Harvard obviously was in no position to do in the two days between the filing of the complaints and graduation. So Plaintiff's theory is that Harvard was required to give him a degree even though the accusations against him, if true, would mean he engaged in serious violations of Harvard's sexual misconduct policy multiple times over. The First Circuit allowed that theory to proceed past the pleadings, but the record forecloses it.

For one thing, the undisputed facts make clear that Plaintiff was told before graduation that he could not receive a degree while Harvard investigated the complaints. At the time, Plaintiff never argued that Harvard had no authority to withhold his degree during its investigation. Indeed, he did not even mention this issue in his appeal of the Ad Board's decision, in which he was entitled to raise procedural arguments. Plaintiff's supposed reasonable expectation is contradicted by the undisputed record.

Discovery also made clear that any such expectation would be *unreasonable* in light of the applicable disciplinary procedures. The "Student Information Form" (so denominated in this case) that sets forth the applicable procedures for Ad Board disciplinary cases, and which Plaintiff himself attached to his Amended Complaint, makes unambiguously clear that a degree cannot issue if a complaint has been filed against a student. Plaintiff relies on a different document that he says is inconsistent. There is no inconsistency between the documents, but even if there were, the record reflects that the Student Information Form was the controlling document on all procedural matters. Indeed, it is the document that the Ad Board Secretary, John ("Jay") Ellison, sent Plaintiff when the disciplinary case against him was initiated; it is the

document that Ellison reviewed with Plaintiff at their initial meeting; and it is the document that by its terms provides the specific rules governing disciplinary cases.  Discovery has demonstrated that any expectation that the Student Information Form would not control in disciplinary cases would be unreasonable.

Discovery, moreover, has highlighted the absurdity of Plaintiff's position.  He admitted at deposition that, under his theory, ██████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████  This Court has already rejected that bizarre result as implausible.  *Dinu v. President of Harvard College*, 56 F. Supp. 2d 129, 133 (D. Mass. 1999).  Plaintiff's claim should likewise be rejected.

Discovery has shown his remaining claims to be equally meritless:

- Plaintiff alleges that his Ad Board Representative, Laura Johnson, breached her duty to advocate for him.  But the Student Information Form expressly says that the Board Representative "will not advocate for you," and the evidence adduced in discovery confirms that understanding.

- Plaintiff alleges that Johnson also improperly divulged confidential information.  Yet discovery has shown that not only do Board Representatives have no duty of confidentiality, but Plaintiff cannot name a single piece of confidential information that he thinks Johnson actually divulged.

- Plaintiff argues that Harvard failed to tell him the names of the witnesses against him.  But the record shows (among other things) that Plaintiff knew witness names, and if he did not, it was because Johnson tried to tell him and he refused to listen.

- Plaintiff alleges that Johnson failed to attend a meeting that the evidence shows she attended, and that Ellison failed to hold a meeting that the evidence shows he held.

- Finally, Plaintiff argues that he is entitled to damages for alleged lost employment opportunities in the finance and entertainment industries, even though discovery has shown that the reasons he has lost job opportunities are that: (i) he engaged in criminal insider trading; (ii) he lied to his employers about his criminal activities and the reason he did not get his degree; and (iii) the allegations of sexual misconduct (which Harvard had no role in publicizing) became public.

For these and the other reasons explained in detail below, Harvard is entitled to judgment as a matter of law on the undisputed record.  Summary judgment should be granted.

## SUMMARY OF UNDISPUTED FACTS[1]

**A.      Ann and Cindy Initiate Complaints Against Plaintiff Before Graduation and Plaintiff is Told He Will Not Receive His Degree.**

On May 17, 2013, Harvard's Ad Board Secretary, Jay Ellison, met with Plaintiff and explained that several students had raised concerns that Plaintiff may have violated Harvard's sexual misconduct policies.  SUF ¶¶ 62–63.  Ellison memorialized that conversation in a letter.  *Id*. ¶ 65.  The same day, Plaintiff's Resident Dean, Laura Johnson, emailed Plaintiff ████

████████████████████████████████████████████████████

████████████████████████████████████████████████

Plaintiff and Johnson spoke later that day, ███████████████████████████████

███████████████████████████████████████

---

[1] Under Local Rule 56.1, the material facts in support of Harvard's Motion are set forth in the Statement of Undisputed Facts ("SUF") which will be filed concurrently with Plaintiff's opposition to the Motion, pursuant to this Court's standing order regarding summary judgment motions.

On May 28, 2013, two days before Plaintiff's graduation ceremony, two women, Ann

and Cindy,[2] filed separate sexual misconduct complaints against Plaintiff, alleging that he

engaged in non-consensual sexual intercourse with them.  *Id.* ¶ 73.  That same day, Ellison

emailed Plaintiff ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████  Plaintiff did not respond.  *Id.* ¶ 76.

On May 29, 2013, Ellison emailed Plaintiff a second time, ███████████████████

█████████████████████████████████████████  Again, Plaintiff did not

respond.  *Id.* ¶ 90.  Johnson later emailed Plaintiff a letter from Ellison ████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████

On May 30, 2013, Plaintiff responded to Ellison, ████████████████████████████

█████████████████████████████████████████  They eventually scheduled a

phone meeting (which would also include Johnson) for the following Monday, June 3, 2013.  *Id.*

¶¶ 91–92.  In the interim, Plaintiff walked at graduation but did not receive a degree.  *Id.* ¶ 95.

In advance of the June 3 meeting, Ellison emailed Plaintiff the ████████████████

████████████████—four separate documents, including a document titled "The

Administrative Board of Harvard College Information for students facing allegations in a peer

dispute case" (the "Student Information Form").  *Id.* ¶¶ 96–97.  ██████████████████

[2] Consistent with the pseudonyms used in the Amended Complaint, this brief refers to the complainants by those same pseudonyms because of the sensitive subject matter involved.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

As part of the disciplinary procedure, Plaintiff could choose a member of the Ad Board to serve as his Board Representative, a role that acts as a liaison between Plaintiff and the entire Ad Board. *Id*. ¶¶ 36, 121.  Plaintiff selected Johnson as his Board Representative. *Id*. ¶ 126. Plaintiff could also choose a "personal adviser," provided that person was not a member of the Ad Board, *id*. ¶ 128, but he chose not to do so. *Id*. ¶ 130.

**B.      Betty Initiates a Complaint Against Plaintiff.**

On June 4, 2013, a third woman, Betty, submitted a complaint alleging that Plaintiff had non-consensual sexual intercourse with her on several occasions. *Id*. ¶ 109.  The same day, Ellison emailed Plaintiff (copying Johnson) ████████████████████████████████████ ██████████████████████████████████████ The next day, June 5, Ellison emailed Plaintiff a letter informing him of Betty's formal complaint. *Id*. ¶¶ 112, 135. Plaintiff again chose Johnson as his Board Representative in Betty's case. *Id*. ¶ 126.

