UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

DAMILARE SONOIKI,

               Plaintiff,

    v.                                    Civil Action No. 1:19-cv-12172-LTS

HARVARD UNIVERSITY, et al.,

               Defendants.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 7.2,  Plaintiff Damilare Sonoiki ("*Plaintiff*" or "*Sonoiki*") by and through counsel, and pursuant to Local Rule 7.2, hereby opposes the Motion for Summary Judgment filed by Defendants', Harvard University, Harvard University Board of Overseers, and the President and Fellows of Harvard College, (together, "*Harvard*" or "*Defendants*"), Motion for Summary Judgment.[1]

## I.      INTRODUCTION

As Harvard commencement approached, a world of possibilities was open to Sonoiki. As the immigrant son of a single mother, who had spent his early years in Lagos, Nigeria, he looked back on his life, knowing that his hard work and pursuit of academic excellence had paid off. Although accepted into fifteen colleges and all eight Ivy League colleges, he chose to attend what he perceived as the best Ivy, Harvard. By mid-May 2013, Sonoiki completed his academic requirements and was a student in good standing. Bull. Decl., Ex. 16, ¶ 5. He had secured a job

---

[1] This Opposition is supported, in part, by the Declaration of Anna Bullock ("Bull. Decl.") and its exhibits, filed concurrently.

offer from Goldman Sachs and was set to begin a finance career. *See id.* at ¶ 6. He was also a featured Harvard speaker at a graduation event. Only on commencement day did Sonoiki learn that his degree would not be in the envelope he received on Harvard's stage. After Sonoiki served his purpose for Harvard, Defendants withheld Sonoiki's degree in violation of the process set forth in Defendants' own policies and Sonoiki's reasonable expectations. Defendants' actions cost Sonoiki employment and educational opportunities, including a spot in Harvard's 2+2 MBA program and an offer to join Taconic Capital Advisors, an eight-billion-dollar hedge fund.[2]

Defendants argue that they did not violate their policies or Sonoiki's reasonable expectations, and, even if they did, that Sonoiki cannot show damages. Harvard's argument centers on *their* interpretation of the policies, but this is not the lens through which a student's claim is evaluated. Instead, courts must permit a student's claim to move forward if the *student's* fair read of the policy at issue supports the reasonable expectations drawn therefrom. *See Doe v. Stonehill Coll., Inc*., 55 F.4th 302, 316 (1st Cir. 2022); *see also Doe v. Brandeis Univ.,* Civil Action No. 20-CV-12162-AK, 2023 U.S. Dist. LEXIS 21045, at *24 (D. Mass. Feb. 8, 2023).

Defendants wash their hands and frame all questions at issue as simple questions of law to be decided in their favor. However, with competing interpretations of ambiguous policies supported by the factual record, there are triable issues of fact that must go to the jury. At this stage, the record must be "viewed in the light most favorable to" Sonoiki, the non-movant. *Brandeis*, 2023 U.S. Dist. LEXIS 21045, at *24 (D. Mass. Feb. 8, 2023) (citing *Paul v. Murphy,* 948 F.3d 42, 49 (1st Cir. 2020)).

---

[2]William Alden, Taconic Capital Co-Founder to Retire, DEALBOOK, The New York Times, December 3, 2013. https://archive.nytimes.com/dealbook.nytimes.com/2013/12/03/taconic-capital-co-founder-to-retire/

## II.    FACTUAL BACKGROUND

Harvard's Administrative Board ("*Ad Board*") carries out disciplinary actions against students. Defendants' policies require steps that must occur before Harvard takes a disciplinary action. Although allegations of sexual misconduct against Sonoiki were reported to Dean Ellison ("*Ellison*"), Secretary of the Ad Board, no later than May 17, 2013, Defendants waited to issue a charge until June 25, 2013. Harvard withheld Sonoiki's degree *before* any Ad Board action was taken and before a disciplinary "case" was pending through the issuance of a "charge," each of which are terms of art in Defendants' policies.

On commencement day, May 30, 2013, Sonoiki reasonably expected to graduate. Unbeknownst to Sonoiki, ████████████████████████████████████████ ████████████████████████████████████████████ Sonoiki's Currier House Resident Dean, Laura Johnson ("*Johnson*") pulled him aside *during* commencement and stated, ████████████████████████████████████████████ ████████ The die was cast, and Defendants improperly withheld Sonoiki's degree.

### A. May 17, 2013: Sonoiki Received News of Unspecified, Anonymous Allegations of Sexual Misconduct.

On May 17, 2013, Ellison summoned Sonoiki to his office and ████████████████ ████████████████████████████████████████ Sonoiki was on Harvard's radar long before May 17, 2013. ████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



Following the meeting between Sonoiki and Ellison, Ellison sent a letter summarizing their

conversation. ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████ At the

time Ellison sent Sonoiki the letter, Ellison could have formed a subcommittee to consider a

charge. *See* ████████████████ Johnson also ████████████████████

████████████████████████████████ Johnson was

████████████████████████████████████████████

████████████████████

Harvard's policies provide a mechanism for the Ad Board to issue charges *sua sponte.*

Harvard's Handbook for Students ("*Handbook*") specifies that "[t]he Administrative Board may

independently initiate a charge against a student, and usually does so when a student has been

charged with a crime in a court of law." Doc. No. 146-4, HU-DS-984. Ellison specified that when

████████████████████████████████████████████

████████████████████ As of May 17, 2013, no subcommittee had

convened in relation to Sonoik, and no charge was issued. *Id.* 43:14.

---

[3] Sonoiki's Amended Complaint refers to his former classmates who became complainants in the
Ad Board process under pseudonyms: "Ann," "Betty," and "Cindy."

**B.  May 29, 2013: Sonoiki Delivered his Class Day Oration.**

Sonoiki was chosen as an orator for Class Day, a graduation-related event. Bull. Decl., Ex. 16, 169:19-20.[4] When asked about allowing Sonoiki to speak, Ellison stated that Harvard ███ ████████████████████████████████████████ However, Ellison clarified that Class Day ███████████████████████     ███████████████ ████████████████████████████ in 2013, though he does not recall to whom he expressed those concerns (and the record contains no evidence of these "concerns"). *See id.* 52:13-17. Ellison does not recall ████████████████████████████████████████ Regardless, Sonoiki spoke, representing Harvard's Class of 2013 before an audience of faculty, students, and guests.

That same day, Ellison emailed another letter to Sonoiki, stating that his degree would be withheld pursuant to a provision of the Handbook outlining that a degree cannot be issued to a student who is not in good standing or against whom a disciplinary charge is pending. Doc. No. ████████████████████████ of the letter because he was preparing for his speech and was visiting family in town for graduation. Bull. Decl., Ex. 16, 154:21-22;155:23-24; *id.*, Ex. 16, ¶ 7. Sonoiki never received *any* notification that he would not graduate until Johnson pulled him aside in line at graduation, ██████████ █████████████████████████████████

---

[4]The speech remains on Harvard's YouTube channel, detailing Sonoiki's path as an immigrant child who had overcome violence, poverty, and hardship to achieve great things. *See* Harvard University, *Harvard Orator: Damilare Sonoiki / Harvard Commencement 2013*, YOUTUBE (June 4, 2013), https://www.youtube.com/watch?v=jaubNt7zvvk&feature=youtu.be.



███████████████████████████████ Michael Burke, Harvard's

corporate representative, ███████████████████████████████

███████████████████████████████

The circumstances in which a student's name would be removed include ████████

███████████████████████████████ Sonoiki had paid

all term bills, fulfilled all academic requirements, and had no pending disciplinary case. Bull.

Decl., Ex. 16, ¶ 10.

Ellison indicated that ███████████████████████████████

███████████████████████████████ This contradicts Ellison's prior statements ██████

███████████████████████████████

██████████

**C.  May 30, 2013: Sonoiki Was in "Good Standing" and No Disciplinary Charges Were Pending Against Him.**

Sonoiki's status as a student in "good standing" is undisputed.[5] Bull. Decl., Ex. 16, ¶ 14.

Sonoiki was not aware of any complaints filed against him. *Id.*, ¶ 9. At graduation, Sonoiki

---

[5]Defendants also could have placed Sonoiki on disciplinary probation, which would render him "not in good standing" prior to graduation. Doc. No. 146-4 HU-DS-986. They failed to do so. The charge recommendation issued on June 25, 2013 lists Sonoiki's Probation Status as "none." Doc. No. 145-6.

expected to receive his degree. Bull. Decl., Ex. 12, 164:14. Moreover, according to Harvard's own policies, students involved in disciplinary matters ordinarily cannot participate in graduation or related exercises, yet Sonoiki spoke at a graduation event and walked at commencement. Bull. Decl., Ex. 12, 294:1-3; 19-2; Doc. No. 146-7 HU-DS-1564. These factors contributed to Sonoiki's reasonable expectation that he would graduate and receive his degree.