**C.      The Investigation and Findings of Sexual Misconduct.**

Consistent with the disciplinary procedures set forth in the Student Information Form, which governed peer disputes such as Plaintiff's cases, *id*. ¶¶ 29, 115, an Ad Board Subcommittee and an independent factfinder were assigned to investigate each of the three complaints to determine whether a charge should issue. *Id*. ¶¶ 33, 120.  Under the disciplinary procedures, a "charge" meant that the Ad Board had determined that the allegations, if true, might constitute a violation of the Harvard College rules. *Id*. ¶ 34.  The Subcommittee and independent factfinder began by soliciting statements and responses from, and then interviewing,

Plaintiff and the three complainants. *Id.* ¶¶ 133, 143, 147–49.  On June 25, 2013, the

Subcommittee recommended that the Ad Board issue charges against Plaintiff in each case. *Id.*

¶ 155.  The Board adopted the recommendation of the Subcommittee and referred the cases for

further investigation. *Id.* ¶ 156.

Between June and September 2013, the Subcommittee solicited additional written

statements from the complainants, Plaintiff, and several witnesses. *Id.* ¶¶ 159, 161–64.  Plaintiff

received copies of each written statement. *Id.* ¶¶ 166, 168, 170.  The Subcommittee also

collected documentary evidence from the complainants, Plaintiff, and several witnesses; Plaintiff

received copies of all of that material. *Id.* ¶ 175.  Through October 2013, the Subcommittee

interviewed the people from whom it had received written statements, including Plaintiff. *Id.*

¶¶ 178–79, 183.

Consistent with the disciplinary procedures, Johnson was allowed to attend all of the

interviews so she could tell Plaintiff what was said. *Id.* ¶¶ 37, 174–75.  Johnson repeatedly

offered to share with Plaintiff what she learned in the witness interviews, but Plaintiff rejected

these offers. *Id.* ¶¶ 174–76.  In their email exchanges between June and November 2013,

Johnson also asked Plaintiff on multiple occasions if he had any questions about the process, and

she encouraged him to reach out to Ellison if Plaintiff was confused about the disciplinary

process. *Id.* ¶¶ 156, 160, 195, 213.  Plaintiff repeatedly rejected these offers too. *Id.* ¶¶ 157, 160.

On November 13, 2013, the Subcommittee issued three lengthy reports. *Id.* ¶ 193.  Each

report found that Plaintiff had violated Harvard's prohibition against sexual misconduct and

recommended that the Ad Board: (i) require Plaintiff to withdraw from Harvard College and (ii)

recommend to Harvard's Faculty Council that Plaintiff be dismissed, severing his connection to

Harvard, and allowing readmission only by a vote of the Faculty Council.  SUF ¶¶ 193, 196–98.

Plaintiff received the reports and was given the opportunity to respond to them in writing.

*Id*. ¶¶ 193–94.  In his responses to the reports and recommended sanctions— █████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████ Plaintiff said that, ██████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██ He wrote that he ████████████████████████████████████████████

At the same time, he acknowledged █████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

After reviewing Plaintiff's responses, Johnson emailed Plaintiff and said ████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██ Plaintiff responded ██████████, saying █████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

The next day, November 19, 2013, the Ad Board agreed with the Subcommittee's

recommendations, and on November 25, 2013, it notified Plaintiff of its decision requiring his

withdrawal and recommending to the Faculty Council that he be dismissed.  *Id.* ¶ 209.

### D.        Plaintiff's Appeal.

In May 2014, Plaintiff appealed the Ad Board's decision to the Faculty Council.  *Id.*

¶ 216.  Plaintiff █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████  Plaintiff's appeal included none of the arguments that he raises in this litigation as to why

Harvard's process resulting in his dismissal was procedurally improper.

On October 16, 2014, the Faculty Council denied Plaintiff's appeal.  *Id.* ¶ 219.  On

December 10, 2014, the Faculty Council dismissed Plaintiff from Harvard College.  *Id.* ¶ 220.

### E.        Plaintiff's Employment Opportunities and Insider Trading Guilty Plea.

Before his planned graduation date, Plaintiff had already been offered a job at Goldman

Sachs.  *Id.* ¶ 234.  He began working there in June 2013, even though he had not received his

degree.  *Id.* ¶ 234.  Beginning in July 2014 at the latest, and while at Goldman Sachs, Plaintiff

engaged in an insider trading scheme that lasted through November 2014.  *Id.* ¶ 266.  At some

point, an anonymous person called someone affiliated with Goldman Sachs and said Plaintiff

never graduated from Harvard.  *Id.* ¶ 241.

Around May 2014, Plaintiff was offered a two-year position at Taconic Capital Partners

("Taconic"), a hedge fund, ████████████████████████████████████████████

████████████████████  Plaintiff noted in communications ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████  Plaintiff also

██████████████████████████████████████

█████████

Plaintiff chose to resign from Goldman Sachs around May 2015 and has not since worked in the financial industry.  *Id.* ¶¶ 247–48.  At that time, he transitioned to the entertainment industry, and was a comedy writer for various television shows in Hollywood.  *Id.* ¶¶ 249–50, 258.  Without a Harvard degree, he wrote for *The Simpsons* and *Black-ish*, in addition to other television projects for which he was paid both a salary and residuals.  *Id.* ¶¶ 250, 255, 258.

█████████████████████████████  ████████

████████████████████████████████████████

██████████████████████████████

In August 2018, Plaintiff was charged with insider trading stemming from his time at Goldman Sachs, and he pleaded guilty in federal court in September 2018.  *Id.* ¶¶ 267–68.  On September 19, 2022, Plaintiff also entered into a settlement with the SEC that expressly bars him from associating with "any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization."  *Id.* ¶ 270.  Plaintiff's insider trading conviction attracted media attention; the media reported not only on his insider trading but also his sexual misconduct while at Harvard.  *Id.* ¶ 282.

## PROCEDURAL HISTORY

On November 21, 2019—years after he was dismissed from Harvard but about a year after his insider trading and sexual misconduct became public—Plaintiff filed this suit, alleging four counts: breach of contract (Count One); denial of basic fairness (Count Two); breach of the covenant of good faith and fair dealing (Count Three); and estoppel and reliance (Count Four).  Doc. No. 1 at 50–58.  This Court dismissed the complaint.  Doc. Nos. 23, 41.