**D. May 31, 2013: Johnson Expressed Reservations About Serving as Sonoiki's Board Representative but Did Not Inform Sonoiki.**

On Friday, May 31, 2013, one day after commencement, Johnson sent an email to Ellison expressing her support for Betty, a complainant with allegations of misconduct against Sonoiki. Johnson wrote, ███████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████ At no point did Johnson share with Sonoiki her concerns about working with him, or her support for his accuser. Bull. Decl., Ex. 16, ¶ 24.

**E. June 3, 2013: Sonoiki Receives Documents Indicating He is Involved in a Disciplinary "Matter" that "May Give Rise to a Disciplinary Case."**

On June 3, 2013, Sonoiki met virtually with Ellison again. Doc. No. 145-17, HU-DS-1728. The form Ellison filled out in connection with that virtual meeting contained the following language:

> As a Harvard College student who is involved as a principal or witness in **a matter that is under review** by the Administrative Board, and **that may give rise to a disciplinary case**, you are expected to respect the privacy of others involved.[...] **If the Administrative Board makes a determination to treat this matter as a disciplinary case**, then you will be expected to keep confidential photocopies[.]

*Id.* Even after graduation, Harvard framed the matter under review involving Sonoiki as a potential "case."

### F. Though Sonoiki Completed his Academic Requirements, he had Nothing to Show for his Time at Harvard and Began Losing Opportunities.

As Harvard's Ad Board process got underway, Sonoiki's educational and career prospects crumbled. Sonoiki was forced to withdraw from Harvard's 2+2 MBA program, to which he was accepted prior to graduation, because he never graduated from Harvard. Doc. No. 145-84 SONOIKI 155; Bull. Decl., Ex. 16 ¶¶ 3-4. Although, at the time of graduation, Sonoiki had a position with Goldman Sachs, Sonoiki was offered a position at Taconic Capital Partners in June 2013 with a base salary of $150,000 and a bonus range of $100,000 to $200,000. Doc. No. 145-36, HU-DS-959; Bull. Decl., Ex. 12, 30:14-25; 31:1-13; Doc. No. 145-66 SONOIKI 92-99. This offer was rescinded when Taconic Capital Partners discovered that Sonoiki lacked a Harvard degree. Bull. Decl., Ex. 16 ¶¶ 31-33; *see* Doc. No. 145-69 SONOIKI 90. In April of 2014, an anonymous call was made to Goldman Sachs, alerting the company that Sonoiki did not have a Harvard degree. Bull. Decl., Ex. 12, 230:15-16;315:1-5. Sonoiki ultimately resigned from Goldman Sachs. Doc. No. 146-11 (Stating, Goldman Sachs "became aware of certain issues with respect to Sonoiki not having received his undergraduate degree from Harvard").

The consequences of Defendants' breach continued to follow Sonoiki throughout his career, even as he pivoted to work in the entertainment industry. While he was writing scripts, it came to light that Sonoiki engaged in insider trading during the time he worked at Goldman Sachs. However, this information was not made public until 2018, after he began to write for hit TV programs such as *Black-ish* and *The Simpsons.* At the time that the insider trading issue surfaced,

his lack of a Harvard degree was publicized,[6] which cost him his writing career. Sonoiki was let

go from *The Simpsons* because he lacked a Harvard degree due to findings of sexual misconduct,

rendering him "untouchable" in the industry at the height of the #MeToo movement.[7] Bull. Decl.,

Ex. 16, ¶ 37. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████

## III. Law and Argument

### A. Standard of Review at Summary Judgment.

Summary judgment may be granted only when "the record, viewed in the light most

favorable to the non-moving party, presents no 'genuine issue of material fact,' and the moving

party is entitled to judgment as a matter of law." *Brandeis,* 2023 U.S. Dist. LEXIS at *24 (D. Mass.

Feb. 8, 2023) (citing *Paul v. Murphy,* 948 F.3d 42, 49 (1st Cir. 2020)). In adjudicating a motion

for summary judgment, courts must draw all reasonable inferences in the non-moving party's

favor. *Paul*, 948 F.3d at 49 (internal citation omitted).

### B. Harvard Misstates the Applicable Legal Standard Governing Review of a Reasonable Expectations Breach of Contract Claim.

Harvard ignores recent precedent in the First Circuit and instead provides an incomplete

recitation of the standard by relying only on the outdated cases of *Havlik v. Johnson & Wales*

---

[6]Doc. No. 146-11.

[7]WIKIPEDIA: MeToo movement, available at: https://en.wikipedia.org/wiki/MeToo_movement.

[8]Other entertainment industry giants, including Martha Stewart, have accomplished massive rebrands following insider trading convictions. *See, e.g.,* Kate Taylor, Insider, *Martha Stewart will never stop reinventing herself — here's how she went from a stockbroker to hosting a cooking show with Snoop Dogg*, available at https://www.businessinsider.com/martha-stewart-will-never-stop-reinventing-herself-bio-2018-1. Such a rebrand is impossible for Sonoiki, considering his lack of a Harvard degree. *See* Bull. Decl., Ex. 16, ¶ 37.

*Univ.*, 509 F.3d 25, 34 (1ˢᵗ Cir. 2007)[9] and *Walker v. President and Fellows of Harvard College,* 82 F. Supp. 3d 524, 530 (D. Mass. 2014). Harvard conspicuously omits the evolution and interpretation of *Havlik* and *Walker* set forth in *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 80 (1st Cir. 2018), *Stonehill*, 55 F.4th 316 (1st Cir. 2022)(citing *Sonoiki v. Harvard Univ.*, 37 F.4th 691 (1st Cir. 2022), and *Brandeis,* 2023 U.S. Dist. LEXIS at *24 (D. Mass. Feb. 8, 2023). According to Harvard, "contract interpretation . . . is generally a question of law for the court" and "it does not matter what *plaintiff's* expectations of the proceeding were if those expectations were not reasonable." Doc. 144, 12 (internal citations omitted).

The First Circuit has expressly articulated that, when evaluating a claim for breach of contract based on reasonable expectations, the lens *is now* turned inward on the student as opposed to what a *school* might expect a student to believe. According to *Stonehill,* and as applied to summary judgment by *Brandeis,* the "appropriate inquiry is whether the student's expectations, viewed objectively alongside the express terms of the contract, are based on *the student's* fair interpretation of the contract's provisions. The student must assert facts establishing that the university failed to meet his or her reasonable expectations and must also show injury resulting from the contractual breach." 55 F.4th at 316. *Stonehill* and *Brandeis* clarify that the analysis hinges on the student's reasonable expectations in conjunction with the contract language rather than merely expectations that a college would expect a student to have.

Though Defendants frame the issues in this case as solely legal issues of contractual interpretation, material issues of fact are present. Defendants cite *Walker* for the proposition that "[c]ontract interpretation…is generally a question of law for the court." 82 F. Supp. 3d at 530 (D.

---

[9] It bears noting that *Havlik* was decided under Rhode Island contract jurisprudence, which, among other distinctions, affords broader discretion to private universities to interpret their own contractual terms. *See Havlik,* 509 F. 3d 25, 25-26 (1st Cir. 2007).

Mass 2014). Yet, Defendants' ellipsis omits the important clarification that: "whether any ambiguities in the contract exist in the disputed contractual terms" is generally a legal question. *See id.*[10] Here, the First Circuit has already determined *as a matter of law* that Defendants' contract, as written, is ambiguous on its face, which precluded judgment on the pleadings in this case. *Sonoiki*, 37 F.4th 691 (1st Cir. 2022). "At the summary judgment stage, a trial court is to make legal determinations rather than involve itself in factfinding." *Bos. Coll.*, 892 F.3d at 86-87 (citing *United Paperworkers Int'l Union Local 14 v. Int'l Paper Co.*, 64 F.3d 28, 31 (1st Cir. 1995)).

Finally, the question of causation is also one of fact for the jury. *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 58, 449 N.E.2d 331, 338 (1983)(internal citation omitted). Harvard argues that Sonoiki's conviction for insider trading breaks the chain of causation, even if a breach of contract did occur, asking the Court to rule that being deprived of a degree has zero value. As more fully outlined herein, Sonoiki demonstrates that, as a direct result of not receiving a Harvard degree to which he was contractually entitled, Sonoiki lost (i) the educational opportunity to be a part of Harvard's 2+2 program; (ii) a lucrative job offer from Taconic Capital Partners; (iii) job opportunities in Hollywood; and (iii) other positions that require an undergraduate degree. Just as in *Trs. Of Bos. Coll,* "[t]he record here, viewed in the light most favorable to the [non-movant], necessarily bars summary judgment for this alleged breach of contract claim." 892 F.3d at 87.