Plaintiff appealed and the First Circuit affirmed in part and reversed in part. *See Sonoiki v. Harvard Univ.*, 37 F.4th 691 (1st Cir. 2022). It affirmed dismissal of Counts Two, Three, and Four. *Id*. at 714–17. As for Count One, the First Circuit dismissed many of his theories but held that Plaintiff had plausibly alleged a breach of contract on the basis of five theories (together, the "Remaining Theories"): (i) that Harvard was not authorized to withhold Plaintiff's degree at graduation because it had not yet issued a formal "charge" relating to the allegations of sexual misconduct (the "Charge Theory"); (ii) that Plaintiff's Board Representative, Laura Johnson, failed to advocate on his behalf despite an alleged duty to do so under Harvard's published procedures (the "Advocate Theory"); (iii) that Johnson breached a duty of confidentiality stemming from those same procedures (the "Confidentiality Theory"); (iv) that Harvard failed to provide Plaintiff with the names of witnesses against him (the "Witness Names Theory"); and (v) that Ellison failed to include Johnson in his meeting about the first two complaints and to meet with Plaintiff about the third complaint (the "Meeting Theory"). *See id.* at 704–07, 710–13.

After remand, on August 11, 2022, Plaintiff filed an Amended Complaint. Doc. No. 63. Through this lawsuit, Plaintiff is seeking "damages in an amount to be determined at trial" for "damage to reputation, past and future economic losses, lost educational and professional opportunities, loss of career prospects, and other direct and consequential damages." SUF ¶ 285.[3] Plaintiff claims that "[t]hese damages are in the amount of at least $2,500,000," including his Harvard tuition and alleged lost employment opportunities in finance and the entertainment industry. *Id.*

---

[3] In addition to the above, Plaintiff was also initially seeking damages in this litigation for "emotional and psychological damages." Plaintiff later withdrew those claims after the Court ordered him to produce his purported support for those claims. Doc. Nos. 97, 110.

Harvard now moves for summary judgment on the Remaining Theories, which—if resolved in Harvard's favor—disposes of the action.

## APPLICABLE LEGAL STANDARDS

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580 (1st Cir. 1992). Courts "need not credit" "conclusory, self-serving testimony." *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 20 (1st Cir. 1999).

Plaintiff's contract claim is that Harvard failed to follow the procedures set forth in Harvard College's Student Handbook and Ad Board procedures incorporated by reference in the Handbook. *Sonoiki*, 37 F.4th at 703. Contracts between students and universities are interpreted "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them." *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007). It does not matter "what *plaintiff's* expectations of the proceeding were" if those expectations were not reasonable—it is "an objective reasonableness standard." *Walker v. President and Fellows of Harvard College*, 82 F. Supp. 3d 524, 530 (D. Mass. 2014).

"Contract interpretation … is generally a question of law for the court." *Id.* at 529. To the extent contractual language is ambiguous, courts may turn to extrinsic evidence such as the parties' course of conduct to interpret the relevant contract terms. *See Zurich Am. Ins. Co v. Watts Regul. Co.*, 860 F. Supp. 2d 78, 93 (D. Mass. 2012).

In a breach of contract action, "if damages are sought causation and the amount of damages must also be proved." *Amicas, Inc. v. GMG Health Sys., Ltd.*, 676 F.3d 227, 231 (1st Cir. 2012). "A plaintiff's failure to produce any evidentiary proof concerning one of the essential elements of his claim is grounds for summary judgment." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013).

## ARGUMENT

I.  **The Undisputed Record Demonstrates That Each of Plaintiff's Remaining Theories of Breach Is Meritless.**

   A.  **Harvard's Disciplinary Proceedings Authorized Harvard To Withhold Plaintiff's Degree While Investigating Complaints Filed Against Him.**

Plaintiff's primary remaining claim is that he had a reasonable expectation, in light of Harvard's disciplinary procedures, that Harvard lacked "jurisdiction" to withhold his degree because by the time of graduation, Harvard had not yet issued a "charge"—*i.e.*, a determination, made after investigation, that if the allegations against him are true, he would be subject to sanction. *See* 37 F.4th at 704; Am. Compl. ¶¶ 266–67.

That is wrong. The undisputed evidence demonstrates that Ellison informed Plaintiff in advance of graduation that he would not be granted a degree while the complaints against him were being investigated. SUF ¶ 79. Ellison accordingly ███████████████████ ████████████████████████████████████████████████████ Yet Plaintiff did not object then, or at any other point during the process, nor did he argue that Harvard was obligated to grant him a degree because no charge had issued before graduation. Indeed, he did not even raise this issue in his appeal of the Ad Board's decision, despite his right to raise any "procedural" issue at that time. *Id*. ¶¶ 56, 218.

Thus, Plaintiff never had any expectation of receiving a degree while Harvard was investigating whether he committed serious violations of its rules governing sexual

misconduct—that alleged expectation was invented for purposes of this litigation.  The First Circuit held that at the pleadings stage——where it "indulge[d] every reasonable inference hospitable to [Plaintiff's] case," including "with respect to determining what a student may have reasonably expected terms in the [contract] to mean," 37 F.4th at 709—that Harvard's public procedures could be ambiguous.  But the parties have now conducted discovery.  And the undisputed record evidence makes clear not only that Plaintiff had no such expectation, as just explained, but also that any such expectation based on Harvard's published disciplinary procedures would be unreasonable.

The Student Information Form—which Plaintiff concedes is part of his contract with Harvard, Am. Compl. ¶¶ 376–77—forecloses Plaintiff's argument.  That Form states without qualification that "[a] student *cannot* receive a degree before a pending *disciplinary case* is resolved."  SUF ¶ 32 (emphasis added).  It further states that "a disciplinary case always begins with an *allegation* of student misconduct in the form of a complaint or report."  *Id*. ¶ 31. (emphasis in original).  Taken together, these provisions mandate that Harvard cannot grant a degree to a student against whom a misconduct complaint has been filed.  And it is undisputed that two of the complaints here were filed against Plaintiff before his May 30, 2013 graduation.  Thus, Harvard was not only allowed, but *required* under its disciplinary procedures to withhold Plaintiff's degree while it investigated the complaints against him.

Plaintiff's contrary argument relies on language in another document, the overview of the Ad Board in the Student Handbook ("Ad Board Overview"), providing that: "A degree will not be granted to a student . . . against whom a disciplinary charge is pending."  *Id*. ¶ 20.  Plaintiff claims this means that if a student has been accused of sexually assaulting his classmates during his tenure at Harvard, but the accusation comes shortly before graduation, Harvard must either (i)

grant the student a degree, or (ii) immediately issue a charge without investigating the allegations against the student.  As explained below, Plaintiff misreads the Ad Board Overview—there is no conflict between the Overview and the Student Information Form.  *See infra* at 18–20.  But even if there were a conflict, basic principles of contract interpretation, as well as the extrinsic evidence developed through discovery, make clear that the Student Information Form controls.

1.  Contract-interpretation principles and extrinsic evidence foreclose Plaintiff's reading.

To the extent there is tension between the Overview and Student Information Form, the latter document—which unambiguously states that Harvard may not issue a degree once a complaint has been filed and is still being investigated (*i.e.*, once a "disciplinary case" has been commenced), *supra* at 14[4]—controls in light of the extrinsic evidence and ordinary contract interpretation principles.