---

[10]The *Walker* case is also factually distinct. It concerned a Harvard process surrounding academic decisions (with respect to which courts are more deferential to colleges) and the reasonable meaning of the term "submitted" in a specific context within Harvard's policies. *See id.* at 539. In assessing the meaning of the term, the court held only one reasonable meaning could be attributed to "submitted" given the grammatical context in which the term appeared. *Id.*

**C. Sonoiki Reasonably Expected to Receive His Degree Based on the Language of the Governing Harvard Policy, the Ambiguity in Harvard's Policy, and Harvard's Conduct.**

There is no dispute that the relationship between Sonoiki and Harvard is based in contract. The First Circuit acknowledges "[a] student's relationship to his university is based in contract." *Stonehill,* 55 F.4th at 316. The terms of that contract are based in the language of the policy at issue and the ancillary documents incorporated therein. *See Doe v. W. New Eng. Univ.*, 228 F. 3d 154, 169, (D. Mass 2016)(finding that a student's relationship to a university was governed by "the terms contained in the Handbook and other college materials"). However, the language of the policy itself is not the end of the inquiry when defining the scope of contractual duties owed to a student. The First Circuit has determined, a "student's expectation can be reasonable even if the precise expectation is not stated explicitly in the contract's language." *Sonoiki*, 37 F.4th at 709 (1st Cir. 2022).

**1. When Evaluating Sonoiki's "Jurisdiction" Argument, Harvard's Handbook, Not the Student Information Form, Governed Sonoiki's Ad Board Process.**

Sonoiki reasonably expected to receive his degree because the Handbook stated, "[a] degree will not be granted to a student who is not in good standing[11] or against whom a disciplinary charge is pending" Doc. No. 146-4 HU-DS-985. The Handbook provided, after receipt of a complaint, "the College will decide whether to issue a charge and, if so, against whom and for what." *Id*. Under Harvard's policies, a charge is "a decision by the [Ad] Board to pursue a case against a respondent." Doc. No. 146-1, HU-DS-1561. At the time of his graduation, Sonoiki was

---

[11]Although not affirmatively defined in Harvard's policies, "good standing" is the default status for a Harvard student when the student enrolls at Harvard, which can be changed through Ad Board action. *See* Doc. No. 146-7 HU-DS-1569 (outlining potential outcomes of an Ad Board proceeding which "do not change [a student's] status at the College, meaning that [the student] remain[s] 'in good standing[.]'")

in good standing and no disciplinary charge was issued by the Ad Board. His reasonable expectation of receiving his degree was further supported by The Ad Board's General Information on Disciplinary Cases, which states, "[t]he Administrative Board's decisions are governed by the rules and regulations contained in the Handbook for Students, and guided by the standard responses and considerations of equity." Doc. No. 146-6, HU-DS-1562-63.

In response to Sonoiki's reasonable expectation to receive his degree given that he was a student in good standing and no charge was issued by the Ad Board, Defendants argue that the Student Information Form ("Form") foreclosed any such expectation. According to the Form, "a student cannot receive a degree before a pending disciplinary case is resolved" and that "a disciplinary case always begins with an allegation of student misconduct in the form of a complaint or report." Doc No. 146-7, HU-DS-1564. However, that language is not where analysis of Sonoiki's reasonable expectations ends.

Harvard wrongly asserts that any "tension" between the Form and the Handbook, (which Harvard mislabels the "Overview")[12] should be resolved with the understanding that the Form "controls" in case of any conflict. Doc. No. 144, 15. This framing of the issue is incorrect: there is not a "conflict" between the Handbook and the Form, but rather an ambiguity. Thus, the contract interpretation principle of *contra proferentem*–construing the contract against the drafter– mandates that the ambiguity be read in Sonoiki's favor. *See Wright v. Commonwealth*, 351 Mass. 666, 673 (Mass. 1967). Applying Defendants' other cited principles—favoring specific over general language, reviewing extrinsic evidence, reading terms in context and harmoniously, and a

---

[12]Defendants' framing mischaracterizes the Handbook. The Handbook itself is a "guide to academic requirements, [Harvard's] residential system, and the many activities that take place outside the classroom. It also clarifies the standards that should inform academic and personal conduct within the College." Doc. No. 146-2 HU-DS-1. It is also a "user's manual for the College[.]" Doc. No. 146-3, HU-DS-767.

commonsense approach—all support Sonoiki's reading of the contract and reasonable expectations.

### a. Defendants Decline to Acknowledge that Ambiguity in Contractual Language is Construed Against the Drafter.

Because there is an ambiguity in the contract language, the principle of *contra proferentem* must be applied. Under Massachusetts law, "contracts must be scrutinized with particular care because they are often the product of unequal bargaining power [.]" *Townsend Oil Co., Inc. v. Tuccinardi*, 2020 Mass. Super. LEXIS 12, at *8 (Jan. 13, 2020) (cleaned up). Here, Harvard held the power in constructing the contract, having drafted each term upon which Sonoiki relied. *Contra proferentem* supports a read of the ambiguous contract terms in Sonoiki's favor, especially at the summary judgment stage, where all "reasonable inferences" must be drawn in Sonoiki's favor as the non-movant. *See Paul*, 948 F.3d at 49.

Although Defendants claim that charges were pending against Sonoiki as of May 28, 2013, ███████████ cases were pending on May 30, the day of his commencement, because "[a] charge is a decision by the board to pursue a case against a respondent[,]" Doc. No. 146-1, HU-DS-1561, and no subcommittee was convened nor tasked with *even considering* whether a charge was appropriate until *after* commencement. *See* Doc. No. 145-6, HU-DS-1796. In this context, it is reasonable to interpret "a charge is pending" to refer to the situation in which a charge has issued, and the parties are "waiting for [the charge] to…be decided[.]" *See Id*. Burke confirmed, ███████████ ████████████████████████████████████████████ ███████████████████████████ The author of an ambiguous contractual term is held to any reasonable interpretation attributed to that term relied on by the

other party. *Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 363 N.E.2d 688, 690 (Mass. 1977). Here, Sonoiki's interpretation that a "pending" charge must be "issued" is reasonable.

A contract term is ambiguous if it is susceptible of more than one meaning, in which case a party may offer evidence to remove or explain the ambiguity. *See Gen. Convention of The New Jerusalem in the U.S. of Am., Inc. v MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007); *see also S. Union Co. v. Dep't of Pub. Utils.*, 941 N.E.2d 633, 640 (Mass. 2011). Here, Sonoiki has adduced evidence that the reasonable meaning of a "pending" case under Harvard policies is clear—where a "charge" is defined as a "decision by the Board to pursue a case," a case cannot be pending until a charge is *issued*. *See* Doc. No. 146-1, HU-DS-1561. "Once the charge has been investigated, the Board will review the case and issue a *finding* and *outcome*, which is a determination as to whether a student has violated the rules of the College and the College's response, as appropriate." Doc. No. 146-7, HU-DS-1567. So, when does a "case" become "pending," under Harvard policies? At a minimum, the parties' competing interpretations are inextricably wound in fact issues inappropriate for disposal at summary judgment. *See Sampel v. Whole Foods Mkt. Grp., Inc.,* Civil Action No. 18-cv-11752-ADB, 2020 U.S. Dist. LEXIS 155515, at *32 (D. Mass. Aug. 27, 2020).

### b. If Specific Language Controls, the Handbook, Not the Form, Dictates When a Degree Can Be Withheld.

Harvard claims that, to the extent there is "tension" between the Form and the Handbook, the "specific" contractual provisions should govern more "general" provisions as a general principle of contract interpretation. Doc. No. 144, 15, (citing *Astra USA, Inc. v. Bildman,* 455 Mass. 116, 141 (2009)). The Handbook is quite *specific* regarding the circumstances in which a student will not receive a degree. It specifies that "[a] degree will not be granted to a student who is not in good standing or against whom a disciplinary charge is pending." Doc. No. 146-4 HU-DS-985. Surely, this specific provision is clearer than Defendants' selected provision from two

separate sentences in the Form that, only when "taken together," could be interpreted to support Defendants' position. *See* Doc. No. 144, 14; *see also Astra USA, Inc.*, 455 Mass. at 141 (2009). As of May 30, 2013, it is undisputed in the record before the Court that Sonoiki had completed all academic requirements for graduation, was a Harvard student in good standing, and had no unfulfilled financial obligations. Bull. Decl., Ex. 11, 74:4-6; Bull. Decl., Ex. 16, ¶ 14. Reading the specific clause in the Handbook indicating that a degree will not be granted to a student "who is not in good standing or against whom a disciplinary charge is pending," Sonoiki held a reasonable belief that he would graduate. *See* Doc No. 146-4, HU-DS-985. Defendants bury in a footnote that the First Circuit recognized that Harvard's policies use the term "case" to mean different things depending on the context in which the term appears, unlike "charge," which is a defined term. *See* Doc. No. 144, 15, FN 4; *see also* 37 F. 4th at 705-706.