*First*, the Student Information Form controls under the rule that the specific controls the general.  *Astra USA, Inc. v. Bildman*, 455 Mass. 116, 141 (2009).  The Overview is "a brief introduction" to the Ad Board generally, SUF ¶ 19, whereas the Student Information Form is a detailed explanation of a disciplinary case from start to finish, *id.* ¶ 26.  The Student Information Form is far more specific about the rules applicable in disciplinary cases and controls the more general Overview in the case of any conflict.

---

[4] The First Circuit suggested that the Student Information Form "potentially" used the term "case" to mean two different things depending on the context.  *See* 37 F.4th at 705–06.  It cited the "Charge Decision" subheading of the Form, stating that "[i]n all cases, [the accused student] and the complainant will be informed by [their] respective Board Representatives whether the Board issued a charge."  *Id.*; *see also* SUF ¶ 33. And it contrasted that language with a passage under the "Conclusion of the Case" subheading, stating "[i]n cases other than those involving allegations of sexual assault or physical violence, the complainant will not be informed of the Board's decision."  37 F.4th at 705–06; *see also* SUF ¶ 35.  But those passages are both referring to different stages of the same disciplinary "case"—the disciplinary "case" starts when a complaint is filed, *id.* ¶ 31, the accused student and complainant are informed later in the "case" if there has been a decision to issue a formal "charge," *id.* ¶ 33, and the Board's ultimate findings are not communicated to complainants except in disciplinary cases involving sexual assault or physical violence, *id.* ¶ 35.

*Second*, the documents themselves, and the relevant extrinsic evidence, confirm the point. The Overview expressly states that it provides an overview of the process, and that students should look on the Ad Board's website for more details. *Id*. ¶ 25 ("For a more detailed description . . . visit the website of the Administrative Board at www.adboard.fas.harvard.edu"). The Student Information Form was the document on the Ad Board's website that described the details of the disciplinary case process involving sexual misconduct. *Id*. ¶ 26. That is why Ellison sent Plaintiff the Student Information Form (not the Overview) and went over the Student Information Form (not the Overview) in detail with Plaintiff during their initial meeting. *Id*. ¶ 96. There is no dispute that both Harvard and Plaintiff understood that the Student Information Form controls the details of the disciplinary case process. *Id*. ¶ 115.

*Third*, and finally, there is common sense. *See Fishman v. LaSalle Nat. Bank*, 247 F.3d 300, 302 (1st Cir. 2001) ("Common sense is as much a part of contractual interpretation as is the dictionary or the arsenal of canons."). On Plaintiff's theory, if a student is alleged to have committed a serious disciplinary offense just before graduation, Harvard has only two choices: (i) grant him a degree, despite the possibility that he is not entitled to one, or (ii) issue a formal charge immediately without taking any steps to make a preliminary determination that a complaint is frivolous or fails to state a violation under Harvard's policies, or that further investigation is likely to enable the Ad Board to resolve the case. Indeed, Plaintiff testified that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

That is absurd. As this Court has recognized:

It cannot be that a student having passed all examinations necessary for a degree can, before his graduation, excite disturbance and threaten injury to the school or college

> without being amendable [*sic*] to some punishment. No course would seem open except to forthwith expel him or refuse his degree.... The faculties of educational institutions having power to confer degrees ... are necessarily vested with a broad discretion as to the persons who shall receive those honors.... Any other rule would be subversive of all discipline in the schools.... We see no reason why the right to discipline is not as great between the final examination and the graduation as before....

*Dinu*, 56 F. Supp. 2d at 133 (quotation omitted).  Indeed, in *Dinu*, this Court entered summary judgment for Harvard and rejected a contention very similar to that which Plaintiff presses here. In doing so, the Court presented what it believed to be an obviously implausible hypothetical: "Assume, for example, that a senior completes his course work, learns that he will not graduate with honors, and, in a rage, attacks the chair of his department. Plaintiffs cannot seriously suggest that Harvard would be powerless to enforce its disciplinary r[u]les in that instance." *Id.*

Yet that is essentially Plaintiff's position here.  Plaintiff would require reading this absurdity into Harvard's disciplinary procedures; or, at the very least, require Harvard to issue a formal charge immediately after a complaint is filed to avoid this result.  The Court should not read the contract in that bizarre manner, especially when a much more plausible reading is readily available: once a complaint is filed against a student, Harvard must investigate that complaint before granting a degree, and either grant the degree once the accused student is cleared, or else withhold the degree (or impose whatever other sanction is appropriate) if the student is found to have violated University policies.  That reading not only comports with the language of the policies and the undisputed extrinsic evidence, but also with common sense and fair practice for the student.[5]

---

[5] As the First Circuit noted, Plaintiff also argues Harvard never had jurisdiction to adjudicate Betty's complaint (filed June 4), because he "should have had his degree by then."  37 F.4th at 706 n.18.  But as explained above, his pending disciplinary charges undercut any reasonable expectation that he would receive his degree before those charges were resolved.  Because Harvard properly withheld his degree before his graduation—thus preserving his status as a student—it maintained jurisdiction to adjudicate Betty's complaint.

2. <u>The Ad Board Overview and Student Information Form are consistent</u>.  Plaintiff is in any event wrong that there is a conflict between the Student Information Form and the Overview, for two reasons.

*First*, Plaintiff misreads the word "pending" in the Overview's statement that a degree cannot issue once "a disciplinary charge is pending."  Plaintiff thinks that the quoted phrase means that a degree cannot be granted once a disciplinary charge has already been *issued*.  But "pending" and "issued" do not mean the same thing.  A "disciplinary charge is pending" *not* only once a charge has issued, but rather as soon as a complaint has been made against the student and a case has been initiated by a complaint from a student.  In other words, the Overview and Student Information Form are entirely consistent—they both preclude Harvard from granting a degree once a complaint has been filed and is being investigated.

That is because, in context, "pending" does not mean "in progress" (as Plaintiff's argument assumes).  Rather, it means something that has happened *or* is "waiting to happen."[6] The word "pending" is used that way elsewhere in the Overview.  *See*, *e.g.*, SUF ¶ 21 ("When court action is ***pending or in progress***, the Administrative Board may delay or suspend its own review process…" (emphasis added)).  And even Plaintiff admitted at deposition that ███████████ ████████████████████████████████████ That is the only way to read "pending" in context, for several reasons.

For one thing, it is a "well settled" principle of Massachusetts law that contract documents "should be read harmoniously" whenever possible.  *Happ v. Corning, Inc.*, 466 F.3d 41, 46 (1st Cir. 2006).  According to Plaintiff, his reading of "pending" could create an inconsistency between the Overview and the Student Information Form.  *But see infra* at 19–20.

---

[6] *See Pending*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/pending.