1.   The Form: in Context.

Defendants advocate for application of the contract interpretation principle of reading contractual terms in the context in which they appear. *See* Doc. No. 144, 18. Contractual terms should not be read in isolation, but in context. *See Sawyer v. United States,* 75 F. Supp. 3d 353, 358-59 (D. Mass. 2015). In arguing that Sonoiki could not have reasonably expected to graduate, Defendants rely upon the Form's language, which reads, "[a] student cannot receive a degree before a disciplinary case is resolved" and "[a] disciplinary case always begins with an allegation of student misconduct in the form of a complaint or report." Doc. No. 144, 19. Defendants' argument is logically flawed. A necessary condition (i.e., an allegation) does not equal a sufficient condition (i.e., issuance of a charge, marking a pending case that will ultimately be

adjudicated by the Ad Board).[13] The *next sentence* of the Form provides additional context, reading, "[i]n a peer dispute case, one student makes an allegation against another student (peer), ***but any ensuing charges must be brought by, and on behalf of, the college. In other words, an allegation begins an initial review*** by the Administrative Board that may or may not end with the college issuing a charge***…Once the charge has been investigated, the Board will review the case*** and issue a finding and outcome[.]" Doc. No. 146-7, HU-DS-1564. Clearly, as gleaned from the surrounding context of Defendants' selective quotation, while every case may *begin* with an allegation, it does not follow that an allegation *itself* constitutes a disciplinary case, particularly since a *charge* marks the beginning of a review by the Ad Board.

    2.  <u>When a Disciplinary Case Begins: In Context.</u>

Contrary to Harvard's claim, a disciplinary case cannot begin until a charge is issued. Under Harvard's policies, a charge is "a decision by the [Ad] [B]oard to pursue a case against a respondent." Doc. No. 146-1, HU-DS-1561. Burke specified that ██████████████

███████████████████████████████████████████████████████

████████████████████████████████ Between the filing of a complaint and decision regarding the issuance of a charge, ████████████████████

███████████████████████████████████████████████

████████████████████ A charge is issued ████████████████████

████████████ Harvard did not issue a charge against Sonoiki before commencement on May 30, 2013.

---

[13] *See* Brennan, Andrew, "Necessary and Sufficient Conditions," The Stanford Encyclopedia of Philosophy (Fall 2022 Edition), Edward N. Zalta & Uri Nodelman (eds.), https://plato.stanford.edu/archives/fall2022/entries/necessary-sufficient/.

On June 3, 2013, Sonoiki spoke with Ellison again. Doc. No. 145-17, HU-DS-1728. The form Ellison filled out in connection with that call referred to Sonoiki's situation as "**a matter that is under review** by the Administrative Board, and **that may give rise to a disciplinary case[.]**" (emphasis supplied). *Id*. It further specified, "**If the Administrative Board makes a determination to treat this matter as a disciplinary case**, then you will be expected to keep confidential photocopies[.]" (emphasis supplied). Doc. No. 145-17, HU-DS-0001728. Even after graduation, Harvard believed the matter was under review and did not yet give rise to a disciplinary "case." In fact, Sonoiki could not  review the actual statements submitted against him until at least June 5, 2013 (Doc. No. 145-21, HU-DS-2591) and no charges were considered or issued against Sonoiki until June 25, 2013. Doc. No. 145-6, HU-DS-1796.

Burke stated, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Following the initial review, ███ ██████████████████████████████████████████████████████████████████████████████████████████ Absent a charge, an allegation does not go before the full Ad Board for decision, so there is no "case" pending resolution. A peer dispute case thus cannot be pending and awaiting a decision by the full Ad Board before a charge is considered and ultimately issued. Burke further explained, █████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████

---

[14]Defendants rely on this provision to support withholding Sonoiki's degree. However, a necessary condition is not a condition sufficient. Although a story begins with a single word, a single word is not a story. An allegation and a case cannot be read as one and the same, as discussed more fully *infra* at Section C(1)(b).

Harvard's contentions surrounding the meaning of "pending" defy common sense in context. Sonoiki acknowledged that the word "pending" "can have various meanings." Bull. Decl., Ex. 12, 175:24-25. Despite their briefing with the First Circuit, Defendants now take a  different approach with this Court by engaging in word play with "pending." In their appellate brief, Defendants wrote:

> [T]he fact that 'a degree *will not* be granted to a student…against whom a disciplinary charge is pending,'…does not mean the inverse is true—that a degree *must* be granted to every student 'against whom a formal disciplinary charge is not yet pending'….The Regulations are simply silent on whether Harvard must or even may grant a degree to a student against whom a complaint remains pending.

Brief of Appellee, *Sonoiki,* 37 F.4th, Doc. No. 00117677409, p. 28. In that brief, Defendants referred to a charge "pending" meaning a charge had been *issued.* Now, Harvard claims "pending" means "waiting to happen."

Defendants' most recent premise means a case was "pending" as soon as Ellison was given the slightest suspicion that allegations of misconduct had been lodged against Sonoiki—at least as early as May 17, 2013 (or even 2012). *See* Doc. No. 145-63, HU-DS-2156 and HU-DS-2165-2167. But that is not how Harvard frames its argument. Instead, to evade responsibility for depriving Sonoiki of the process due under its policies before withholding his degree, Harvard asserts that the case against Sonoiki was "pending" on May 28, 2013, once *written* complaints were filed just two days before commencement. If "pending" is "waiting to happen" at any time in the future, then there is a "pending" disciplinary case against every Harvard student about whom rumors of misconduct exist, including issues such as cheating, drugs, drinking, sexual misconduct, etc.

### 3. When Reading Contractual Terms Harmoniously and Avoiding Surplusage, Sonoiki's Interpretation Prevails.

Defendants raise the "well settled" principle of Massachusetts contract law that contract documents "should be read harmoniously" whenever possible. *See* Doc. No. 144, 18, (citing *Happ*

*v. Corning, Inc.*, 466 F.3d 41, 46 (1st Cir. 2006)). However, Defendants seek to selectively enforce their own policy language. Massachusetts law "directs courts to give reasonable effect to each provision of an agreement wherever feasible." *Fed. Deposit Ins. Corp. v. Singh*, 977 F.2d 18, p22 (1st Cir. 1992). Wherever possible, courts should avoid contract interpretation that renders a particular word, clause, or phrase meaningless or relegates it to the category of mere surplusage. *Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004) (citing *Acadia Ins. Co. v. Buck Constr. Co.*, 2000 ME 154, 756 A.2d 515, 517 (Me. 2000)); *see also Tupper v. Hancock*, 64 N.E.2d 441, 443 (Mass. 1946) (citation omitted). The fact that Harvard included a *specific reference* to a circumstance in which a degree could be withheld belies its argument that it is entitled to withhold a degree in a multitude of unnamed circumstances not specifically contemplated under its policies. *See id.* Such an interpretation renders meaningless the provision that a degree would not be granted to a student who is not in good standing or against whom a disciplinary charge is pending.

### 4. Defendants Falsely Frame Harvard's Options as a Binary, while a Third Option was Available—the *Sua Sponte* Issuance of Charges.

Defendants claim that "the record forecloses" Sonoiki's jurisdiction argument because "a formal charge cannot issue until a preliminary investigation of the complaints" and Harvard "was in no position" to conduct such an inquiry "in the two days between the filing of the complaints and graduation." Doc. No. 144, 2.