But there would be no plausible inconsistency under Harvard's reading of "pending."  *See supra* at 18.  In accordance with "well settled" Massachusetts law, the Court should construe the Student Information Form and Overview to be consistent, not contradictory.  *See Happ*, 466 F.3d at 46.

Moreover, contract terms should not be read in isolation, but rather in the context of the surrounding language.  *Sawyer v. United States*, 76 F. Supp. 3d 353, 358–59 (D. Mass. 2015). Here, directly before the "disciplinary charge is pending" language on which Plaintiff relies, the Overview states: "Students are expected to comply with all disciplinary rules from matriculation until the conferring of the degree."  SUF ¶ 22.  Under Plaintiff's reading of the Overview, Harvard would be *required* to grant a degree to a student who *did not* comply with all disciplinary rules while at Harvard, merely because the Ad Board had not yet conducted a sufficient investigation to issue a charge in advance of graduation.  Plaintiff's reading therefore necessarily creates a nonsensical inconsistency in the Overview itself.

The extrinsic evidence in the record also supports Harvard's reading of "pending."  For example, Ellison's May 29, 2013 letter to Plaintiff explained that ███████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████  Ellison cited ███ █████████████████████████████████████████████████████████ ███████████████████████████  Harvard's conduct, as explained in Ellison's letter, thus confirms that a disciplinary charge was "pending" once the complaints against Plaintiff were filed.  *See Zurich Am. Ins. Co. v. Watts Regul. Co.*, 860 F. Supp. 2d 78, 93 (D. Mass. 2012) (party's course of conduct "is of great significance" in resolving ambiguity); *Jensen v. Jensen*, 2011 WL 2174898, at *6 (D. Mass. 2011) (extrinsic evidence

includes parties' "post-contract conduct.").  Ellison testified ████████████████████
████████████████████████████████████████████████████████  Plaintiff's

reading of "pending," meanwhile, is unsupported either by principle or by the record evidence.

Properly understood, the Overview and the Student Information Form are entirely consistent.

     *Second*, and in any event, the Overview does not provide an exhaustive list of when a

degree can be withheld.  Even if the Overview could be read to say that a degree cannot issue

once a charge has been *issued*—which, as just explained, is not what it says—that does not mean

that a degree *must* issue before a charge is issued.  Other governing documents can provide other

circumstances in which a degree may be withheld.  And the Student Information Form provides

one such circumstance—a degree cannot issue once a complaint has been filed.  *See supra* at 14.

Especially because the Overview and Information Form should be read as consistent rather than

conflicting, *see supra* at 18–19, Plaintiff's argument fails for this reason as well.

     3.  <u>Plaintiff cannot prove damages.</u>  Even assuming Plaintiff is right about the Charge

Theory, he cannot prove that the breach resulted in any damages.  That is, even if Harvard were

required to grant Plaintiff his degree at graduation, there was nothing preventing Harvard from

continuing its investigation after he had graduated, arriving at the same conclusion, and

ultimately revoking his degree.  *Id*. ¶ 58 (explaining that Harvard has historically revoked

degrees previously awarded to students if it learned that, while enrolled, the student violated

Harvard's policies).  If that had happened here, then Plaintiff would have found himself in the

same position legally as he is in now.  In other words, regardless of whether Harvard breached its

contract with Plaintiff by failing to issue a "charge" before withholding his degree, there is no

evidence to support a claim that he would have retained that degree despite a subsequent finding

that he was responsible for sexual misconduct while a Harvard student.

**B.**   **Plaintiff's "Advocate Theory" Fails Under Express Contract Language And The Undisputed Extrinsic Evidence.**

Plaintiff's next argument is that his Board Representative, Laura Johnson, was required to advocate on his behalf under the Student Information Form but failed to do so. *See* 37 F.4th at 710. But the Student Information Form itself states that a student's Board Representative "will not advocate for [the student]." SUF ¶ 37. Indeed, the Student Information Form proceeds to emphasize the *absence* of advocacy in the disciplinary process, noting that the process is "pedagogical rather than judicial" and that "attorneys for students are not permitted to participate." *Id*. ¶ 30; ████████████████████████████████████ ████████████████████████████████

Plaintiff has relied on language in the Form indicating that the Board Representative "represent[s] [the student] to the subcommittee and the Board," "speaks on [the student's] behalf," and "will make certain that [the student's] perspective is clearly presented." *Id*. ¶ 37. All of those statements are true—the Board Representative is the student's liaison to the Board and therefore is meant to clearly present the student's perspective. But presenting the student's perspective can be done objectively; it does not require advocacy. The Student Information Form further says—in language the First Circuit did not address—that the Representative "will present to the Board a *full* summary of the facts of the case" and will "address the [Board] briefly if there are *relevant facts* that [the student and the Board Representative] previously discussed but that [the student] failed to raise in [their Board] interview." *Id*. ¶¶ 37, 39 (emphasis added). That express responsibility to pass on *all* relevant facts, even if the student declines to do so himself, is inconsistent with an advocacy position that would ostensibly only pass on those facts helpful to the student. So even if the incomplete, cherry-picked language on which Plaintiff relies could, in isolation, be understood to create the expectation of an advocacy relationship, it

cannot possibly be read that way in light of the document as a whole, including the clear admonition in the same document that the Board Representative "*will not advocate* for [the student]," *Id*. ¶ 37 (emphasis added), and will provide the Board with all relevant facts even if the accused student does not, *id.* ¶ 39.

The extrinsic evidence confirms the point.  For example, Ellison [7]

The fact that Plaintiff did not raise this Advocacy Theory in his appeal of the Ad Board's determination confirms that he shared Harvard's understanding.  *See supra* at 9.

Moreover, as the article cited in Plaintiff's Amended Complaint explains, important amendments to the disciplinary procedures were adopted in 2009—and resulted in the procedures governing Plaintiff's case—precisely because the Board Representative *was not an advocate*, and the College believed that it needed to bolster the role of the "personal adviser" to provide the student with an advocate who is not on the Ad Board.[8]  That sort of evidence of the contract's understood meaning at the time of formation is crucial extrinsic evidence for resolving contractual ambiguity.  *See Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008).

Finally, Plaintiff cannot prove that a breach under the Advocate Theory caused him harm. The Ad Board afforded Plaintiff the opportunity to provide his own statements in response to the

---

[7] Plaintiff chose not to consult a lawyer, and also did not select a personal adviser to support him in the proceedings. SUF ¶¶ 130, 160.

[8] Am. Compl. n.5 (citing Mercer R. Cook & Rebecca D. Robbins, *Ad Board's Advising System Faces Criticism*, The Harvard Crimson (Oct. 24, 2012), https://www.thecrimson.com/article/2012/10/24/Resident-deans-ad-board-role/).