Defendants refer to their argument as "common sense," stating that it would be "absurd" for Harvard to (i) issue a charge in accordance with its policies when it became aware of alleged misconduct against a student; or (ii) grant the student a degree. Doc. No. 144, 16-17. Defendants also argue that merely because they withheld Sonoiki's degree, his status as a student was "preserved" *indefinitely and perpetually*. *See* Doc. No. 144, 17, FN 5. This cannot be true, as Defendants failed to act according to their policy to "preserve" Sonoiki's student status by issuing

a charge. *See* Doc. No. 146-4, HU-DS-984. Harvard *could have* followed its policies in conducting

the proper preliminary investigation owed to Sonoiki prior to issuing a charge before graduation,

as there was nothing preventing Defendants from issuing a charge. This is far from reading

"absurdity" into Defendants' policies. Doc. No. 144, 17. Defendants could have issued a charge

*sua sponte* at any time and did not need to wait for written complaints ███████████████   *See*

Doc. No. 146-4, HU-DS-984. Defendants must "live with" the promises they have made to

students by virtue of their policies and actions. *See Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 194

(D.R.I. 2016). Defendants cannot now claim that their violations should be excused if, in their

view, they were "technical." *See id.*

Harvard's hypothetical regarding a murder on campus the night before graduation, appears

based on the decision of *Dinu v. President & Fellows of Harvard College,* 56 F. Supp. 2d 129, 133

(D. Mass 1999), which defies common sense and is inapposite to Sonoiki's circumstances. *See*

Doc. No. 144, 17. As Defendants point out, "[c]ommon sense is as much a part of contractual

interpretation as is the dictionary or the arsenal of canons." Doc. No. 144, 16, (citing *Fishman v.*

*LaSalle Nat.* Bank, 247 F.3d 300, 302 (1st Cir. 2001)). Harvard's claim of an unmanageably short

timeline is absurd. As noted above, Harvard had more than the two days to issue charges against

Sonoiki.

The *Dinu* case Defendants cite is easily distinguished from Sonoiki's. In *Dinu,* the plaintiffs

challenged a decision to withhold their Harvard degrees when the students *were not in good*

*standing* prior to graduation by virtue of being placed on disciplinary probation and were *prevented*

*from attending commencement*. *See Dinu,* 56 F. Supp. 2d at 132. No such actions exist in Sonoiki's

case. Ironically, the *Dinu* court emphasized, "it is not difficult to imagine cases in which a school

might improperly withhold a degree for impermissible reasons[.]" *Id.* at 133. Sonoiki's situation presents one such situation in which a degree was improperly withheld. *See id.*

Harvard's policies specifically contemplate delaying or suspending a student conduct process while a criminal case is in progress. Doc. No. 146-4, HU-DS-984. However, Harvard's counsel specifically asked about a situation in which "there are no criminal charges yet, it's just the beginning of the process to figure out what happened—but there are witnesses that say that a particular student did this, does Harvard have to give that person a degree despite those accusations?" Bull. Decl., Ex. 12, 268:13-20. Sonoiki answered, "there would have to be a reason that there weren't criminal charges then…[and] *if the [accused] student is still in good standing…and in the absence of charges*, I think they would reasonably expect to receive their degree." Bull. Decl., Ex. 12, 268: 22-25; 269:8-13 (emphasis added). Harvard's choice to frame its hypothetical with an accused "murderer" was chosen for its inflammatory effect. Furthermore, Harvard would not allow a suspected "murderer" to speak at a college-sanctioned event, represent Harvard or walk at graduation. Yet, Harvard permitted Sonoiki to do just that.

Further, relying on a commonsense interpretation of Harvard's policies: a "charge" is defined as "the decision by the Board to pursue a case against the respondent[.]" Doc. No. 146-1, HU-DS-1561. The Form states: "[a] student cannot receive a degree before a pending disciplinary case is resolved." Doc. No. 146-7, HU-DS-1570. That a "disciplinary case" could be "pending" absent a "decision by the Board to pursue a case" is illogical. *See Fishman*, *supra,* 247 F.3d at 302 (1st Cir. 2001). Burke noted the difference between an allegation and a charge, stating, "an allegation is a complaint or report[,]" while a "charge indicates that the allegations, if true, might constitute a violation of the rules of the Faculty of Arts and Sciences and that further investigation is likely to enable to resolve the case after an allegation comes in." Bull. Decl., Ex. 11, 17:18-24.

### 5. The Ad Board Does Not Retain Jurisdiction Over Students Following Graduation.

Defendants attempt to hedge their position by arguing, even if Harvard is found to have violated the Ad Board procedures by withholding Sonoiki's degree, they could have nonetheless sought to revoke the degree *after* graduation. *See* Doc. No. 144, 20. This position defies common sense and is belied by Harvard's policies. Burke stated, ███████████████████████████

████████████████████████████████████████[15]" Bull. Decl., Ex. 11, 49:18-21. Burke further clarified that ████████████████████████████████

████████████████████████████ *Id.* 49:12-14 (emphasis added). Harvard's Ad Board appeals policy echoes this understanding of the process. "[O]nce a student has been awarded a degree from Harvard College, the option to have the board reconsider a decision or to appeal to the faculty council is closed." Doc. No. 146-8, HU-DS-1572.

Defendants argue that because they withheld Sonoiki's degree, his status as a student was "preserved," allowing Defendants to retain jurisdiction adjudicate Betty's complaints. *See* Doc. No. 144, 17, FN 5. Paradoxically, Defendants also assert that even if Sonoiki's degree was granted, Defendants still retained jurisdiction to discipline Sonoiki by revoking the degree. These positions are irreconcilable. Either Defendants would have lost jurisdiction by awarding the degree or perpetually retained jurisdiction despite awarding the degree.

---

[15]As Burke stated, a Harvard student's standing changes when a student "die[s], [is] expelled, [is] dismissed, ***graduate[s]***, [is] placed on probation or withdraw[s]." (Emphasis supplied) Bull. Decl., Ex. 11, 23:5-10.

   **c. Harvard's Conduct Supports Sonoiki's Reasonable Expectation to Receive His Degree.**

  Defendants correctly note that evidence of the parties' conduct is "of great significance" in contract interpretation to resolve ambiguity. Doc. No. 144, 16, (citing *Zurich Am. Ins*, 860 F. Supp. 2d at 93 (D. Mass. 2012)). Here, analysis of the parties' conduct favors Sonoiki.

  1. <u>Prior to Graduation Day, No One Told Sonoiki He Would Not Receive His Degree and Ellison was Not Authorized to Single-handedly Block the Vote on Conferral of Sonoiki's Degree.</u>

  Defendants argue that Ellison "informed" Sonoiki that he would not be granted a degree while the complaints against him were pending. Doc. No. 144, 13. This statement is incomplete. Ellison's May 29, 2013 letter was not read or received by Sonoiki prior to commencement. Bull. Decl., Ex. 16, ¶¶ 7-8; *id.,* Ex. 12, 158:2. In fact, Sonoiki never received *any* notification that he would not receive his degree until he was pulled aside at the graduation ceremony by Johnson, ███

███████████████████████████████████

  Harvard asserts that because Ellison's letter should have alerted Sonoiki that he would not receive his degree, Harvard should be excused from adherence to its own procedures. However, even if Sonoiki received Ellison's letter when sent, or if he understood the import of Johnson's statement at graduation, providing notice that a party to a contract intends to breach the contract does not excuse liability for a later breach. *See* Restat. 2d of Contracts, § 243 (a breach by non-performance accompanied … by a repudiation gives rise to a claim for damages for total breach).

  Moreover, the unilateral disciplinary action by Ellison to block the vote on awarding Sonoiki's degree ***in and of itself*** violated Harvard's policies. Burke specified that ███

████████████████████████████████████

█ This disciplinary action was done without any Ad Board action. The record is devoid of evidence that the Ad Board voted to block Sonoiki's degree, let alone that a majority vote by the Ad Board

ratified such a decision. Further, the action violated Harvard policy requiring a subcommittee to be convened prior to issuing a charge. Burke confirmed there are no special policies implicated by the proximity of graduation that would relieve Harvard of its obligations to issue a charge under the Ad Board policy. *See id.* 45:20-21.

2.  Sonoiki Had a Reasonable Expectation to Receive his Degree Based on Harvard's Conduct Surrounding His Participation in Graduation Activities.

From Sonoiki's perspective, he was participating in graduation activities, so it was reasonable to expect his degree. Sonoiki thought, "I still walked, I still gave the speech… I'm still going to get [my degree]." Bull. Decl., Ex. 12, 164:18-20. Moreover, according to Harvard's own policies, students with disciplinary cases pending cannot ordinarily participate in graduation or related exercises, yet Sonoiki did both. *Id.* 294:1-3, 19-2; Doc. No. 146-7, HU-DS-1564. When Sonoiki last spoke with Ellison, on May 17, 2013, Sonoiki was only told that he and Ellison "might have to have another conversation." Bull. Decl., Ex. 12, 171:15-18. No such conversation occurred between May 17, 2013 and May 30, 2013.

Defendants assert (without support anywhere in the Handbook or caselaw) that Sonoiki should have "object[ed]" when he learned he would not receive a degree. Doc. 144, 13. Yet, in asserting this argument, Harvard ignores the fact that Sonoiki reasonably expected to receive his degree and had no prior notice suggesting otherwise. Defendants' actions fell outside of Harvard's procedures. It is also unclear *how* Defendants suggest that Sonoiki could have lodged an effective objection *while participating in commencement activities*.