Subcommittee reports for each complaint—and that is exactly what Plaintiff did.  SUF ¶ 155.
Plaintiff has never articulated what else Johnson should have done (or refrained from doing) that
might have caused the outcome of the Ad Board proceedings to be different.  Summary judgment
is warranted on the Advocacy Theory for this reason as well.

### C.     Johnson Did Not Owe Plaintiff A Duty Of Confidentiality, And He Cannot Show That She Breached Any Such Duty In Any Event.

Related to his Advocate Theory, Plaintiff also asserts that Johnson owed him a duty of
confidentiality under the terms of the Student Information Form.  The First Circuit held that,
"[w]hile a close call," Plaintiff "plausibly alleged a breach on th[is] basis."  37 F.4th at 711.  This
argument fails at summary judgment based on the undisputed evidence.

1.  <u>Board Representatives have no duty of confidentiality</u>.  As explained above, a Board
Representative is not a student's advocate, but rather is a *member of the Ad Board* who serves as
a student's liaison to the Board, and whom the Student Information Form describes as an "officer
of the College."  SUF ¶¶ 36–37.  Under Plaintiff's argument, if a student told their Board
Representative—again, a member of the Ad Board and officer of the College—that they had
sexually assaulted another student, or plagiarized a paper, then the Board Representative must
remain silent and inform no one.  There is no plausible basis for that bizarre result.

Certainly, the Student Information Form says nothing about a duty of confidentiality—a
particularly glaring omission in light of the Student Information Form's numerous other
descriptions of confidential relationships in other contexts.[9]  And indeed, the description of the
Board Representative's duties contradicts any possible confidential relationship.  Again, the

---

[9] *E.g.*, SUF ¶ 41 ("[t]he Board's proceedings and decisions are confidential and communicated only to those with a need to know."); *Id*. ¶ 42 ("any material related to a case must remain confidential and its disclosure to anyone other than Board representatives, resident deans, family members, legal counsel, or personal advisers (officers of the University affiliated with the Faculty of Arts and Sciences . . .) is strictly prohibited."); *Id*. ¶ 43 (Report is described as a "confidential report").

Board Representative "will present to the Board a *full* summary of the facts of the case" and will "address the [Board] briefly if there are relevant facts that [the student and the Board Representative] previously discussed but that [the student] failed to raise in [their] interview," *Id.* ¶¶ 37, 39 (emphasis added).  A responsibility to disclose all relevant facts whether or not a student does so is incompatible with a confidential relationship.

The extrinsic evidence again confirms this point.  Harvard told Plaintiff that Johnson would share Plaintiff's communications with the Board, disabusing him of any notion of confidentiality. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Plaintiff, for his part, did not treat his communications as confidential—████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

2. <u>Plaintiff has not identified any purportedly confidential information that Johnson allegedly disclosed</u>.  In any event, Plaintiff has failed to articulate what purportedly confidential information Johnson supposedly disclosed to the Ad Board.  When initially asked at deposition

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ Then he suggested that

█████████████████████████████████████████████████████████████

██████████████████████████████████ But when ████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████  Plaintiff's failure to identify any confidential information he gave Johnson that he believes

she divulged independently forecloses his claim.

3.  <u>Plaintiff fails to establish that any breach of confidentiality caused him harm.</u>  In any

event, Plaintiff cannot demonstrate that, had Johnson refrained from sharing some (unidentified)

confidential information with the Board, he would have been found "not responsible" in the

disciplinary proceedings, and subsequently received a degree from Harvard.  That failure to

demonstrate causation forecloses his claim.

### D.      Plaintiff's Witness Names Theory Fails For Numerous Reasons.

Plaintiff's Witness Names theory fails for numerous reasons, including because the

undisputed evidence shows that he either knew the witness names or did not care to learn them.

*First,* the theory he now presses—that *Johnson* failed to provide him witness names[10]—is

not what he pleaded.  Rather, he alleges that "the *Subcommittee* never identified by name any of

the adverse student witnesses against him."  Am. Compl. ¶ 313 (emphasis added).  If that is so, it

is because Harvard redacts the names of students (including witnesses) in documents related to

its disciplinary proceedings, such as witness statements and the Subcommittee reports, to ensure

that student identities are protected.  SUF ¶ 6.  But as described below, participants in the

disciplinary process—including the accused student—can learn the witness names.  *Id.* ¶ 7.  That

suffices to reject the claim.  *See Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 85 (1st Cir.

---

[10] *See* Doc. No. 57 (stating that a remaining issue in the case following remand was "Whether Plaintiff's reasonable expectations were breached by his Board Representative not providing him the identities of witnesses.").

2008) ("It simply will not do for a plaintiff to fail to plead with adequate specificity facts to support . . . a claim, all-the-while hoping to play that card if her initial hand is a dud.").

*Second*, Plaintiff's assertion that he was not aware of witness names is false.  Plaintiff alleges that the only witness name Harvard provided him was of a Harvard administrator—the then-Director of the Office of Sexual Assault Prevention and Response.  Am. Compl. ¶ 314.  Not so.  For example, ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ In response, ████████████ ██████████████████████████████████████████████ Separately, Plaintiff ██████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████

*Third*, to the extent Plaintiff did not know other witnesses' names, it is because he never asked.  Ellison specifically ████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Nevertheless, Plaintiff ████████ ████████████████████████████████████████████

And that was not for lack of Johnson's trying to pass on that and other information. ███████████████████████████████████████████████████████████████ ███████████████████████████



Johnson thus repeatedly attempted to "inform [the student] . . . about what was said during the [witness] interview[s] and about any information that was obtained," *id*. ¶ 40, but Plaintiff repeatedly declined. In light of this undisputed record evidence, Plaintiff's allegation that Johnson failed to satisfy her obligations is especially remarkable, and especially frivolous.

*Fourth*, even if Harvard failed to provide Plaintiff with witness names, he cannot show any resulting harm. The undisputed record shows that his receipt of the names would not have changed what he communicated to the Ad Board. ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████ The Witness Names Theory fails for this additional reason.

### E.   Plaintiff's Meeting Theory Likewise Fails For Numerous Reasons.

Finally, Plaintiff argues that Harvard breached its procedures when Ellison (i) failed to include Johnson in the initial meeting about Ann's and Cindy's complaints; and (ii) failed to meet with Plaintiff about Betty's complaint. *See* 37 F.4th at 713. Those arguments fail.

1. <u>Johnson was at Plaintiff's initial meeting, but it would not matter even if she weren't</u>.
Contrary to Plaintiff's allegation, the undisputed evidence demonstrates that Johnson *was* at his

initial meeting.  Johnson says she attended the meeting.  SUF ¶ 99.  ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ And if that were not enough, █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ But the Court "need

not credit" that kind of "conclusory, self-serving testimony," especially given the lack of

documentary support and the contrary evidence.  *See SMS Sys.*, 188 F.3d at 20; *cf. Scott v.

Harris*, 550 U.S. 372, 380 (2007).