3.  After Sonoiki Participated in Commencement, Ellison Labeled Sonoiki a Graduate.

In the days following his participation in commencement, Sonoiki communicated with Ellison regarding privacy concerns in a Harvard Facebook group. When responding to Sonoiki, Ellison indicated that Harvard could be limited in its ability to address the situation because

Sonoiki was a graduate. Doc. No. 145-19, HU-DS-2539. Ellison stated, ██████████████ ████████████████████████████████████████████ This communication further supported Sonoiki's expectation of receiving his degree.

### D. Ellison Breached the Ad Board Procedures.

#### 1. Ellison Failed to Inform Sonoiki that He was Entitled to Have Johnson Join his Initial Meeting on June 3, 2013.

The Ad Board Overview states, "[d]isciplinary cases…begin with a conversation between the student, his or her Resident Dean, and the Secretary of the Administrative Board or his or her designee, during which they discuss the incident, the relevant College rules or standards of conduct, and possible courses of action." Doc. No. 146-4, HU-DS-983-84. Sonoiki alleged Ellison did not follow the Ad Board process because, "when they met in June 2013 to discuss Ann's and Cindy's submitted complaints, Ellison did not advise Sonoiki he was entitled to have his resident dean present." *Sonoiki*, 37 F.4th at 712 (1st Cir. 2022). ████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

██

Sonoiki confirmed that Johnson *did not join* his June 3, 2013 virtual call with Ellison. Bull. Decl., Ex. 12, 197:20–22; 191:25; Bull. Decl., Ex. 16 ¶ 18. Ellison stated to Sonoiki that ██████ ████████████████████████████████████████████ The initial meeting is a critical part of the process, and Ellison and Johnson shirked their obligations under Harvard's policies. Johnson was tasked with being Sonoiki's only advocate and representative in meetings with the Ad Board. Ironically, just days before ██████████████████████████████████████████████████ ██████████████████████████████████████████ These conflicts

were never discussed with Sonoiki. Bull. Decl., Ex. 16, ¶¶ 24-25. As such, the initial meeting was of the utmost importance to raise procedural issues on Sonoiki's behalf, ensure that the process was being followed faithfully, and also alert Sonoiki to Johnson's conflict.

### 2.  Ellison Failed to Hold an Initial Meeting in Regard to Betty's Complaint.

Defendants claim that Ellison held an initial meeting on "either June 5 or June 6" regarding Betty's complaint. Doc. No. 144, 28-29. They dismiss Sonoiki's contention that Ellison's failure to hold an initial meeting regarding Betty's complaint would have made a difference, conceding a meeting did not take place. *Id.* at p. 29. Ellison's failure to hold an initial meeting with Sonoiki after Betty filed her complaint constitutes yet another breach of Harvard's policies. *See Sonoiki,* 37 F.4th at 712 (1st Cir. 2022). Betty filed her complaint against Sonoiki on June 4, 2013, following commencement. Doc. No. 145-14, HU-DS-1880. Ellison did not hold an initial meeting with Sonoiki and Johnson concerning the allegations in Betty's complaint, in violation of Harvard policies. Bull. Decl., Ex. 16 ¶ 29.

Because no initial meeting was held, Sonoiki could not learn any procedural differences between a process initiated before graduation versus afterward. To the extent that Defendants claim Sonoiki should have "object[ed]" at various times during the Ad Board process to procedural issues, they implicitly concede that any such objection would not have made any difference in his case, because a procedural meeting could not have helped him. *See* Doc. 145, 13, 29.

### E.  Sonoiki's Expectation of Advocacy by His Board Representative Johnson Was Not Unreasonable Under Express Contract Language.

Harvard's "Advocate Theory" argument about the role of Johnson brings to mind Julius Caesar's betrayal and assassination by his close confidant Marcus Brutus (and senators) on the Ides of March. Much like Caesar's downfall was sealed by his supposed allies, Sonoiki's undoing was tied to Johnson, his purported voice before the Ad Board. Johnson's actions on behalf of

Sonoiki were nothing short of a betrayal. When asked if she recalled refraining from sharing information with the Ad Board that would undermine Sonoiki, she could not deny doing so. Bull. Decl., Ex. 10, 42:1. As outlined in Section D(1), *supra,* without Sonoiki's knowledge, ████████

████████████████████████████████████████████████████████████

Though Harvard argues that Sonoiki's belief that Johnson would advocate for him was unreasonable based on a single declamatory phrase in the Form, his expectation of advocacy was reasonable for several reasons, and thus a material issue of fact exists for a jury to decide. Harvard calls upon the Court to apply "common sense." Here, using that very lens so often suggested by Harvard, it is common sense that Sonoiki expected Johnson to advocate on his behalf before the Ad Board. Bull. Decl., Ex. 12, 214:17. When Sonoiki was expressly prohibited from personally appearing before the Ad Board, there was no other way to present his defense effectively. Indeed, Johnson acknowledged her role, stating ████████████████████████████████████

████████████████████████████████ Johnson explained that, as an Ad Board representative, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

In its argument that Sonoiki's expectation of advocacy was unreasonable considering a single sentence in the Form, Harvard conveniently ignores the *Stonehill* decision. In *Stonehill*, as previously discussed, the court held, "a student's expectation can be reasonable even if the precise expectation is not stated explicitly in the contract's language. Instead, the appropriate inquiry is whether the student's expectation, viewed objectively alongside the express terms of the contact, is based on the student's fair interpretation of the contract's provisions." 55 F. 4th 302, at 316.

When the same and other policy documents governing the Ad Board process state that a student's Board Representative "will make certain that your perspective is clearly presented;" will "speak on your behalf" and "participate[] in deliberations about your case;" will "mak[e] certain the student's 'voice' is heard;" and will act as the student's "official representative[,]" it was not in any way unreasonable for Sonoiki to expect advocacy. *See* Doc. No. 146-6, HU-DS-1562; Doc. No. 146-7, HU-DS-1565-1566.

Harvard nonetheless notes that Johnson never told Sonoiki that she was his advocate. *See* Doc. No. 144, 22. However, the record confirms that in ███████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Johnson acknowledged that her ████████████████████████████████████████████████████████████

Finally, Harvard argues that even if a breach of the "Advocate Theory" did occur, Sonoiki cannot prove the breach caused him harm because he had an opportunity to provide his own statements in response to the Subcommittee reports for each complaint. *See* Doc. No. 144, 23. This opportunity for Sonoiki to respond does not negate harm caused by a breach. When asked if she shared facts that undermined Sonoiki's position, Johnson could not deny doing so. She merely responded that she did not ████████████████████████████████████████████ ████████████████████████████████████████ In fact, Johnson did clearly recall that she *did not* refrain from sharing facts that she believed would undermine Sonoiki's position. *Id.* 42:1. This evidence, coupled with Johnson's ███████████████████████ ██████████████████████████████████████████████████ confirm the existence of a factual dispute for a jury to decide.

1.   **Sonoiki Reasonably Expected a Duty of Confidentiality from Johnson.**

Harvard argues that the Form says nothing about a duty of confidentiality, and any such obligation conflicts with a Board Representative's role in presenting a "full summary of the facts of the case" and to address "relevant facts" that a student may have failed to raise in their interview. Contrary to Harvard's claim, Sonoiki's expectation of confidentiality was reasonable. When assessing reasonable expectations, "the appropriate inquiry is whether the student's expectation, viewed objectively alongside the express terms of the contact, is based on the student's fair interpretation of the contract's provisions." *Stonehill,* 55 F. 4th 302, at 316, (internal citation omitted). Here, Harvard encouraged students to be "open and honest" with their Ad Board representatives. Doc. No. 146-7, HU-DS-1566. Johnson confirmed,



Furthermore, Johnson confirmed that she ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ She also explained that she positioned herself as a confidential resource and was accessible if Sonoiki felt that he would harm himself. She stated, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[16]

Considering the foregoing, whether Sonoiki was reasonable in expecting a duty of confidentiality by Johnson presents a genuine issue of material fact for a jury to decide, as it would defy common sense for Sonoiki to share potentially incriminating information knowing that it would be

---

[16] Johnson seems to have seen her own role as more akin to a "personal adviser" outlined in Harvard's policies. *See* SUF ¶ 128. She provided "support" for Sonoiki and inquired about his emotional state, without fulfilling her role to advocate for him in the Ad Board procedures in "presenting" his perspective in Ad Board meetings to which he did not have access.

disclosed.[17] Sonoiki had no idea what Johnson could or did share from their conversations, ███

███████████████████████████████████████████████████

███████████████████████████████████████████ *See*

Bull. Decl., Ex. 16, ¶ 26. Johnson betrayed his confidence throughout the Ad Board process.[18]

Harvard also attempts to minimize Sonoiki's position, arguing that he failed to identify confidential information that Johnson disclosed to the Ad Board. This argument defies Harvard's commonsense approach. Because Sonoiki was not present for Ad Board proceedings, he has no way of knowing exactly what was shared. Bull. Decl., Ex. 16, ¶¶ 10, 11. Moreover, although Johnson claims to ████████████████████████████████████████

████████████████████████████ when he asked Johnson for copies of her notes, she did not share them with him. Bull. Decl., Ex. 12, 256:11-19;257:5-6. Johnson's notes are also glaringly absent from the record despite Harvard's record retention policies.