Moreover, Plaintiff could not possibly articulate why it would matter whether Johnson

was at his initial meeting or not.  Plaintiff chose Johnson as his Board Representative, she

fulfilled her duties, ████████████████████████████████████████████████

████████████████████████████████████████████████████ Nothing

else in the record suggests that Johnson's supposed absence would have made any difference.

2. <u>Ellison met with Plaintiff regarding Betty's complaint</u>.  Ellison also met with Plaintiff

to discuss Betty's complaint.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████     Collectively, this undisputed sequence of events indicates that

Ellison and Plaintiff connected on either June 5 or June 6 to discuss Betty's complaint.  That

would explain why the record bears no indication that Plaintiff expressed confusion over the

process or surprise at receiving an email with Betty's allegations; he then proceeded to submit

his own initial statement.  Furthermore, Plaintiff can point to no countervailing documents or

emails suggesting that the meeting did not happen.  *See Zielinski v. Citizens Bank, N.A.*, 552 F.

Supp. 3d 60, 65–66 (D. Mass. 2021) (moving party can meet its burden on summary judgment

by demonstrating an "absence of evidence to support the nonmoving party's case.").

Again, even if the meeting did not happen, Plaintiff could not show that it would have

made a difference.  The purpose of the initial meeting, as explained in the Student Information

Form, is to "outline for [the Student] the College's confidentiality policies, disciplinary process,

and the allegation."  SUF ¶ 31.  But Ellison had just done that a few days earlier in their initial

meeting for Ann's and Cindy's complaints.  Ellison and Johnson also made themselves available

to discuss the new complaint.  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████     In sum, Plaintiff's Meetings Theory fails for these reasons as well.

II.     **Plaintiff Cannot Prove Damages Resulting From Harvard's Withholding Of His Degree.**

As described above, the undisputed evidence shows that Harvard did not breach any agreement, and that no harm resulted even if Harvard did.  But even if the Court disagrees, Harvard is independently entitled to summary judgment because Plaintiff cannot prove that Harvard was the proximate cause of any of the purported damages he claims.

"Under Massachusetts law, to recover expectation damages for breach of contract, the plaintiff must prove" that "the breach *caused* the plaintiff to suffer damages."  *Gemini Investors Inc. v. AmeriPark, Inc.*, 643 F.3d 43, 48 (1st Cir. 2011) (emphasis added).  "The causation element [of a breach of contract claim] generally requires the plaintiff to prove that but for the defendant's breach the plaintiff would have realized some gain or avoided some loss."  *Id.* at 48.  However, "where the injured party is the sole proximate cause of the damage complained of, that party cannot recover in contract from a party whose breach … is found to be a mere cause in fact of the damage."  *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839 (1996).

Plaintiff's main basis for seeking damages is lost professional opportunities.  But "as a matter of Massachusetts contract law, a plaintiff may receive consequential damages" *only* if he "proves with sufficient evidence that a breach of contract proximately caused the loss of identifiable professional opportunities."  *Redgrave v. Bos. Symphony Orchestra*, 855 F.2d 888, 894 (1st Cir. 1988).  To establish that a breach of contract resulted in the loss of professional opportunities, a plaintiff must not only present evidence of specific future professional opportunities lost, but also that "such losses were the result of [the breach] rather than the result of other, independent factors."  *Id.* at 896 (citation omitted).  Plaintiff "bears the ultimate burden of proof as to damages and cannot rely on 'mere allegations or evidence that is less than significantly probative'" at summary judgment.  *See Thermal Eng'g Int'l (USA) Inc. v. Lanaville*,

2022 WL 17541938, at *6 (D. Mass. Dec. 8, 2022) (quoting *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994)).  Plaintiff cannot meet this burden.

Plaintiff alleges that, as a result of Harvard's actions, he has suffered reputational harm and lost "professional opportunities" and "career prospects" in finance and entertainment, including the loss of a two-year contracted position with Taconic Capital Advisors.  SUF ¶ 285.  But Plaintiff has identified no specific job opportunities that he "lost" in either industry because of *Harvard's* alleged breach of contract.  Plaintiff also alleges damages for lost educational opportunities that are meritless.[11]

1. <u>Finance</u>.  Although Plaintiff claims that Harvard's breach cost him a two-year contracted position with Taconic, *id.* ¶ 285, Plaintiff repeatedly acknowledged that Harvard had nothing to do with Taconic's rescission of its offer of employment.  In late May 2014, Plaintiff ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████  In September 2014, ███████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████  And in a December 2014 ███████████████████████████████ ███████████████████████████████████████████████████████████ ██████████  There is no evidence that Taconic's decision was made for any reason other than what these statements from Plaintiff plainly say.

Beyond Taconic, Plaintiff identifies no other specific positions in the financial industry that he sought, but did not obtain, because of Harvard's alleged breach.  That alone ends the

---

[11] Likewise, Plaintiff has failed to articulate any theory of breach that would entitle him to any of the other categories of damages he seeks; nor can he show that Harvard had any role in Plaintiff sustaining any such damages.

analysis regarding lost opportunities in the finance industry.  *See Redgrave*, 855 F.2d at 894, 896.

Even if he had sought and failed to obtain such positions, however, Plaintiff's decision to trade

on inside information beginning in July 2014, for which he was later criminally charged and

convicted, indefinitely destroyed his reputation and career prospects in the financial industry, as

did his settlement with the SEC.  As a result, any professional opportunities that Plaintiff lost in

finance were entirely of his own doing and cannot be imputed to Harvard withholding his degree.

*See Exxon Co., USA*, 517 U.S. at 839.  Nor were Plaintiff's actions somehow a foreseeable

consequence of any of Plaintiff's Remaining Theories of alleged breach.  *See id.*

    2.  <u>Entertainment</u>.  Since pivoting from finance to entertainment, Plaintiff has written for

*The Simpsons*, *Black-ish*, and projects affiliated with ███████████████████████

███████.  SUF ¶¶ 249–56, 258–61.  Plaintiff fails to identify *a single* specific professional

opportunity that he lost in entertainment because of any alleged breach by Harvard.

    The *Redgrave* case is instructive.  The plaintiff-actress in that case asserted breach of

contract and contended that the breach resulted in her losing movie and theater offers that she

otherwise would have had.  855 F.2d at 893.  The Court of Appeals explained the "heavy

burden" a plaintiff making such a claim must show as follows:

> [I]f plaintiffs proved other employers refused to hire [the actress] after
> termination of the [defendant's] contract because of that termination (that loss of
> the other employment "followed as a natural consequence" from the termination
> of the contract), that this loss of other employment would reasonably have been
> foreseen by the parties at the time of contracting and at the time of termination,
> and that damages are rationally calculable, then plaintiffs may be entitled to
> damages that include monies for loss of the other employment.