## 2. Sonoiki Reasonably Expected that the Identity of Each Witness Would be Conveyed to Him.

Harvard argues that Sonoiki's claim that Johnson failed to provide him with the names of witnesses fails for several reasons, most notably that he was aware of witness names[19] and, if he was not, it is because he never asked. Harvard cites to examples of witnesses whose identities Sonoiki *did* know and evidence of Johnson trying to share the content contained in her Ad Board notes with Sonoiki. *See* Doc. No. 144, 26-27. Johnson stated that she did not ████████████

---

[17] *See Montague v. Yale University*, Case No. 3:16-cv-00885-AVC, D.Ct., March 29, 2019, ECF 177, pp. 31-33 (denial of summary judgment on student breach of contract count concerning confidentiality obligation of administrator).

[18] ████████████████████████████████████████████████████
████████████████████████████████████████████████████

[19] The few witnesses Sonoiki was able to learn were those unredacted by mistake or that he was able to "figure out" or take a "guess" as to their identity. Bull. Decl., Ex. 12, 237:8-9; 241:12-14.

████████████████████████████████████████ Bull. Decl., Ex. 10, 68:15-

17. Even if she did share the witness identities (which Sonoiki disputes) how could Sonoiki verify

her accuracy? Sonoiki stated that the entire Ad Board process was "shrouded in secrecy" for him.

Bull. Decl., Ex. 12, 228:15-16. And, more importantly for the present purposes, Sonoiki did not

know the identities of the witnesses against him in the Ad Board process. *Id.* 207:3. This evidence

alone confirms the existence of a genuine issue of material fact for a jury. *See Brandeis.,* 2023

U.S. Dist. LEXIS 21045, at *22-24 (D. Mass. Feb. 8, 2023). Given what "[t]he Ad Board

Procedures actually promise...*it is reasonable for a college student to infer that the identity of each*

*witness....is part of the information that would be conveyed from the Board Rep to the student.*"

(Emphasis supplied) *Sonoiki*, 37 F.4th at 712.

### F.  Sonoiki has Suffered Significant Damages Due to Harvard's Breaches of Contract.

In a contract action, damages are calculated to redress the concrete loss Sonoiki suffered

by reason of Defendants' breach. *See Aleo v. SLB Toys USA, Inc.*, 995 N.E.2d 740, 753 (Mass.

2013). The question of damages causation is generally one for the jury. *Mullins v. Pine Manor*

*Coll.*, 389 Mass. 47, 58, 449 N.E.2d 331, 338 (1983)(internal citation omitted). Defendants argue,

even if a breach is shown, Sonoiki cannot show damages. Doc. No. 144, 30. However, Defendants

fail to acknowledge the principle stated in a case against Yale this month: "[t]hose accused of

sexual assault in the higher education context often face life altering and stigmatizing

consequences, including suspension or expulsion, criminal referrals, lack or revocation of

employment offers, loss of future academic opportunity, and deportation." *Khan v. Yale Univ.*, No.

20705, 2023 Conn. LEXIS 139, at *18 (June 1, 2023).

Sonoiki has already faced many consequences by virtue of Harvard's breach of contract.

Many of Sonoiki's professional opportunities were impacted by Harvard's breach and should be

evaluated independently of Sonoiki's later legal issues connected with securities fraud.[20] There is certainly a difference in opportunities afforded to a person who may have a felony conviction *and a Harvard degree*, versus a person in the same circumstance, with no college degree. A jury should decide the value of that harm.

Defendants' argument is divided among the categories of damages for which Sonoiki has adduced evidence: an educational opportunity to be a part of Harvard's 2+2 MBA program, and professional opportunities in finance and entertainment. The parties disagree as to what caused Sonoiki's losses. At a minimum, where there may be multiple causes-in-fact of certain of Sonoiki's losses, there is a question of fact for the jury as to the proximate cause of the harm.

### 1.   Defendants Withheld Sonoiki's Degree, Precluding His Admission into Harvard's MBA Program, to Which He Was Accepted Prior to Graduation.

Defendants argue that Sonoiki "is the sole proximate cause of the damage" complained of, thus recovery is precluded. Doc. No. 144, 30, (citing *Exxon Co., USA v. Sofec, Inc.,* 517 U.S. 830, 839 (1996)). Defendants' argument fails generally, but particularly with respect to their contentions surrounding the loss of Sonoiki's spot in the Harvard 2+2 MBA program. Sonoiki was accepted into the 2+2 program prior to graduation. Bull. Decl., Ex. 16, ¶ 3. Defendants contend that Sonoiki "withdrew" from the 2+2 program, which is misleading. Doc. No. 144, 35. Even in Defendants' brief, they delineate that "[t]he 2+2 program is a Harvard Business School program that accepts undergraduate students to the regular Harvard Business School MBA program *after they receive their undergraduate degree*[.]" Doc. No. 144, 35, FN. 14. Sonoiki was *forced* to withdraw from the 2+2 program because he lacked his undergraduate Harvard degree, which was

---

[20]*See* Doc. No. 146-11 (Referring to Sonoiki, the article reads that, "not having a degree began catching up to him").

a prerequisite to obtain a graduate degree. Bull. Decl., Ex. 16 ¶ 4. On April 12, 2016, Sonoiki received an email from admissions at Harvard Business School informing him that they "must receive [his final, Harvard] transcript by May 1, 2016" to permit him to remain in the program. Bullock Decl., Ex. 7, SONOIKI 135-137. Sending a "final" Harvard transcript would be ridiculous given that Sonoiki was not awarded a degree.

Defendants also minimize the harm incurred by Sonoiki because he attended Harvard on "full financial aid" and therefore incurred no tuition-related expense. *See* Doc. No. 144, 35. This circumstance renders withholding of the degree even more acute. Harvard's business is selling the value of a Harvard education, while boasting a 4% acceptance rate.[21] Defendants' inference that the value of a degree is limited to the value of the tuition dollars paid by its students does not acknowledge the myriad of opportunities—educational or otherwise—that come with the conferral of a Harvard degree.

### 2. Defendants Denied Sonoiki his Degree, Causing Him to Lose an Offer of Employment with an Eight-Billion-Dollar Hedge Fund.

In May of 2014, Sonoiki was offered a position with Taconic Capital Partners ("Taconic"). Doc. No. 145-66, SONOIKI 92-93. Sonoiki was set to begin on May 27, 2014. *Id.* He would have started Taconic *before* the date of his insider trading. Doc. No. 146-10, 38. The offer specified that Sonoiki would be eligible for an annual year-end bonus in part based on the company's performance and that Sonoiki could invest in Taconic while working for the fund. Doc. No. 145-66, SONOIKI 92-93. The offer was withdrawn when a background check revealed that Sonoiki had not received his degree from Harvard. Bull. Decl., SONOIKI 475; Bull. Decl., Ex. 16, ¶ 33;

---

[21]Michelle N. Amponsah and Emma H. Haidar, *Harvard College Accepts 3.41% of Applicants to Class of 2027,* The Harvard Crimson, https://www.thecrimson.com/article/2023/3/31/admissions-decisions-2027/

Doc. No. 146-11. Sonoiki wrote a letter to Taconic's HR department immediately upon withdrawal of Taconic's offer reflecting the reasons the offer was withdrawn and emphasizing his candor about the situation. Bull. Decl., Ex. 5, SONOIKI 500.

Defendants cite off-hand text and email messages from Sonoiki describing his disappointment at the loss of the offer and expressing regret about the timing of his disclosure that he did not have a Harvard degree. *See* Doc. No. 144, 31. Defendants use these statements to support their contention that an issue of "timing" caused Sonoiki to lose his offer, rather than the substance of the disclosure: Sonoiki did not have a Harvard degree or *any* college degree. In fact, Sonoiki was also told he lost the Taconic offer primarily because he did not have his degree. Bull. Decl., Ex. 16, ¶¶ 33-34.

In communications with others, Sonoiki focused on timing and disclosure issues because those were the *only factors he could control* as he continued pursuing employment opportunities. Bull. Decl., Ex. 16, ¶ 34. No point in a hiring process was "ideal" to disclose the full details of Sonoiki's situation. Sonoiki was in an untenable situation caused by Harvard's breach. If Harvard had not breached the contract and withheld Sonoiki's degree, there would be no question about his academic status. He would have worked at Taconic.