*Id.* (quotation omitted).  Applying this standard, the First Circuit ultimately determined there was

insufficient evidence to support most of the actress' claims of lost professional opportunities

because, in part, "[she] presented nothing other than the fact that three expected offers or

productions did not materialize," which was not the "type of circumstantial evidence . . .

sufficient to support a finding of consequential damages." *Id.* at 900; *see also Rice v. Cmty.*

*Health Ass'n*, 203 F.3d 238, 290 (4th Cir. 2000) (reversing lower court for permitting plaintiff to

"seek consequential damages for breach of his employment agreement without requiring proof of

loss of 'identifiable professional opportunities.'" (quoting *Redgrave*, 855 F.2d at 894)).

      In this case, Plaintiff has identified no specific professional opportunities he lost because

of Harvard's alleged breach.  All he offered at deposition was ███████████████████

████████████████████████████████████████ These

statements are not only self-serving hearsay,[12] they are also precisely the type of "evidence" that

courts deem insufficient to warrant an award of damages.  *See Rice*, 203 F.3d at 289, 290;

*Redgrave*, 855 F.2d at 900.

      Even if Plaintiff had satisfied this burden, moreover, he cannot prove that *Harvard*

caused him to lose jobs in entertainment by withholding his degree.  After all, the record here is

replete with evidence of Plaintiff's gainful employment in the entertainment industry despite his

lack of a degree.  The undisputed facts show that since leaving Harvard without a degree,

Plaintiff has worked (and been handsomely compensated for his work) as a writer for a hit

Disney/ABC television show, a writer of pilots for ██████████, and a story editor for *The*

*Simpsons*.  SUF ¶¶ 249–56, 258–60.  So, it could not have been the lack of a degree that cost

him jobs. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[12] "It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."  *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 12 (1st Cir. 2016) (quotations omitted).

███████████████████████████████████████████████

Indeed, Plaintiff has conceded in this litigation that any job opportunities he lost were because of the nature of the allegations against him, not his lack of degree. *Id.* ¶ 280. In a public filing with this Court, Plaintiff states that he "had earned significant sums in television writing, and was in the midst of developing a highly impressive resume ***when his career prospects were derailed and unable to recover after Harvard's withholding of his degree in connection with Title IX allegations were publicized and made him untouchable in the industry.***" Doc. No. 131 at 11 (emphasis added). But the record contains no evidence—and Plaintiff does not even allege—that *Harvard* publicized the sexual misconduct allegations. Indeed, Plaintiff himself testified that ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Harvard has a policy of keeping disciplinary cases confidential. *Id.* ¶ 42. And the evidence shows that the nature of his allegations was publicized when reporters began asking questions surrounding his insider-trading guilty plea in 2018, *id.* ¶ 282— which is also when Plaintiff lost his job at *The Simpsons, id.* ¶ 262. In sum, there is not a shred of evidence suggesting that Harvard caused Plaintiff damages in the form of lost employment in the entertainment industry by withholding his degree.[13]

---

[13] Plaintiff's claim for reputational damages fails for the independent reason that he has not demonstrated that Harvard's alleged breach harmed his professional reputation. As the First Circuit has recognized, "'[d]amages for injury to reputation are usually not available in contract actions,' because such damages are remote, speculative, and not within the contemplation of the parties." *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 22 (1st Cir. 2004) (quotations omitted). Massachusetts courts "have made exceptions to this general rule when plaintiffs have provided evidence of specific harm that is proximately related to their reputational injury." *Id.* (citing *Redgrave*, 855 F.2d at 892). But Plaintiff has made no such particularized showing. At his deposition, Plaintiff testified that ████████████████ ███████████████████████████, but the record identifies no specific job opportunities that Plaintiff lost in any industry because of Harvard's alleged breach. There is thus no genuine issue of material fact with respect to Harvard's role in connection with Plaintiff's alleged "reputational harm." *See Flynn*, 377 F.3d at 23 ("having no difficulty concluding that" plaintiff "failed to introduce evidence substantiating damages from [the defendant's]" actions, including because her trial testimony undercut her claim of causation).

3. <u>Educational Opportunities</u>:  Plaintiff also cannot establish he is entitled to damages resulting from "lost educational" opportunities, including two years of Harvard undergraduate tuition and "tuition for a Harvard MBA (Damilare was accepted to the 2+2 program)."  *Id*. ¶ 285.[14] ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

In addition, the undisputed record establishes that ████████████████████████

████████████████████████████████████████  and thus similarly incurred no out-of-pocket costs in connection with attendance there that he can now seek from Harvard as damages in this case.  As with his undergraduate degree, Plaintiff has not identified a single professional opportunity that he would have received had he been granted an MBA.  And with respect to any argument that Plaintiff lost any other unidentified educational opportunities because of Harvard's alleged breach, the record actually reflects the opposite.  Despite lacking a Harvard degree, Plaintiff ████████████████████████████████████████████████

████████████████████████████████████████  Accordingly, Harvard is also entitled to summary judgment on this category of damages.

## CONCLUSION

For the foregoing reasons, Harvard respectfully requests that the Court grant Harvard's motion for summary judgment.

---

[14] The 2+2 program is a Harvard Business School program that accepts undergraduate students to the regular Harvard Business School MBA program after they receive their undergraduate degree and then complete at least two years of professional work experience.  *See 2+2 Program*, Harvard Business School, *https://www.hbs.edu/mba/admissions/application-process/college-students-2-2/Pages/default.aspx*.

Dated: May 31, 2023                    Respectfully submitted,

                                        */s/ Anton Metlitsky*
                                       ─────────────────────────

                                       Anton Metlitsky (*pro hac vice*)
                                       ametlitsky@omm.com
                                       David Cohen (*pro hac vice*)
                                       dcohen@omm.com
                                       O'MELVENY & MYERS LLP
                                       7 Times Square
                                       New York, NY 10036
                                       Telephone:     (212) 326-2000
                                       Facsimile:     (212) 326-2061

                                       Apalla U. Chopra (*pro hac vice*)
                                       achopra@omm.com
                                       O'MELVENY & MYERS LLP
                                       400 South Hope Street
                                       Los Angeles, CA  90071
                                       Telephone:     (213) 430-6000
                                       Facsimile:     (213) 430-6407

                                       Victoria L. Steinberg (BBO #666482)
                                       vsteinberg@clohertysteinberg.com
                                       Rebecca M. O'Brien (BBO #693592)
                                       robrien@clohertysteinberg.com
                                       CLOHERTY & STEINBERG LLP
                                       33 Arch Street, Suite 3150
                                       Boston, MA  02110
                                       Telephone:     (617) 481-0160

                                       *Attorneys for Defendants,*
                                       *Harvard University, Harvard University*
                                       *Board of Overseers, and the President and*
                                       *Fellows of Harvard College*

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 31, 2023.

*/s/ Anton Metlitsky*
Anton Metlitsky