Sonoiki has adduced evidence from two expert witnesses attesting to the monetary value he has lost by virtue of Harvard withholding his degree. Sonoiki's employment and rehabilitation expert, Mr. Shedlin, opined that, if Sonoiki had his degree and Sonoiki the opportunity to work at Taconic, he could have made between $300,000 and $750,000 per year. Bull. Decl., Ex. 13, 4.[22]

---

[22] To put this in perspective, U.S. Census data shows that the 2014 median U.S. household income was $53,657. For male, non-family households, the 2014 median income was $39,181. For black households, 2014 median household income was $35,398. In 2014, just 2.1% of black households earned more than $200,000. For households where the age of the householder was 15 to 24, 2014 median income was $34,605. Aside from male nonfamily, these figures include dual-

Mr. Shedlin's report reviewed Sonoiki's employment at both Goldman Sachs and Taconic to determine the value of his skills in the financial field with a Harvard degree. Bull. Decl., Ex. 13 161:16-25; 162:1-9. Mr. Shedlin through the Economic Research Institute found financial director information and those salaries are similar to those of a hedge fund director to support his analysis. *Id*. 25:7-12.

The rescission of the Taconic offer was also a clear and direct consequence of Harvard's breach of contract. Sonoiki's inability to present a degree directly resulted in a tangible loss of opportunity and income. This occurrence is not dependent on allegations, investigations, or any subsequent legal issues—it is a direct result of Harvard failing to confer a degree. The lack of a degree led to the loss of a significant and lucrative job offer, damaging his professional trajectory and potential earnings, independently of any other circumstances. Thus, the Taconic situation underscores the very real and direct damages that Harvard's breach of contract inflicted on Sonoiki.

### 3. Sonoiki has Lost Employment Opportunities in Entertainment Due to Harvard Withholding his Degree.

Defendants rely upon *Redgrave v. Bos. Symphony Orchestra, Inc.*, asserting that Sonoiki cannot show consequential damages for the loss of his entertainment employment opportunities. 855 F.2d 888 (1st Cir. 1988). The court in *Redgrave* acknowledged that "consequential damages for loss of professional opportunities could be a legitimate contract claim"—however, the plaintiff in *Redgrave* failed to "carry her burden of presenting evidence sufficient to allow a jury reasonably to infer this causal connection" regarding certain damages. *Redgrave v. Bos. Symphony Orchestra*,

---

income households. For a single income like Sonoiki's, these numbers are even lower. Within one year Sonoiki went from being on a need-based scholarship to receiving a job offer at or near the top 1% of income for black households. *See* 2014 Census Data, Bullock Decl., Exhibit 1.

Inc., 855 F.2d 888, 894-898 (1st Cir. 1988). Defendants' omission of the procedural posture of *Redgrave* is also important: the court in *Redgrave* assessed a motion for judgment notwithstanding the verdict after a jury had considered the evidence and assigned damages. *Id.*, at 890.

Defendants seek to use this opinion to deny Sonoiki the opportunity to *present* evidence of proximate cause to the jury. Yet, the *Redgrave* court held, "the district court erred in reversing the jury's award of consequential damages[,]" although it assigned a different monetary value to those figures based on the evidence presented in the case. *Id.* Defendants' arguments are simply unripe at this time. Sonoiki has learned from his contacts in the entertainment industry that "you know, get your degree… [then] it's a conversation, but in the absence of that…it's going to be a non-starter." Bull. Decl., Ex. 12, 274:1-7. Sonoiki has also received confirmation from his former manager, Kevin Parker, that he needs to "get cleared" and receive his degree, and "once everything is clear there will be a Harvard group ready to take you back in [the entertainment industry] and get going." Doc. No. 145-38, SONOIKI 895, SONOIKI 897. Sonoiki explained that the lack of a Harvard degree "validates that sort of perception" that he has been labeled a "rapist" by his peers. Bull. Decl., Ex. 12, 271:21-23. The consequences of Defendants' breach have followed Sonoiki throughout his career, even as he pivoted to work in the entertainment industry.

When employers discovered that Sonoiki lacked a Harvard degree due to allegations of sexual misconduct, he was rendered "untouchable" in Hollywood at the height of the #MeToo movement. Bull. Decl., Ex. 16 ¶ 37. If Sonoiki's degree was not withheld, Mr. Shedlin opined that Sonoiki could be making $350,000 or more. Bull. Decl., Ex. 13, 5. On this issue, Sonoiki has adduced evidence meeting "the minimal degree of support required to get over the Rule 56 hurdle[,]" precluding summary judgment from being entered for Defendants. *Doe v. Brown Univ.*, 43 F.4th 195, 212 (1st Cir. 2022) (citing *Castellucci v. Battista*, 847 A.2d 243, 249 (R.I. 2004)).

### 4.  Defendants Prevented Sonoiki from Mitigating his Damages.

Harvard put Sonoiki in an even more untenable position when discussing his academic status by *refusing to validate that his academic requirements were met* by insisting that any such letter also include details of the allegations of misconduct lodged against him. A May 14, 2014 email exchange with Jeff Miron, Director of Undergraduate Studies in the Department of Economics, revealed that he was willing to write a letter outlining that Sonoiki had completed the requirements, but Ellison prevented this from occurring. Doc. No. 145-2, HU-DS-1639-641. Harvard's refusal to confirm that Sonoiki had completed his degree requirements precluded Sonoiki from mitigating his damages caused by Harvard's breach. Defendants cite *Gemini Investors v. AmeriPark Inc.* and claim that Sonoiki cannot demonstrate that they caused his damages. *See* Doc. No. 144, 30, (internal citation omitted). To the extent that Defendants claim Sonoiki cannot demonstrate causation, their own actions prevented Sonoiki from mitigating his damages caused by their breach of contract by refusing to issue a neutral letter explaining that Sonoiki fulfilled his academic requirements, which, by Mr. Myron's own statement, was true. Doc. No. 145-2, HU-DS-1639-641.

### 5.  Sonoiki Has Adduced Evidence that his Monetary Damages are in the Millions.

Mr. Staller, relying, in part, on Mr. Shedlin's report, produced tables converting the present value that Mr. Shedlin assessed for Sonoiki's employable skills absent the withholding of his Harvard degree and calculated the losses out over time. *See* Bull. Decl., Ex. 14,  8-9. This evidence shows Sonoiki has lost anywhere from 1.5 million dollars to 16.7 million dollars of value by virtue of Harvard withholding his degree. *See id*.

## IV.  CONCLUSION

Sonoiki was a student in good standing on his graduation day with no disciplinary charges pending against him. He had completed all of his academic requirements and he spoke as the representative Harvard Class of 2013 in a commencement-related address, published by Harvard. He had secured a job in finance at Goldman Sachs and was slated to begin a lucrative career at a hedge fund. Unfortunately, Defendants wrongfully withheld his Harvard degree, and that monumental loss set a series of losses in motion.

The factual record supports Sonoiki's contentions that Harvard's adjudication of the Ad Board process was deficient, breaching both the express language of the policy and Sonoiki's reasonable expectations drawn therefrom. *See Stonehill*, 55 F.4th at 316 (1st Cir. 2022); *see also Brandeis,* 2023 U.S. Dist. LEXIS 21045, at *24 (D. Mass. Feb. 8, 2023). At a minimum, the parties' competing interpretations of the Ad Board procedures at issue are inextricably wound in fact issues inappropriate for disposal at summary judgment. *See id.; see also Sampel*, Civil Action No. 18-cv-11752-ADB, 2020 U.S. Dist. LEXIS at *32 (D. Mass. Aug. 27, 2020). This case must proceed to a jury.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order denying Defendants' Motion for Summary Judgment.

Respectfully Submitted,


**KOHRMAN JACKSON & KRANTZ LLP**

*/s/     Susan C. Stone*
SUSAN C. STONE (*pro hac vice*)
KRISTINA W. SUPLER (*pro hac vice*)
ANNA E. BULLOCK (*pro hac vice*)
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: scs@kjk.com; kws@kjk.com

**NESENOFF & MILTENBERG, LLP**

TARA J. DAVIS (BBO # 675346)
101 Federal Street, 19th Floor
Boston, Massachusetts 02110
Telephone: (617) 209-2188
Facsimile: (212) 736-2260
Email: Tdavis@nmllplaw.com
*Counsel for Plaintiff Damilare Sonoiki*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a true copy of the above document upon all parties with an interest in this matter by electronically filing it through this Court's CM/ECF filing system this June 28, 2023.

*/s/      Susan C. Stone*
SUSAN C. STONE (*pro hac vice*)
